1

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,          ) Case No. CR-10-114-WFN
3                                   ) Case No. CR-11-161-WFN
                    Plaintiff,      )
4                                   ) May 9, 2012,
vs.                                 ) Spokane, Washington
5                                   )
WAYDE LYNN KURT,                    ) Contested Sentencing
6                                   ) Hearing - Day 1
                    Defendant.      )
7   _____    )

              BEFORE THE HONORABLE WM. FREMMING NIELSEN
8              SENIOR UNITED STATES DISTRICT COURT JUDGE

9   APPEARANCES:

10  For the Plaintiff:         Ms. Stephanie A. Van Marter
                               Mr. Earl A. Hicks
11                             U.S. Attorney's Office
                               920 West Riverside, Suite 300
12                             P.O. Box 1494
                               Spokane, Washington 99210-1494
13
    For the Defendant:         Mr. Richard D. Wall
14                             Attorney at Law
                               221 West Main
15                             Suite 200
                               Spokane, Washington 99201
16

17

18

19

20  Official Court Reporter:   Ronelle F. Corbey, #2968
                               United States District Courthouse
21                             P.O. Box 700
                               Spokane, Washington 99210
22                             (509) 458-5283

23

24
    Proceedings reported by mechanical stenography; transcript
25  produced by computer-aided transcription.

1          (Court convened on May 9, 2012, at 9:14 a.m.)

2                 THE COURT:  Good morning, everyone.  Please be seated.

3                 THE COURTROOM DEPUTY:  United States of America v

4    Wayde Lynn Kurt, Case Nos. CR-10-0114-WFN-1 and

5    CR-11-0161-WFN-1, time set for sentencing.

6                 THE COURT:  Well, I understand that we anticipate

7    testimony.  We could proceed this way:  We could deal with the

8    objections first.  But it might be better if we hear the

9    testimony because I anticipate the testimony may be relevant to

10   one or more of the objections that are raised by Mr. Wall on

11   behalf of Mr. Kurt.

12         What are your thoughts, Ms. Van Marter?  Are you going to

13   be handling it?

14                MS. VAN MARTER:  Your Honor, Mr. Hicks and I each have

15   a witness on behalf of the Government.  But I think the Court is

16   correct.  The United States has some exhibits to present to the

17   Court and a video that we'd like to start with that we think are

18   relevant for those rulings.

19                THE COURT:  All right.  Let's proceed that way, then.

20   Mr. Wall, do you have any thoughts about that?

21                MR. WALL:  No, your Honor, that makes sense to me.  I

22   just -- I wanted to let the Court know that there are some

23   people here who want to speak on Mr. Kurt's behalf.  And I don't

24   know at what point you think that would be appropriate.

25                THE COURT:  Well, we'll certainly accommodate them.

1  This is the way I normally like to proceed:  Usually, I just

2  deal with the objections first.  But I do think that, probably,

3  some of the testimony may be relevant to one or more of the

4  objections.  And, then, I usually like to get the thoughts of

5  defense counsel and if at that time you want people to speak.

6  We'll get the recommendation of the Government and, then, hear

7  from Mr. Kurt.

8          MR. WALL:  Okay, your Honor.

9          THE COURT:  But, if you have people that have

10 deadlines, for example, to accommodate their personal schedules,

11 we can certainly talk about that.

12         MR. WALL:  It doesn't appear that that would be a

13 problem.

14         THE COURT:  All right.  Ms. Van Marter.

15         MS. VAN MARTER:  Thank you, your Honor.  The United

16 States would first call Agent Joe Cleary.

17         THE COURT:  Mr. Cleary, raise your right hand to be

18 sworn, please.

19     (JOSEPH M. CLEARY, called by the Plaintiff, was sworn)

20

21                    DIRECT EXAMINATION

22 DIRECT BY MS. VAN MARTER:

23 Q    Good morning.

24 A    Good morning.

25 Q    Could you, please, state your full name and spell your last

 1  name for the record?

 2  A    Joseph M. Cleary, C L E A R Y.

 3  Q    And, again, did you testify during the course of the trial

 4  against United States v Wayde Kurt?

 5  A    I did.

 6  Q    And are you the case agent for this portion of the

 7  investigation?

 8  A    I am.  I'm the case agent for Wayde Kurt.  I was also the

 9  case agent for the Vanguard Kindred.  I inherited that case

10  midyear of 2009.

11  Q    And, when you say, the investigation of Vanguard Kindred,

12  was that a separate investigation prior to the investigation of

13  Wayde Kurt?

14  A    Yes.

15  Q    And, approximately, what time period was that

16  investigation?

17  A    The Vanguard Kindred was begun in early 2009.

18  Q    And are you familiar with a video that was played during

19  the course of trial identified as Government's Exhibit No. 50?

20  A    Yes.

21  Q    Video specifically played during the cross examination of

22  Mr. Kurt.  That video.  Do you recall that?

23  A    I do.

24  Q    And were you familiar with that video clip?

25  A    Yes.

1  Q    As being the case agent in the investigation of Vanguard

2  Kindred?

3  A    Yes.

4  Q    And can you, again, explain to the Court what that video

5  clip was from?

6  A    The video clip was dated January 10th, 2009.  It was from a

7  meeting -- a Vanguard Kindred meeting that was -- that occurred

8  before a blot, and I think it occurred in an apartment in the

9  Valley of Spokane.

10 Q    And, again, just so that we're all familiar with the same

11 terminology, what is a blot?

12 A    It's an Odinist ceremony.

13 Q    And you're familiar with Mr. Kurt's testimony regarding his

14 involvement with the Odinist religion.  Is that correct?

15 A    Yes.

16 Q    And, during your investigation, again, who were the

17 Vanguard Kindred?

18 A    It was a group of white separatists, white nationalists,

19 white supremists lead by Keegan VanTuyl.  And they operated in

20 the Spokane Valley, City of Spokane area.  They would hold

21 blots.  They would also engage in violent criminal activity.

22 Assaults.

23 Q    And, specifically, assaults against whom?

24 A    Minorities.

25 Q    And this particular video clip, Government's Exhibit 50, at

1  what point in time during this meeting was this clip taken from?

2  A    What time?  It was around 4:40 p.m. in the afternoon.

3  Q    And was that before or after any blot ceremony?

4  A    That was before.

5  Q    And are you familiar with who was present?

6  A    Yes.

7  Q    Who was present?

8  A    The defendant was present.  Also in that video clip was

9  Dan Wilson, also known as "Church."  Also present at the meeting

10  -- at the -- at the party before the blot, Mike Hubbard -- other

11  members of the Vanguard Kindred:  Mike Hubbard, Keegan VanTuyl,

12  Dave Udseth, Carma Blalock, Don Lindquist, a gentleman named

13  Shep Kuester.

14  Q    Ben Bargiel?

15  A    Ben Bargiel was present.  That's correct.

16  Q    And, obviously, Mr. Udseth testified and was identified as

17  a confidential source.  Is that correct?

18  A    Yes.

19  Q    And did this meeting occur before or after he became a

20  confidential source?

21  A    Before.

22  Q    How far before?

23  A    Several months.  I couldn't tell you the exact date.

24  Q    Okay.  So, were you asked to see if there were other

25  portions of that evening that were video recorded?

1  A    Yes.

2  Q    Were you able to locate any?

3  A    I was.  Earl Hicks called me yesterday, said that Mr. Wall

4  would like more clips regarding that event.  So, I contacted a

5  sheriff's sergeant -- or, excuse me, detective -- who actually

6  had video clips.  I brought those to Mr. Hicks yesterday.

7  Q    And did you provide them on disk?

8  A    I did.

9  Q    And have those disks now been marked as Government's

10 Exhibit No. 1 for sentencing?

11 A    Yes.

12 Q    Did you also prepare a summary of those clips?

13 A    I did.

14        MS. VAN MARTER:  And, your Honor, we've previously

15 handed up what's been marked for identification as Government's

16 Exhibit 1a.  Do you have a copy before you?

17        THE COURT:  No.  Now I do.

18 Q    (BY MS. VAN MARTER)  And, Agent Cleary, is this a copy of

19 the summary that you provided of these video clips?

20 A    Yes.

21 Q    And did you do that in aid of viewing the videos today?

22 A    I did.

23 Q    Had you seen these video clips before?

24 A    I'd seen some of them.  The party pre-blot I'd seen before,

25 but I don't recall seeing the blot video.

1 Q    And, again, what was the FBI's interest in the Vanguard

2 Kindred during this part of the investigation?

3 A    They were committing violent assaults.  We had gotten

4 reports that there had been assaults at the Bottoms Up Tavern.

5 Two African Americans were assaulted.  There was some assaultive

6 behavior on members of his own group.  A female was assaulted,

7 Adrienne Oaks, we believe.  There was also an assault that we

8 couldn't track down that happened in Post Falls.  Post Falls

9 Park, I believe, in late 2008.

10 Q    And is that assaultive behavior mentioned during the course

11 of these clips?

12 A    There's discussion about attempting to do assaults.  That's

13 correct.

14 Q    And how do the members characterize it?

15 A    They characterize it as "going coon hunting," which is

16 looking for African Americans to assault.

17 Q    And is this all clips from that same evening or day,

18 January 10th?

19 A    January -- January 10th, 2009, yes.

20 Q    And, again, was this video taken, also, prior to the

21 assault of Mr. Johnson as highlighted during the course of the

22 trial?

23 A    Yes.  I believe the video was taken, approximately,

24 two-and-a-half months prior to Anton being assaulted.

25 Q    So, let's play each video.  Let's start with

1  Video Clip No. 1.  And, if you'll look at Government's Exhibit

2  No. 1a, you've entitled this "Church."  Is that correct?

3  A    Yes.  I haven't entitled it "Church."  This is

4  Detective Fairbanks, Spokane County Sheriff's Department.  But,

5  yes, it's entitled "Church."

6  Q    And who is that in reference to?

7  A    Dan Wilson, who is a member of the VK.

8         THE COURT:  Is Exhibit -- Clip No. 1 the Exhibit 50

9  that we saw at trial?

10        MS. VAN MARTER:  No, your Honor.  This has now been

11 marked -- remarked as Government's Exhibit No. 1.  Exhibit

12 No. 50 is, actually, Video Clip No. 5.  And we'll -- we'll

13 review that, as well.

14    (Video Clip No. 1 played)

15 Q    (BY MS. VAN MARTER)  Was there any discussion in that clip

16 about the Odinist religion?

17 A    No.

18 Q    And who was the man of the hour?

19 A    Adolph Hitler.

20 Q    And, at the beginning of the clip, what was the question

21 posed to Mr. Kurt?

22 A    I believe it was "What have you for.

23 Your race."

24 Q    And his response was?

25 A    "Plotting and scheming, 88, Heil Hitler."

1  Q    Now, do you recall, during trial, some testimony from

2  Mr. Kurt about what "88" was?

3  A    Yes.

4  Q    And, in the context of this video -- or let me ask you

5  this:  In your training and experience, what's your

6  understanding of what "88" is?

7  A    It usually stands for the eighth letter of the alphabet,

8  which is H, which "HH," Heil Hitler.

9       Sometimes people refer to it as the "88 Precepts of

10 David Lane."

11      But, usually, it's Heil Hitler.

12 Q    And, again, who's David Lane?

13 A    He was in The Order.  He was a prominent member.  He also

14 founded the Fourteen Words, which is a slogan that, if you see

15 14/88, it's in reference to the Fourteen Words, which is the "We

16 must secure the existence of our race and the -- and a future

17 for white children," which is a slogan that white supremists

18 often use.  And the 88, of course, on the -- on the 14/88 is

19 Heil Hitler.

20 Q    I want to show you trial transcript of Mr. Kurt's

21 testimony, Page 45 and 46.  And this is the direct testimony

22 from Mr. Wall, again, asking Mr. Wayde Kurt about his meaning of

23 "88."  Could you read that to the Court?

24 A    "Answer, '88' in this context is the eighth letter of the

25 alphabet, H, and H again, and commonly referred to as Heil

1  Hitler."

2  Q    And the next question?

3  A    "Okay.  Is there some reason you would have signed a letter

4  like that if you were not an adherent to any kind of Nazi

5  beliefs?

6       "Answer, No."

7  Q    Please continue the answer.

8  A    "I normally would not sign any letters unless I was trying

9  to make contact with someone who would recognize it as [a] like"

10 -- "recognize it as like a common hail for racists."

11 Q    And "Did you" -- so, the next question, "Did you have

12 a . . . purpose in putting '88' on this letter to Mr. Udseth?"

13 And what was Mr. Kurt's answer?

14 A    "Yes.  To show that I've (sic)" -- "I'm with him in his

15 ideals."

16 Q    And did Mr. Kurt go on to testify that he was not -- did

17 not espouse white supremacists' beliefs or beliefs in Nazi,

18 Hitler -- or Hitler beliefs or that type of Nazi society?

19 A    I -- I believe my recollection of Mr. Kurt's testimony was

20 that he was not a Nazi or did not adhere to the Nazi beliefs.

21 Q    And is that consistent with that clip in the video?

22      MR. WALL:  Your Honor, at this point, I guess I'm

23 concerned that we're just having a witness read testimony that

24 could be put in front of the Court and speaks for itself.  I'm

25 not sure where we're -- what the purpose of this --

1          THE COURT:  Well, it's helpful just to point out.  We

2    don't have to go into everything but to point out what's being

3    said.  The Court hasn't had a chance to review the entire trial

4    transcript.  So, I think it's appropriate to point it out.

5    Q    (BY MS. VAN MARTER)  I'd also point you to Mr. Kurt's

6    testimony on Page 158 of the trial transcript.  Can you see

7    that, Agent Cleary?

8    A    I can see that better now, yes.

9    Q    Okay.  Sorry.

10   A    Okay.

11   Q    Okay.  Would you, please, read starting from Line 3?

12   A    Line 3.  "Question.  All right.  Do you" -- "So you had an

13   interest in a free white racial society?

14        "Answer.  Only to the effect of my contact with

15   David Udseth."

16   Q    Keep going, please.

17   A    Continue?  Okay.  "Okay.  But the final solution --

18   wouldn't that result" -- the sticky's there.  I think it says --

19   Q    Okay.

20   A    -- "result in a free white racial society, sir, and your

21   final solution?

22        "Answer.  That's the general term of white supremists

23   (sic).  Yes.

24        "Question.  And that's what would be the end result of your

25   final solution, from the video, would be a free white racial

 1  society.  Is that correct?

 2      "Answer.  It's not my final solution, but I'm making

 3  reference to white supremist (sic) beliefs in the final

 4  solution.

 5      "Question.  Hm.

 6      "Answer.  I'm aware of that.  It's nothing that I embrace.

 7      "Question.  You just pretend to embrace it.  Right?

 8      "Answer.  I have in the past."

 9  Q    And, again, this video took place before Mr. Udseth was a

10  CS and before the secondary investigation into Mr. Kurt.

11  Correct?

12  A    Yes.

13  Q    And this --

14  A    Correct.

15  Q    And this video that came into the hands of FBI was unknown

16  and unaware to Mr. Kurt.  Correct?

17          MR. WALL:  Objection to that, your Honor.

18          THE WITNESS:  I --

19          MR. WALL:  He can't testify to what Mr. Kurt is aware

20  of or was aware.

21          THE WITNESS:  I'd speculate, yes.

22          THE COURT:  Okay.

23          MS. VAN MARTER:  Let's go to the next video.

24          THE COURT:  Again, when there's an objection, slow

25  down so I can think about it and rule.

1  Q    (BY MS. VAN MARTER)   Okay.  So, let's go to Clip No. 2

2  entitled "Group Shot."

3       (Video Clip No. 2 played)

4  Q    (BY MS. VAN MARTER)   Is Mr. Kurt in that video?

5  A    I believe he is.

6  Q    Could you circle on your screen where he's standing?

7  A    There's a better picture of him in the previous -- in the

8  beginning of the video, but --

9  Q    All right.  Back it up a bit?

10  A    -- I believe it's right there (indicating).  If you backed

11  up to the beginning, you could see him.

12           THE COURT:  You can erase that by touching your

13  screen.

14           THE WITNESS:  Oh, thank you, sir.

15       (Video Clip No. 2 replayed)

16           THE WITNESS:  He's -- he's to the right of

17  Dave Udseth.

18  Q    (BY MS. VAN MARTER)   Can you circle --

19  A    Second row.

20  Q    Where?

21  A    Well --

22  Q    There.

23  A    There we go.

24  Q    Okay.

25  A    I believe that's Mr. Kurt.

1  Q    What's he doing with his arm?

2  A    Raising his hand.

3  Q    In what type of symbolic gesture?

4  A    It could be Heil Hitler.  Sometimes it's Hail Odin.  He

5  said, "88."

6       (Video Clip No. 2 replayed)

7  Q    (BY MS. VAN MARTER)  And what's on the flag?

8          THE COURT:  You can erase it, Ms. Van Marter.  Okay.

9  Thank you.

10         THE WITNESS:  There's an iron cross.  A swastika.  It

11 appears to be a Nazi flag.

12 Q    (BY MS. VAN MARTER)  And, based on your training and

13 experience in investigating white supremacist groups, are those

14 symbols significant?

15 A    Yes.  Significant with white supremacy.

16 Q    Clip No. 3, "KJ smackdown."  What is -- what is that in

17 reference to?

18 A    There was a member of the Vanguard Kindred, who went by

19 "KJ," who was not at this -- not in attendance at this

20 gathering; and Daniel Wilson was upset that he was not.

21 Q    And, again, Daniel Wilson was referred to as "Church," as

22 well?

23 A    "Church."  That's correct.

24      (Video Clip No. 3 played)

25 Q    (BY MS. VAN MARTER)  And, again, where is Mr. Kurt?

 1  A    He's sitting -- on the screen, he's to the right next to

 2  Church.

 3       (Video Clip No. 3 continued to be played)

 4  Q    (BY MS. VAN MARTER)  So, this, again, occurred prior to

 5  Mr. Johnson's assault.  Correct?

 6  A    That's correct.

 7  Q    And Mr. Kurt was sitting right next to Church during this

 8  statement?

 9  A    Yes.

10  Q    So, Mr. Kurt is aware at this point in time that there's

11  references to violence.  Correct?

12  A    I believe he would be.

13  Q    And he makes a statement about "HSH."  What is "HSH"?

14  A    Hakenkreuz Skinheads.  It's a white supremist group.  A

15  skinhead group.

16  Q    Again, is there any mention about the Odinist religion in

17  this clip?

18  A    I don't believe so, no.

19  Q    Okay.  I think this is the right one.  So, the next one,

20  Video Clip No. 4 -- and there's a couple that are entitled "What

21  have on you done?"  Is that in reference to that question "What

22  have you done for your white race?"

23  A    Yes.

24  Q    Okay.

25       (Video Clip No. 6 played)

 1 Q    (BY MS. VAN MARTER)  Sorry.  Is that supposed to be No. 6?

 2 A    That's 6.

 3 Q    Okay.  Sorry.  There we go.

 4      (Video Clip No. 4 played)

 5 Q    (BY MS. VAN MARTER)  Okay.  So, in this section or in this

 6 sequence of the meeting, are they -- are they going around the

 7 room and asking this question?

 8 A    Yes.  "What have you done for your race last week?"

 9 Q    And, so, compared to Government Exhibit 50, which was

10 played at trial, were these the ones that occurred prior to

11 being -- Mr. Kurt being asked the same question?

12 A    I believe so, yes.  They were just prior to it.

13 Q    And this is, actually, after Video Clip No. 1 when Mr. Kurt

14 references "plotting and scheming."  Is that correct?

15 A    That's correct.  I believe these are all in sequential

16 order by time.

17 Q    Okay.  Play No. 5, which was Government's Exhibit 50.

18      (Video Clip No. 5 played)

19 Q    (BY MS. VAN MARTER)  Mr. Kurt mentions carrying out a plan

20 in the next four months.  Is that correct?

21 A    That's correct.

22 Q    And, again, this was January of 2009?

23 A    That's correct.

24 Q    Was there action taken by the FBI after this time period,

25 after this video was made, that targeted the Vanguard Kindred?

1  A    Yes.

2  Q    And what was that?

3  A    March 7th, 2009, we attempted to disrupt the group by doing

4  several interviews.  We contacted several members of the

5  group -- we did contact Mr. Kurt -- basically, as a means to

6  disrupt the group, any plans that they had.  We weren't sure

7  what they were.  Hopefully, it would be disrupted with our

8  increased presence and interest.

9  Q    And did you come to learn if the FBI was successful in

10 disrupting Mr. Kurt's plans?

11 A    I believe so.

12 Q    Did you bring Attachment --

13 A    Attachment D.

14 Q    -- D with you?

15 A    Yes.

16 Q    And were there other sources available to the FBI during

17 the course of these investigations?

18 A    Yes.

19 Q    And did you attach, or did the United States attach, in

20 Government's Exhibit D reference to the disruption of plans

21 according to the timing that Mr. Kurt had stated in terms of

22 within the next four months?

23 A    Yes.  The second page of Attachment D.

24 Q    Could you read the discovery page number at the bottom?

25 A    It's 143.  I think the Bates number is 00050178.

1 Q    And, again, if you could, read what was learned during this

2 time period.

3 A    It's -- it's the fourth paragraph.  It says, "Kurt stated

4 that he had 3 'projects' underway when the FBI started doing

5 interviews of Vanguard Kindred . . . members.  He stopped his

6 projects because he believed . . . he was under scrutiny from

7 the FBI.  He now believes that the FBI is not focused on him and

8 he is comfortable working on his projects again."

9 Q    So, in terms of these two investigations, we have the

10 investigation of the Vanguard Kindred and, then, ultimately, an

11 investigation into Mr. Kurt that occurs later.  Is that correct?

12 A    Yes.

13 Q    Based upon this video and what you learned in this

14 investigation, did you believe that Mr. Kurt, again, planned to

15 proceed forward with a plan?

16 A    On the -- with my preceding investigation?

17 Q    Yes.

18 A    Yes.

19 Q    Towards the final solution?

20 A    Yes.  He was planning something in my opinion.

21 Q    And, then, if you could -- on Page 143, second paragraph,

22 if you could please read that, as well.

23 A    It begins "Kurt stated"?

24 Q    Yes.

25 A    "Kurt stated that he needed" -- excuse me.  "Kurt stated

1  that he needs two additional guys for a 'job' that he is

2  planning.  Kurt did not state the nature of the job, but did say

3  that they are (sic) -- that they will make a lot of money.  Kurt

4  also stated that he needs an airplane pilot for the job.  Kurt

5  declined to discuss it further after Nicole Kuester, who was

6  present, started to ask some questions.  Kurt told the CHS that

7  it was a discussion for another day."

8  Q     And, then, does he make reference to his having full access

9  to his employer's business?

10 A     Yes.  He states that, on Paragraph 3, ". . . he has full

11 access to all areas of his employer's business.  . . . he has

12 [the] codes and keys for everything."  And he showed the large

13 key chain as proof.

14 Q     And did he mention working on his projects in his

15 employer's business?

16 A     Yes.  Next sentence, "He stated that he often stays at the

17 office or shop all night working on his personal projects."

18 Q     And, again, what was the date of this report?

19 A     Contact date was May 18th, 2009.

20 Q     And, again, that was prior to this investigation of

21 Mr. Kurt and the use of Mr. Udseth as a CS in 2010 --

22 A     That's correct.

23 Q     -- and 11.  Is that correct?

24 A     That's correct.  The report author was Agent William Long,

25 Coeur d'Alene FBI.

1 Q    Let's go to Video Clip No. 6.

2      (Video Clip No. 6 played)

3 Q    (BY MS. VAN MARTER)  And, again, who was that?

4 A    Ben Bargiel.  He's a member of the VK.

5 Q    And, in the earlier part of the clip, they hold up a flag

6 and make reference to some more initials.  What are they talking

7 about there?

8 A    NSM, National Socialist Movement.  It's -- it's a white

9 supremist group.

10 Q    And, again, the same flag with the swastika -- type of

11 signals on it -- or symbols on it, the swastika?

12 A    Yes.

13 Q    Let's go to Video Clip No. 7.

14      (Video Clip No. 7 played)

15 Q    (BY MS. VAN MARTER)  Okay.  So, who -- who is this in the

16 video right here (indicating)?

17 A    That's Jake Wilson.

18 Q    And who is Mr. Wilson referring to as far as "a good guy"?

19 A    Wayde Kurt.

20 Q    And he's referencing going out New Year's Eve.  Is that

21 correct?

22 A    That's right.

23 Q    And what's the significance of that time period in terms of

24 this investigation and the identification of Mr. Kurt?

25 A    I believe that's when members of the Vanguard Kindred first

1  met Mr. Kurt was New Year's Eve, 2008.

2  Q    And, again, what were they doing that evening?

3  A    According to Mr. Wilson, they were "coon hunting," looking

4  for African Americans or minorities to assault.

5  Q    And do you recall testimony from Mr. Kurt as to how he,

6  supposedly, met these individuals?

7  A    Yes.

8  Q    During trial?

9  A    Yes.

10  Q    Okay.  I'm going to refer you to Page 10 of the trial

11  transcript.  Can you see that?

12  A    Yes, I do.

13  Q    And the section highlighted?

14  A    Yes.

15  Q    Okay.  Just so we can have some context, cross started up

16  here in terms of the questioning by Mr. Wall and Mr. Kurt's

17  answer.

18  A    "Question, . . . when did it (sic) -- when did that happen?

19      "Answer, I believe it was on First Night, downtown here in

20  Spokane, in 2009.  January 1st, 2009.

21      "Okay.  Can you describe how that took place?

22      "Answer, I believe there was some (sic) -- there was a big

23  snow that winter.  I was involved in snow removal, so I remember

24  it quite well.  But I had been downtown.  I lived downtown in an

25  apartment.  And I was walking around, enjoying myself.  Had a

 1  little bit of a break from snow removal.  And a car was kind of

 2  having trouble getting up one of the streets, and the windows

 3  were all rolled down in this car.  And I heard somebody shout

 4  "Hail Odin."  And I recognized the hail, and so I hailed them --

 5  "Hail, Odin" -- back, in return to them.  And they pulled over

 6  and all jumped out.  It appeared that they were -- you know --

 7  party revelers themselves and had been probably drinking a bit

 8  too much.  But they all -- you know -- like, embraced me.  And

 9  -- you know -- it was like they wanted to welcome me to their

10  group and said something [that] was going -- and said something

11  was going on.  I hadn't been involved in a -- in a group for

12  some time.  And so I joined up at that point."

13  Q    Is there any mention in there about asking Mr. Kurt where

14  the "niggers" or "Jews" were?

15  A    No.

16  Q    And, again, this video was prior to Mr. Kurt understanding

17  that he was under investigation.  Correct?

18  A    That's my belief, yes.

19  Q    Actually, next I'd like to show Mr. Kurt's testimony on

20  Page 19 of the transcript.  Can you see that section that's

21  highlighted?

22  A    Yes.

23  Q    And could you please start up with the question and, then,

24  the answers by Mr. Kurt.

25  A    "Question, Okay.  Can you describe what kind of things were

 1  discussed?

 2      "Answer, They would talk about episodes where they -- and

 3  I'm referring to the Valhalla Bound Skinheads that were forming

 4  at this point in early 2009 -- about going out to bars and

 5  looking for people of other races that were coming in and

 6  harassing them, basically, and try to goad them into some sort

 7  of confrontation.

 8      "Question, Did you ever directly take part in those kinds

 9  of discussions?

10      "Answer, No.  I stood in the background and listened and

11  did not engage in that."

12  Q   And, again, according to that video, did Mr. Kurt directly

13  engage in assisting in "coon hunting"?

14          MR. WALL:  Objection, again, your Honor.  It's the --

15  the video and the -- the testimony speaks for itself.

16          THE COURT:  I saw the video.  Go ahead.

17  Q   (BY MS. VAN MARTER)  Okay.  Let's go on to Video Clip No. 8

18  entitled "Pre-Blot."  And what is that in reference to?

19  "Pre-Blot"?

20  A   There's a clip that shows a fire -- a large fire burning.

21  They haven't begun their blot ceremony yet.  So it's a

22  gathering.  They're just getting ready to begin.

23          THE COURT:  Now, this is a year later?

24          MS. VAN MARTER:  No.  This is the same evening, your

25  Honor, January 10th of 2009.

1          THE WITNESS:  Three hours after the --

2          MS. VAN MARTER:  Three hours later.

3          THE WITNESS:  -- meeting at the apartment.

4          MS. VAN MARTER:  There might have been a -- it's all

5   the same evening.

6          THE WITNESS:  Oh, that's a typo.  It looks like

7   January 9th of 2000 --

8          MS. VAN MARTER:  It should be 2009 --

9      (Interruption by the reporter)

10         THE WITNESS:  Oh, I'm sorry.

11     (Interruption by the reporter)

12         THE WITNESS:  I could clear that up.  It should say

13  January 10th, 2009.  It looks like the 9 and the 10 were

14  transposed.

15  Q    (BY MS. VAN MARTER)  And, approximately, what time did this

16  video take place?

17  A    8:08 p.m. on the 10th of January, 2009.

18     (Video Clip No. 8 played)

19         MS. VAN MARTER:  Okay.  I'm going to start that from

20  the beginning, your Honor.  It started moving before it got

21  switched over.

22     (Video Clip No. 8 played)

23  Q    (BY MS. VAN MARTER)  I want to refer you to Page 13 of

24  Mr. Kurt's testimony from the transcript.  And, during this

25  portion of the transcript on Page 13, what is Mr. Kurt,

1   generally, talking about?

2   A    I believe he's talking about blots.

3   Q    "Being hammered in at a blot"?

4   A    Yes.

5   Q    Now, is that, actually, a common methodology or part of the

6   Odinist religion?

7   A    Having a blot?

8   Q    Yes.

9   A    Yes.  That's how they -- that's their celebration.

10  Q    And, in these videos that we've watched and we're going to

11  watch some more about the blot, is there a constant theme being

12  weaved in here, as well, of white supremacy?

13  A    In these VK blots, yes.

14  Q    And, in this section of Mr. Kurt's testimony, if you could,

15  read the highlighted section.

16  A    It says, part of an answer, ". . . you can invite anyone of

17  any race to observe."

18  Q    And is he referencing a blot?

19  A    Yes.

20  Q    And, in this section of the video at the pre-blot, what

21  kinds of flags were being hung?

22  A    There was a swastikas flag.  There was a -- like, a

23  confederate flag of sorts that said, "The South Will Rise

24  Again."

25  Q    And are you familiar with that term or that type of flag,

 1   "The South Will Rise Again"?

 2   A     Yes.

 3   Q     And what is that in reference to?

 4   A     A Confederacy; that they will be back.

 5   Q     And, at the beginning of this video, Video Clip No. 8,

 6   there was -- somebody mentions "White Power" and, again, the

 7   hail sign.  Is that correct?

 8   A     That's correct.

 9   Q     Yet Mr. Hurt testified that "anyone of any race" is welcome

10   to come?

11   A     Yes.  That's correct.

12   Q     Let's go to Video Clip No. 9.  This is entitled "Raising

13   the Wall."  What does that mean?

14   A     It's reference to what Keegan VanTuyl is saying during the

15   blot ceremony.

16   Q     And what's Keegan VanTuyl's role during the blot?

17   A     He's the gothi or the leader.  He's the religious leader.

18   He leads the blot.

19         (Video Clip No. 9 played)

20   Q     (BY MS. VAN MARTER)  And is Mr. Kurt in attendance?

21   A     Yes.  I believe that's Mr. Kurt standing in front of

22   Mr. Keegan VanTuyl in this video clip.

23         (Video Clip No. 9 continues)

24   Q     (BY MS. VAN MARTER)  Now, what -- what portion of the blot

25   were we observing there?

1  A    I believe at the beginning, but I wasn't present so I'm not

2  sure; but I believe at the beginning.  And they're going around

3  and -- and hailing the -- the four gods.

4  Q    And Keegan VanTuyl makes a statement after each time he

5  hails.  Do you recall what some of those statements were?

6  A    He's asking Odin to -- for assistance in protecting them

7  from the "niggers," the "chinks," the "beaners."

8  Q    And who are the "beaners"?

9  A    I believe he's inferring or implying Mexicans, Hispanics.

10  Q    And, so, after every time he hails, he makes a statement of

11  "Keep the niggers at bay," "Keep the chinks at bay," and "Keep

12  the beaners at bay."  Is that correct?

13  A    That's correct.

14  Q    And is that part of the Odinist religion or white

15  supremacy?

16  A    I don't believe that's part of the Odinist religion.  And

17  I -- and I know Mr. Kurt said that, you know, "anyone of any

18  race" is welcomed.  That would be surprising.  I wouldn't feel

19  welcomed if I was a minority.

20  Q    And we made reference to this twice and just so that the

21  record is clear, Who are "chinks"?

22  A    I believe Asians.

23  Q    All right.  Let's go to Video Clip No. 10.

24      (Video Clip No. 10 played)

25  Q    (BY MS. VAN MARTER)  I'm going to pause it here real quick.

1  What's happening at this portion of the ceremony?

2  A    They are hammering in Wayde Kurt into a member of the VK.

3  That's my understanding.  And "hammering in" isn't, like, a gang

4  term where you -- you beat somebody down.  It's just like they

5  take the -- the Thor's hammer that Keegan has and -- and knock

6  it on a -- maybe a Thor's necklace.

7  Q    So, this is the point in which Mr. Kurt becomes an official

8  member of the Vanguard Kindred.  Is that correct?

9  A    That's my belief, yes.

10 Q    And, at this point in time, he's joining or being "hammered

11 in" after being a part of all of the other videos and things

12 that we saw from earlier this day.  Correct?

13 A    Yes.

14 Q    And after exclamation of "White Power."  Correct?

15 A    Yes.

16          MR. WALL:  Objection, your Honor.

17          THE COURT:  Overruled.

18 Q    (BY MS. VAN MARTER)  I'm going to refer -- before we finish

19 the video, I want to refer to another section of Mr. Kurt's

20 testimony; and this time during cross examination, Page 171.

21 Could you please read the question that starts on Line 20 and

22 Mr. Kurt's answer.

23 A    "You [do] go to these meetings.  And from the very first

24 one, they're talking about red laces, they're talking about this

25 stuff.  So you knew what this group is like.  You knew what it's

 1  about from the very beginning, don't you?

 2      "Answer, I knew what portions of it was about -- being [a]

 3  white supremist (sic); and other parts of it were Asatru,

 4  supposedly.  It" --

 5  Q    And, based on the video clips, are there any parts of this

 6  that were wholly Asatru without white supremacy?

 7  A    This was a VK blot, and it was white-supremist based.  Not

 8  all --

 9  Q    Is there --

10  A    Not all Odinist ceremonies are, but this one was.

11  Q    So, there are Odinist ceremonies out there that don't

12  involve espousing white-supremacist beliefs.  Is that correct?

13  A    That's -- that's my understanding, yes.

14  Q    So, in terms of the Vanguard Kindred that Mr. Kurt is just

15  becoming a member of, then, are -- is any of it about pure

16  Asatru?

17  A    It appeared to me it was an Odinist ceremony with a

18  white-supremist bent.

19      (Video Clip No. 10 continued)

20  Q    (BY MS. VAN MARTER)  I want to go to sections of that video

21  clip where Mr. Kurt speaks.  Specifically, the section where he

22  talks about being a seeker.  What does he say after being a

23  seeker?

24  A    I'd like -- "to bring to bear all resources [that] he can"

25  to help "the group" grow in "power in this part of the world."

1  Q    "An overwhelming force in this part of the world"?

2  A    Yeah.  I believe it's "overwhelming power," yes.

3  Q    And, based upon your investigation of Mr. Kurt -- and

4  there's some historic materials that have been presented to the

5  Court, what type of resources does Mr. Kurt offer?

6  A    He's quite skilled at counterfeiting U.S. currency.

7  Q    And is putting forth money a common theme that Mr. Kurt

8  presents during the course of this investigation?

9  A    Yes.

10 Q    And, specifically, what he does reference?

11 A    He references funding a movement behind the scenes.

12 Q    And, aside from counterfeiting currency, does Mr. Kurt

13 offer other resources?

14 A    Well, he's -- he was able to obtain firearms.  So, those

15 are, certainly, resources for a movement.

16 Q    And what about identifications?

17 A    Yes.  He's quite adept at manufacturing -- has been for

18 years -- false identifications.

19 Q    As well as Social Security cards?

20 A    Yes.

21 Q    I want to move on.  You previously testified that there

22 came a time during this investigation where the FBI determined

23 it needed to intervene.  Could you, please, again, explain to

24 the Court what occurred in that time period where the FBI needed

25 to intervene.

1  A    In March of 2009?  Is that what you're referring to?

2  Q    During the firearms investigation when the FBI -- moving on

3  to the unredacted transcript section.

4  A    Oh, sorry.

5  Q    That's okay.

6  A    Yes.

7  Q    The intervention of -- of his arrest in this investigation.

8  A    As we heard at trial, they -- we did four consensual

9  recordings with Mr. Kurt:  July 22nd, August 12th, August 21st,

10  and August 30th.

11      On August 21st, after listening to that transcript, Kurt

12  had always been saying, you know, "I'll be behind the scenes.  I

13  can't be out front.  I can finance."  But his -- his rhetoric

14  changed on the 21st of August and he -- something to the effect

15  of "I'm a three-time loser.  I'm not going down on the fourth

16  time.  I'm getting -- I'm becoming an old man.  I'm desperate."

17  Q    Could you refer -- were these attached to the Court as

18  Government's Exhibit E?

19  A    Yes.

20  Q    Or Attachment E?

21  A    Yes.

22  Q    And do these reference portions of transcripts that were

23  redacted for purposes of trial?

24  A    Yes.

25  Q    And have we unredacted them for Court's consideration for

1  sentencing?

2  A    We have.

3  Q    Okay.  You were specifically referencing a particular

4  portion of the transcript.  Again, what date was that?

5  A    That was August 21st, 2010.

6  Q    And, again, this is unredacted transcripts that have been

7  previously provided to counsel.  Is that correct?

8  A    Yes.  And, specifically, I'm referencing 207, Bates stamp

9  00000672.

10  Q    Okay.  And could you, please, read into the record the

11  section that caught your attention during the course of the

12  firearms investigation.

13  A    Yes.  I believe this is after they were -- after the source

14  and Kurt had gone shooting, Kurt said, ". . . I'm not going to

15  stand by and just let it go on.  Maybe it's just desperation of

16  an old man that's figured he's gone too far spent too many years

17  in prison, hell you know I've done almost twenty years in

18  federal prison."

19       The source says, "Damn."

20       Kurt continues, "Real close to twenty years.  Eighteen and

21  a half years and always on parole, in like three, three segments

22  being in prison, out on parole, back in.  Never once giving up,

23  and always for the right reasons not for criminal acts.  For

24  fighting against the government for our white race every time."

25       CHS says, "Yeah the shit just ain't right.  It's like a

1  police state."

2      Kurt, "This is my fourth time around.  I'm going to do it.

3  Never got (get) off the ground, always get ratted off, not this

4  time this time's going to be different . . . follow through."

5      And, then, he continues on.

6  Q   And, based upon your understanding of Mr. Kurt's history,

7  he references the "fourth time around."  What is that about?

8  A   I understood the "fourth time" to be this time.  The time

9  that he was actively obtaining firearms and obtaining ammo,

10 training.

11 Q   And, previous to that, he makes reference to always being

12 "ratted out."  Are there previous federal investigations where

13 Mr. Kurt has been prosecuted over the years?

14 A   Yes.  It's my understanding that there were other

15 investigations by the Secret Service and other agencies where

16 sources were used or people turned and -- and discussed criminal

17 activity Kurt was involved in.

18 Q   And, so, why was that session, then, significant to you in

19 terms of how -- how much farther the FBI was going to continue

20 the firearms investigation?

21 A   It struck me as his mindset had changed.  He said himself

22 he's -- he's becoming an old man and he's desperate.  And he

23 certainly has the funding.  He has the training.  And now he has

24 the mindset and, certainly, a long criminal history.  He was

25 planning something, and we couldn't let it continue.  He had to

1  be stopped.

2  Q    And, again, you mentioned previously that Mr. Kurt had a

3  history of being behind the scenes and not being at the

4  forefront because of his name.  What is that in reference to?

5  A    He says more than once that his -- his reputation -- that

6  the Jews would -- would jump on it.  And, with his long criminal

7  history, he couldn't be the face of a movement; but he could

8  work behind the scenes -- through funding, through other

9  things -- to help the cause.

10 Q    Again, utilizing his skills?

11 A    Yes.

12 Q    Now, were there other portions of the transcripts that we

13 submitted to the Court that were unredacted that were

14 significant in terms of potential plans of Mr. Kurt aside from

15 the one you just referenced?

16 A    Yes.  The next page it continues.

17 Q    And, again --

18 A    Continue reading?

19 Q    Yes, please.

20 A    This is Page 209.  I'm sorry.  If I could start on 208, the

21 last paragraph.  "Kurt:  Man, the white people I was working

22 with would get greedy [and] start doing stupid shit, and then

23 get caught doing their own stupid shit, nothing to do with my

24 counterfeit, and rat me off.  What the fuck man.  And I made it

25 very clear to them (sic) this is all for [a] political purpose

 1  (sic), this money is going towards our race, re-establishing

 2  ourselves.  And their brains just don't totally" -- "And their

 3  brains just don't totally [go] to mush as soon as they are (sic)

 4  arrested.

 5       The source says, "Yep."

 6       Kurt continues:  "So, I'm going to . . . take care of some

 7  shit next year and then I'm going to take care of all the rats.

 8  They haven't been visited by me yet.  They've got to

 9  answer . . . what they've done.

10       Source says, "Yeah everything that goes up must

11  come down...one way or another.

12       Kurt continues:  "But business first, take care of

13  business.  Got to stop Barry Soetoro from being

14  re-elected...absolutely."

15       And Barry Soetoro is -- is who Kurt references as President

16  Barack Obama.

17  Q    And I'm going to ask you in a minute about reference to

18  "the rats," but does he make other reference to Barry Soetoro in

19  a previous transcript?

20  A    He does.

21  Q    And which transcript is that?

22  A    That is a good question.

23  Q    I believe it's -- look at the July 21st, part of

24  Attachment E.  Oh, I'm sorry.  August 12th.

25  A    What page?

1  Q    It should be marked.  It should be marked with a tab.

2  A    Oh, here it is.  I'm sorry.  On Page 192.

3  Q    And, again, is this a part of Government's Attachment E?

4  A    It is.  "Kurt:  Just fucking I mean you know, killing the

5  President of the United States because (sic) he is a fucking

6  nigger and how to do it.  Oh my God..."

7  Q    And who's making that statement?

8  A    That's Kurt.

9  Q    If you could, reference who's making the statement as you

10  read along.

11  A    I'm sorry.  Yes.  Kurt.  Kurt said that.  And, then, it's

12  unintelligible.

13       Source says, "I hear he is supposed to be coming to the

14  Northwest?

15       "Kurt:  Who?  Barry Soetoro?  Barack Hussein Obama?  His

16  real name is Barry Soetoro.  That's what he was born from

17  the...that's his, his . . . name."

18  Q    And does he continue to discuss making sure Barry Soetoro

19  doesn't get elected?

20  A    He does.  Farther down on the -- that page, Page 193.

21       "Kurt:  And he's got no interest in the United States,"

22  referring to President Obama, "whatsoever other than running us

23  right into the ground...he needs to be killed, needs to be

24  killed."

25  Q    And that was Mr. Kurt?

1  A    Yes.

2  Q    And going back to -- then going back to the transcript,

3  referencing taking care of business first and, then, taking care

4  of the rats.  Who is Mr. Kurt referring to when referencing "the

5  rats"?

6  A    It's my understanding informants.  People who have talked

7  to the police about him.

8  Q    And, obviously, you previously testified earlier in the

9  transcript he expressed being caught by informants or rats.

10  A    That's correct.

11  Q    And does he repeatedly reference informants and rats during

12  the recorded conversations on all four occasions?

13  A    He does.  He -- he -- it's a theme throughout.

14  Q    And are you familiar with Government's Exhibit No. 51, a

15  letter that was written by Mr. Kurt and admitted during the

16  course of trial?

17  A    Yes.

18  Q    And does that letter also focus on the confidential source

19  or informant used in this investigation?

20  A    Yes.  That letter named Informant Dave Udseth.  And

21  Mr. Kurt tried to use a third-party, James Pope, to get the

22  letter out of jail to, I believe, Keegan VanTuyl to put the word

23  out that Dave Udseth was a source of the FBI.

24  Q    And are you familiar of testimony by Mr. Kurt during the

25  course of trial where he indicated he would tell anybody he

1   could about who the informant was?

2   A    Yes, that's what he said.

3   Q    And I want to move, then, to unredacted portions of the

4   transcripts submitted on August -- or August 30th.  Do you have

5   that in front of you?

6   A    I do.

7   Q    And, during this section of the unredacted transcript, what

8   is Mr. Kurt generally discussing?

9        THE COURT:  What page are you talking about now?

10        MS. VAN MARTER:  I'm sorry.  The entire portions

11   before August 30th, your Honor, that were submitted.

12        THE COURT:  That starts on Page 210, if I follow you.

13        THE WITNESS:  Okay.  That's correct.  It does start on

14   210.  There -- there's a few themes in this but one is that he's

15   trying -- Mr. Kurt is talking about setting up a -- appears to

16   be a front organization akin to the Northwest Front, which is a

17   white supremist group.  And he was going to help fund it with a

18   hundred thousand dollars.  He would pay for two employees.  And

19   that would be the -- the PR face of the movement.  And he would

20   not be the face of the movement.  He would be behind the scenes.

21   Q    (BY MS. VAN MARTER)  And, again, this was discussed

22   somewhat during trial but what group were Mr. -- was Mr. Kurt

23   interested in presenting this information to?

24   A    I don't understand your question.  I'm sorry.

25   Q    Another group that he was --

1  A    Northwest Front?  Yes.  Yeah, he was trying to -- yes.  My

2  understanding is, from reading this, he was trying to mirror the

3  group to be somewhat like Northwest Front, an out-there group, a

4  public group advocating white supremacy.

5  Q    And does Mr. Kurt use racial rhetoric during this portion

6  of the under -- unredacted transcripts?

7  A    He does.

8  Q    And we've -- we've kind of included some of the unredacted

9  portions.  And, obviously, the redacted portions the Court's

10  already aware of from trial.  But, during the totality of those

11  transcripts, is there any mention in there of the informant

12  asking Mr. Kurt to be an armorer?

13  A    No.  There's no reference to being an armorer.

14  Q    And is there any mention in those transcripts about

15  Mr. Johnson's assault?

16  A    No.

17  Q    And, based upon the totality of what we've reviewed here in

18  court, all the segments of the videos and your investigation of

19  Mr. Kurt, what was your concern about Mr. Kurt's supposed plans?

20  A    After listening to the tape, especially on August 21st, it

21  struck me that he had two plans:  One, he wanted to take care of

22  people that informed on him possibly through silent deadly

23  kills, which he had referenced before.  And he also seemed to

24  have a bigger plan.  One he referenced:  Oklahoma City.  It's

25  going to be bigger than that.

1    I believed he was planning something.  Again, I -- I can't

2  say what it was.  I didn't know.  I didn't want to wait.  We

3  couldn't risk that.  And our job is to disrupt groups,

4  individuals, who would commit terrorist acts; and that's what we

5  did with Mr. Kurt.  We had to act quickly.

6  Q    And, in terms of separate plans, were there references

7  during the course of the tape-recorded conversations regarding

8  silencers?

9  A    Yes.

10  Q    Silent deadly kills?

11  A    Yes.

12  Q    Manufacture of ammunition that didn't leave trace evidence?

13  A    Yes and subsonic rounds that were quieter.

14  Q    And, then, in terms of a more global potential plan, is

15  this consistent with Mr. Kurt's statement as to the final

16  solution?

17          MR. WALL:  Objection, your Honor.

18          THE COURT:  Well, that's his opinion.

19          MR. WALL:  I don't think he's qualified to give an

20  opinion.

21          THE COURT:  What?

22          MR. WALL:  I don't think he's qualified to give an

23  opinion on that.

24          THE COURT:  Well, based on his investigation, he's

25  come to some conclusions.  Overrule the objection.  Go ahead,

1  Agent Cleary.

2          THE WITNESS:  He -- he -- Mr. Kurt references the

3  final solution.  I -- I believe Mr. Kurt had a plan that

4  involved the President of the United States in a terrorist

5  attack of some sort.  That's my belief.

6  Q    (BY MS. VAN MARTER)  And, again, why is it that the FBI

7  intervened at the point that it did at the end of this firearms

8  investigation?

9  A    I just can't wait.  He has the means.  He had, certainly,

10  the intent.  He was desperate.  He had the training to follow

11  through with a terrorist attack.  He, certainly, was talking

12  about one.  And it's my job, and people I work with, to disrupt.

13  Not wait for the event to happen and then arrest the people.  We

14  need to stop them before they -- before they occur.  So, we

15  charged Mr. Kurt with felon in possession.

16          MS. VAN MARTER:  If I could have a moment, your Honor.

17      (Pause in the proceedings)

18  Q    (BY MS. VAN MARTER)  And -- and just so -- so that the

19  Court is clear, obviously, the statements of concern that you

20  testified occurred on August 21st.  Is that correct?

21  A    Yes.

22  Q    And when was Mr. Kurt arrested?

23  A    August 30th.

24  Q    And between the 21st and the 30th, what was the FBI doing

25  in reference to Mr. Kurt?

1   A   We were trying to surveil him, trying to keep tabs on what

2   he's doing, getting documents ready for an arrest.

3   Q   And surveilling him was -- what was the point of the

4   surveillance at that time?

5   A   To see who he's meeting with; to further determine, if

6   there was a plot, what the plot was.

7   Q   And was he doing anything of concern between the 21st and

8   the 30th?

9   A   I'm trying to remember.  I can't recall, actually, what he

10  was doing.

11  Q   Was he making any purchases?

12  A   That was on the 30th.  Yes.  He had gone to several stores.

13  We surveilled him going to several stores buying wires, bolts,

14  things like that.  We believed at the time, based upon, also,

15  some of his conversations, that, perhaps, he's building a device

16  -- explosive device.

17  Q   And did that speeden (verbatim) up -- or speed up

18  the reaction?

19  A   That certainly sped up the timeline.  Yes, he was arrested

20  that day.  It appears he wasn't building a device but probably a

21  marijuana grow.

22      MS. VAN MARTER:  Your Honor, we have no other

23  questions of this witness.

24      THE COURT:  Mr. Wall.

25

1                          CROSS EXAMINATION

2    CROSS BY MR. WALL:

3    Q    Good morning, Agent Cleary.

4    A    Good morning.

5    Q    You initially testified about the -- regarding these videos

6    that were taken at a meeting that occurred on January 10th,

7    2009.  Correct?

8    A    Correct.

9    Q    Okay.  And I just want to be clear on that.  And it's your

10   understanding that that was a meeting of the group you called

11   the Vanguard Kindred.

12   A    That's correct.

13   Q    Were you aware or -- well, let me put this a different way.

14   Some of the people that were at that meeting and professed to be

15   members of the Vanguard Kindred were also part of a group called

16   the Valhalla Bound Skinheads.  Correct?

17   A    I don't believe the Van (sic) -- the Valhalla Bound

18   Skinheads were formed then.  So, no.

19   Q    Okay.  They became members of a group called the Valhalla

20   Bound Skinheads.

21   A    Some of those members at the VK subsequently, yes, joined

22   the VBS.

23   Q    And there were more than one person at that meeting that

24   was an agent of the Government.  Isn't that true?

25   A    At the time?

1  Q    Yes.

2  A    There was one.

3  Q    Yes.  Only one.  Okay.  There was another one who became an

4  agent for the Government.

5  A    That's correct.

6  Q    And, since you were asked about what was in the video, I

7  will ask you some questions about that, as well.  A number of

8  people are saying things like "White Power" and those kind of

9  things.  Mr. Kurt never says, "White Power," "Hail to White

10 Power," does he?

11 A    I never hear him say, "White Power."

12 Q    All right.  When they're going around the room asking

13 people what they have done, a number of people indicate that

14 they've been out assaulting or trying to entice minorities into

15 confrontations so that they can assault them.  Correct?

16 A    Yes.

17 Q    Yeah.  In fact, that's prime -- that's the primary theme of

18 the people responding to the question, "What have you done for

19 your race?"  Would that be fair to say?

20 A    Yes.

21 Q    Yeah.  Mr. Kurt never says he did anything like that, does

22 he?

23 A    No.  He says he's -- he says other things.

24 Q    Yes.

25 A    He doesn't say --

1  Q    He says other things.  No one in the group indicates that

2  Mr. Kurt ever participated with them in doing any of those

3  things, did they?

4  A    That's not accurate.  Jake Wilson said that Mr. Kurt

5  pointed out where to find the niggers and the Jews --

6  Q    Okay.

7  A    -- which is participating.

8  Q    I'm talking about, actually, participating in assaults.

9  A    Actually striking someone else?  No.

10 Q    Or going out and trying to intimidate people or trying to

11 entice them into confrontations.  He never -- no one ever said

12 that "I went out last week and Kurt was with me and we did

13 this."

14 A    That's right.

15 Q    Yeah.  All right.  You don't know who invited Mr. Kurt to

16 that meeting, do you?

17 A    Do I know?  No.  It seemed from the video he befriended

18 Jake Wilson and Shep pounds them -- Shep sponsors him to join

19 the VK.  But who invited him I do not know.

20 Q    You don't know what Mr. Kurt was told about that meeting

21 before he was -- before he came to it, do you?

22 A    That's correct.

23 Q    So, you don't know what his expectations were when he came

24 to the meeting.

25 A    Before the meeting, what his expectations were, I do not

1 know.  No idea.  Once the meeting starts, it's pretty clear;

2 but --

3 Q    And you talked, at that point in your testimony, about

4 developing an investigation to try to disrupt Mr. Kurt's plan.

5 Do you recall that testimony?

6 A    Initially, it was to disrupt the Vanguard Kindred.

7 Q    Yeah.  But I think there was some specific testimony about

8 -- directed at Mr. Kurt's plans; that is, on the video, Mr. Kurt

9 says, "Something's going to happen within four months."  Do you

10 recall that?

11 A    Yes.

12 Q    Okay.  Would you agree that was pretty vague statement that

13 he made?

14 A    That was vague.

15 Q    Yeah.  He --

16 A    That's fair to say.

17 Q    He didn't say anything specific about what he was actually

18 going to do.

19 A    He was just plotting and scheming something, yes.

20 Q    Yes.  And he didn't even say anything specific about what

21 he had actually done.

22 A    That's correct.  He makes no admissions.

23 Q    Yeah.  Well, not just admissions, he just doesn't say

24 anything.  Correct?  He doesn't say anything specifically that

25 he had actually done any particular act or was going to do any

1  particular act.  Correct?

2  A    Well, he's -- he's working 20 years on the final solution.

3  So, I -- I -- my interpretation is he's planning his final

4  solution.  He's planning something.  He's working toward that.

5  Does he admit to assaulting African Americans?  No.

6  Q    Does he admit to doing anything?

7  A    He admits to planning something.

8  Q    Planning something.

9  A    But admitting an immediate act?  No.

10 Q    What plans did you think that you were going to disrupt?

11 A    A terrorist event of some sort that he was planning.

12 Q    Just a terrorist event of some sort.

13 A    Well, he -- he said he wanted to kill the people that

14 ratted him out.  He wanted to --

15 Q    No.  I'm --

16 A    -- eliminate the rats.

17 Q    I'm speaking about your testimony regarding that initial

18 meeting.

19 A    Oh, okay.

20 Q    Because you had testified at that point that -- that your

21 agency developed a plan -- developed an investigation to disrupt

22 Mr. Kurt's plan.

23 A    No.  I think I testified that plan was to disrupt VK's

24 actions.

25 Q    Okay.  All right.

1  A    I didn't specifically say Mr. Kurt.  And he -- according to

2  the source, he changed his actions based upon our interviewing

3  other members of the VK.  We did not interview Mr. Kurt.

4  Q    And that was according to your source that was at the

5  meeting.

6  A    That's correct.

7  Q    Okay.  And was your source being paid?

8  A    Yes.

9  Q    Okay.  So, your source would have an incentive to give you

10  information that he thought you wanted to hear, wouldn't he?

11  A    He's incentivized to tell the truth.  If we find him

12  exaggerating the truth in any way, we cannot work with him.

13  Q    But how would you know if he's exaggerating?

14  A    Well, we can corroborate other ways.

15  Q    Yeah, when you can corroborate.  Correct?

16  A    And we did corroborate that source's statements.  Yes.

17  Q    What statement?

18  A    The statement I read.  If you continue on, I can go through

19  that, if you like.

20  Q    Which -- I'm talking about the source that was at the

21  meeting in January 10th, 2009.

22  A    Yes.

23  Q    Yes.  And we -- we saw a video of a blot that occurred

24  later in that evening.

25  A    Yes.

1  Q    Correct?

2  A    Um-hum.

3  Q    How many blots have you personally observed?

4  A    Just one.  That one.

5  Q    Just that one.

6  A    That's correct.

7  Q    Okay.  But it is your understanding that blots, generally,

8  are about the Odinist or Asatru religion.  Correct?

9  A    Yes.

10  Q    Is it your understanding, also, that they do not,

11  generally, include references to "White Power" or other kind of

12  white-supremacist beliefs?

13  A    Yes.  That's true.

14  Q    Yeah.  So, generally, they don't.

15  A    It's my understanding it's a pure Odinist, Asatru religion.

16  Yes.

17  Q    Okay.  And, in fact, there was a -- fair amount of activity

18  that was shown on that video that was consistent with your

19  understanding of the Asatru religion.  Correct?

20  A    I'm no -- I'm not a gothi.  I don't practice that religion.

21  So -- but, yes.

22  Q    Okay.  When we see Mr. VanTuyl doing the four raising of

23  the shields to each --

24  A    Um-hum.

25  Q    -- each direction of the compass, that's something that

1  typically takes place in the blot.  Correct?

2  A    I've observed one blot.

3  Q    Oh, so you don't know.

4  A    It's certainly consistent with the VK blot.

5  Q    And, so, you don't -- or is it your testimony that you

6  don't know if that's what's normally happens?

7  A    That's what I've said, yes.

8  Q    All right.  We do see Mr. Kurt making some statements on

9  that video.  Correct?

10 A    Yes.

11 Q    We see a lot of people raising their hand and saying,

12 "White Power."  Correct?

13 A    We do.

14 Q    We never see Mr. Kurt saying, "White Power," do we?

15 A    The only time I saw him raise his hand he said, "88" and --

16 twice during that whole video and "Heil Hitler" once.

17 Q    At the meeting, when Mr. Kurt -- at the blot, when Mr. Kurt

18 speaks, he speaks about the Goddess Scottie.  Correct?

19 A    That's correct.

20 Q    That's part of the Asatru religion.  Correct?

21 A    That's my understanding.

22 Q    Yeah.  He talks about bringing resources to the betterment

23 of the Vanguard Kindred.  Correct?

24 A    Bringing resources -- I don't know if it's "the

25 betterment."  It was "To bring" -- "To bring to bear all

1  resources he can so the group can be an overwhelming power in

2  this part of the world."

3  Q    He doesn't make any reference to any kind of racial purpose

4  in making that statement, does he?

5  A    I did not see any racist comments in that statement, no.

6  Q    And you've testified at some length about statements that

7  Mr. Kurt made to Mr. Udseth, who's the person who became a

8  confidential informant.  Correct?

9  A    Yes.

10 Q    And we had quite a bit of testimony about that during

11 trial.  So, I'm not going to go through it again in detail.  But

12 you specifically reference some testimony that was not included

13 in what was presented at trial.  And it was your indication

14 that, based upon what you heard on those tapes, you believed

15 that Mr. Kurt had some plans that needed -- that needed to be

16 disrupted.

17 A    Yes.

18 Q    Okay.  What exactly were those plans?

19 A    As I testified, I don't know specifically what his plans

20 were.  I just strongly believe he had plans.  He mentioned his

21 plans.  And he was going to -- he was desperate, he was old, he

22 wasn't -- you know, he was done, and he was going to make

23 something happen.

24 Q    That's what he told the CI.

25 A    Yes.

1  Q    He also told the CI a lot of other things that you probably

2  -- you knew at the time were not really true.  Isn't that

3  correct?

4  A    Like what specifically?

5  Q    He told the CI that he had made a silencer by cutting --

6  taking a tube and cutting slices in the side of it.  That --

7  that won't make a silencer, will it?

8  A    I don't know.  I didn't find any silencers.

9  Q    You don't know whether that would work as a silencer?

10 A    It doesn't sound like a very good silencer to me, but --

11 Q    Yeah.  It -- it would -- are you familiar with what is

12 called a "muzzle break"?

13 A    No.

14 Q    No.

15 A    I'm not a firearms expert.

16 Q    Okay.  You never found any evidence that he ever

17 manufactured a silencer, though, did you?

18 A    No.

19 Q    Okay.  He talked about spraying some kind of liquid on

20 bullets to make them armor piercing.

21 A    Yeah.

22 Q    Yeah.  To your knowledge, is that something that can be

23 done?

24 A    I don't know.  I've never done it.  I'm not sure.

25 Q    Okay.  You don't know that either.  All right.  Did you

1 ever consult with anybody to see if that was something that

2 could be done?

3 A    No.

4 Q    All right.

5 A    If Teflon, then, no.

6 Q    Did you ever, in the course of your investigation, find any

7 evidence that Mr. Kurt had actually planned to be in the same

8 place where President Obama was going to be?

9 A    No.

10 Q    Did you ever find anything indicating that he was tracking

11 the movements of President Obama?

12 A    I did not find any evidence of that, no.  Again, I -- I do

13 not know what his plan was.  He referenced a plan.  He was

14 working toward a plan.  Again, what his plan was I don't know.

15 We arrested him before we knew.

16 Q    Okay.  But you specifically referenced his statement to

17 Mr. Udseth that the -- President Obama needs to be killed.

18 Correct?

19 A    Yes.

20 Q    Yeah.  And I think you testified that you thought he had

21 some sort of plan to carry that out.

22 A    Yes.  If I were to speculate on what his plan was -- as,

23 again, I do not know -- it was something to do with the

24 president.

25 Q    But you would be speculating.

1  A    Sure.

2  Q    You never found any evidence, actually, of any specific

3  plan to carry out any kind of terrorist activity, did you?

4  A    Again, I -- I said I do not know what his plan was.

5  Q    Well, that wasn't my question.  My question was whether you

6  found any evidence indicating that he had any plan to carry out

7  any kind of specific terrorist activity.

8  A    What his plan was, I do not know.  That's correct.  He

9  certainly had the means.  He had the training.  He had the

10  weapons.  He had the motivation.  He had a desperation.  But

11  what his plan was I've got no evidence of.

12  Q    Well, all those things you just discussed are things that

13  you're taking from his statements to the confidential informant.

14  Correct?

15  A    No.  No.  And -- and the evidence we seized, the weapons.

16  His statement at trial that he's a master counterfeiter.

17  Q    Well, okay.  But your statement that he was desperate.

18  That was a statement that he made to the CI.

19  A    Oh, yes.

20  Q    Okay.

21  A    And that he's a three-time loser and he's -- you know, he's

22  up for the fourth time; that he's been arrested several times.

23  Q    You didn't find any writings of his when you -- when he was

24  arrested and his residence was searched indicating that he was

25  planning to do something that would get him arrested.

1  A    Writings?  Could you --

2  Q    Did you find any notes?  Any -- any --

3  A    About a plan?

4  Q    -- written plans of any kind?

5  A    No.

6  Q    No.  You didn't find any kind of notes or letters to other

7  people saying, "I'm going to do something soon, and I'm going to

8  get -- I'm going to be arrested for it or something bad's going

9  to happen."

10 A    No.

11 Q    No.  You didn't find any -- any kind of evidence that he

12 was constructing any kind of explosive device.

13 A    No.  I believe he had a book on RPGs at his residence, but

14 I don't --

15 Q    And what's an "RPG"?

16     (Interruption by the reporter)

17         THE WITNESS:  It's a -- it's a -- basically like a --

18 a grenade you can shoot.  A projectile.

19 Q    (BY MR. WALL)  And that -- and that was, actually, a book

20 that referenced how to make something that would look like one

21 but didn't actually function as one.  Correct?

22 A    I -- I'm trying to remember.  It think it was quite a

23 detailed book about RPGs.  I'm not sure if it was how to make

24 them.  I think it was.  How to use them.

25 Q    But you didn't find any bomb-making materials.

1  A    That's correct.

2  Q    You didn't find any books about how to make bombs.

3  A    Again, we found no evidence of a explosive device or what

4  his plot -- plan was.

5  Q    You didn't find any -- any evidence of -- that he had been

6  studying up on how to make a silencer.

7  A    That's correct.

8  Q    Okay.  So, other than the fact that he was in possession of

9  firearms, he had counterfeited in the past, your belief about

10 him having some grand plan to carry out some terrorist-type

11 activity was based upon what he told Mr. Udseth.

12 A    Yes.  That was --

13 Q    Okay.  Thank you.

14 A    -- accurate.

15        THE COURT:  Any redirect, Ms. Van Marter?

16

17                    REDIRECT EXAMINATION

18 REDIRECT BY MS. VAN MARTER:

19 Q    Agent Cleary, was Mr. Kurt, after having several contacts

20 with law enforcement -- was he rather suspicious of law

21 enforcement activity?

22 A    Yes.  His operation security was very high.

23 Q    And -- and why do you say that?

24 A    He would drive several blocks away from his house to make a

25 cell phone call.  He rarely -- he did not like to use the phones

1  for fear of being tapped.  He would use snail mail to

2  communicate with Mr. Udseth.  He did not like to use the phone.

3  Q    And, obviously, from his prior experiences, he had been

4  caught by informants on several previous occasions.  Is that

5  correct?

6  A    That's correct.

7  Q    So, did you expect to find a written blueprint of his plans

8  when you searched his residence?

9  A    No.

10 Q    Did you expect to find highlighted plans or photographs --

11 A    No.

12 Q    -- at his residence?

13 A    No.

14 Q    Why not?

15 A    It would be foolish.  It would not be good OPSEC for him to

16 keep those documents around.

17 Q    And Mr. Kurt, having been around, by his own statements,

18 for 20 years, did he become relatively savvy in his -- in his

19 plans or his ideals?

20        MR. WALL:  Objection, your Honor.  There's no basis

21 for that opinion.

22        THE COURT:  Well, just what Agent Cleary observed

23 during his investigation.

24        THE WITNESS:  Yeah.  I've been an agent for 16 years,

25 and he's -- regarding operation security, he's -- is very high,

1  very well done.

2  Q    (BY MS. VAN MARTER)  And, so, Mr. Wall was asking lots of

3  questions about the lack of evidence.  Did you consider

4  Mr. Kurt's statements to be evidence?

5  A    Yes.

6  Q    And, again, these statements were made prior to Mr. Kurt

7  knowing that Udseth was an informant.  Correct?

8  A    That's correct.  He thought they were brothers in the arms.

9  Brothers in the struggle.

10  Q    And Udseth was present a year prior when Mr. Kurt was

11  hammered into the VK.  Correct?

12  A    That's correct.

13  Q    And, during that ceremony, was there a lot of conversation

14  about brothers and brotherhood and being a member of the VK?

15  A    Yes.

16  Q    So, then, theoretically, was Mr. Udseth somebody that

17  Mr. Kurt trusted?

18  A    I would --

19           MR. WALL:  Objection, again, your Honor.

20           THE WITNESS:  I would say -- my opinion that Mr. --

21           THE COURT:  Just a minute.  Overrule the objection.

22  Go ahead.

23           THE WITNESS:  I would say that Mr. Kurt did trust

24  Mr. Udseth.  Mr. Kurt didn't trust too many people, but he did

25  trust Mr. Udseth, which was our vehicle into getting sufficient

1  evidence to capture and arrest Mr. Kurt.

2  Q    (BY MS. VAN MARTER)  And was there something particularly

3  appealing to Mr. Kurt that was discovered during the

4  investigation about Mr. Udseth?

5  A    Something appealing?  Yes.  Mr. Udseth doesn't have a --

6  did not, at the time, have a criminal history.  He was clean.

7  He could be a face while Mr. Kurt worked behind the scenes.  He

8  could purchase, possess firearms.  Mr. Kurt couldn't.

9  Q    And did Mr. Udseth also have open property that Mr. Kurt

10 could practice on?

11 A    Yes.

12 Q    Mr. Wall asked you several questions about Mr. Kurt not

13 being a part of the "coon hunting."  Is that correct?

14 A    Yes.

15 Q    And do you recall sections in the recorded transcripts

16 where Mr. Kurt talked about members of the Valhalla Bound

17 Skinhead drawing too much attention?

18 A    Yes.

19 Q    And what was that about?

20 A    I believe it was about the assaults.  I'm trying to

21 remember.  His assault on Anton Johnson.

22 Q    And was Mr. Kurt upset about the attention --

23 A    Yes.

24 Q    -- that these VK members were drawing?

25 A    Yes.  That law enforcement would be focusing on the group

1  and he was, as part of the group, would get focused on.  That

2  law enforcement would be focused on him, as well.

3  Q    And, in fact, that occurred, is that correct, that law

4  enforcement focused on those members.

5  A    That's correct.

6  Q    And, in fact, Mr. Church and Mr. VanTuyl were arrested

7  prior to the completion of this investigation of Mr. Kurt.

8  A    Yes.  And both have been sentenced.

9  Q    So, based on those statements, would Mr. Kurt be one to

10  want to draw attention to himself by law enforcement in terms of

11  being a part of "coon hunting"?

12  A    No.

13  Q    During the video that we saw -- and if you have

14  Government's Exhibit No. 1a -- what time was the first video

15  clip?

16  A    4:31 p.m.

17  Q    What time was the last video clip?

18  A    I believe it began at 8:50 p.m.

19  Q    So, how many hours had passed during this time period?

20  A    Over four hours.

21  Q    So, Mr. Kurt was present for over four hours during all of

22  these video clips.  Is that correct?

23  A    I believe so.  He was in the first clip, and he was in the

24  last clip.  Yes.

25  Q    And is there any indication in those videos that Mr. Kurt

1  was not free to leave?

2  A    No.  I saw no evidence that he was held against his will

3  there.  He was fully participating.

4  Q    You were also asked some questions about the first source

5  during the time in which the Vanguard Kindred -- when the FBI

6  was attempting to disrupt the Vanguard Kindred.

7  A    Yes.

8  Q    And you were asked if -- about corroboration.

9  A    Yes.

10 Q    Were you able to corroborate the source's information?

11 A    Yes.  The source was reliable.

12 Q    And how were you able to corroborate specific to this

13 investigation?

14 A    He spoke about -- that source spoke about the assault on

15 Anton.  He heard it from Kurt.  And that source report,

16 regarding the assault on Anton, which was told to him by Kurt,

17 mirrors very closely what Dave Udseth testified to; that

18 Ben Bargiel, Keegan, and Church were the assaultees.  That

19 Dave Udseth did not participate in the assault.

20 Q    And you were here during Mr. Kurt's testimony at trial.

21 Correct?

22 A    Correct.

23 Q    And did Mr. Kurt testify as to Mr. Udseth's involvement in

24 that assault?

25 A    He did.

1  Q    And what was his testimony?

2  A    It was different than what he had told the source and what

3  Mr. Udseth testified to.

4  Q    So, earlier in time, close to when this video was made,

5  Mr. Kurt said what to the source regarding Mr. Udseth's

6  involvement in that assault?

7  A    That he was not -- that he was not involved.

8  Q    Yeah.  In testimony he said what?

9  A    He was involved.

10 Q    And, aside from the assault on Mr. Johnson, were there

11 other areas in which you were able to corroborate the source's

12 statements?

13 A    I believe this -- he told the source -- or the source,

14 excuse me, told us, after speaking to Kurt, that Kurt is a

15 counterfeiter, had shown cash -- counterfeit currency to Dave

16 and Carma.  And that's what Mr. Udseth said, as well.

17 Q    And, again, is this consistent with the resources that

18 Mr. Kurt would typically offer based on your understanding of

19 previous investigations and his testimony in this case?

20 A    Yes.

21      (Pause in the proceedings)

22 Q    (BY MS. VAN MARTER)  And, also, just for clarification

23 regarding the assault itself, you were present during

24 Mr. Johnson's testimony?

25 A    Yes.

1   Q    And what did Mr. Johnson testify regarding Mr. Udseth's

2   involvement in the assault?

3   A    Mr. Johnson's testimony, as I recall it, was consistent

4   with Mr. Udseth's testimony and the testimony -- or the

5   statement from the source that the assaultees were Bargiel,

6   VanTuyl, and Dan Wilson "Church," and that Dave Udseth did not

7   participate.

8              MS. VAN MARTER:  I have no other questions, your

9   Honor.

10             THE COURT:  Recross?

11             MR. WALL:  Just a few questions, your Honor.

12

13                      RECROSS EXAMINATION

14  RECROSS BY MR. WALL:

15  Q    Agent Cleary, you testified a little bit about Mr. Kurt's,

16  I guess what you called, security --

17  A    Operational security.

18  Q    -- sophistication or operations --

19  A    OP -- OPSEC, yes.

20  Q    Whatever that means.  I don't know.  But fair to say

21  Mr. Kurt has been surveilled quite a bit by the United States

22  over the last 20 years?

23  A    He's been involved in criminal activity for about 20 years,

24  and he's been surveilled by law enforcement.  That's correct.

25  Q    And he was sometimes surveilled even when he wasn't,

1  necessarily, involved in criminal activity.  Correct?

2  A    I couldn't say.

3  Q    Well, you were aware he was surveilled at times by the

4  Secret Service?

5  A    That's correct.

6  Q    Yeah.  And you testified about the -- that meeting on the

7  10th of January.  Wasn't there a break between the meeting that

8  was indoors initially that we saw on the video and, then, the

9  meeting that was somewhere outdoors where they had the bonfire?

10  A    There appears to be, yes, in time.

11  Q    Yes, um-hum.  So, it wasn't like all these people stayed

12  together for that entire day.

13  A    I wasn't -- I don't know.

14  Q    No.  Okay.  And your testimony about what Mr. Kurt told

15  your confidential informant about Mr. Udseth's involvement in

16  the assault on Mr. Johnson comes only from that informant.

17  Correct?

18  A    That statement.  Yes.  That statement that the informant

19  told us came from Mr. Kurt, yes.

20  Q    Well -- but you don't have any recording of that statement.

21  A    No.

22  Q    You don't have any other witnesses who say that's what he

23  said.  Your only source for that is from that informant.

24  A    Yeah, that's correct.  Yes, sir.  It's corroborated; but,

25  yes, that is it.  There's no recorded statement by Mr. Kurt.

1  Q    Well, no.  Let me make this clear.  You don't have

2  corroboration that he made that statement to Mr. -- to the

3  confidential informant.  All you have is the confidential

4  informant's statement to you that it was made.

5  A    That's correct.

6  Q    Okay.

7  A    That statement is in lockstep with two or three other

8  statements.

9  Q    Well, that's your opinion.  But my question to you was --

10  A    Yes.  To answer --

11  Q    -- the only source of information you have about Mr. Kurt

12  having made that statement --

13  A    Yes.

14  Q    -- is from the informant.

15  A    That's correct.

16  Q    Okay.  And Ms. Van Marter asked you about counterfeit and

17  if that was a resource that Mr. Kurt would typically offer to

18  people.  Do you have any information that Mr. Kurt offered to

19  make counterfeit for anybody after January 1st, 2009?

20  A    I believe he did to Keegan VanTuyl, my recollection.

21  Q    You believe he did.

22  A    Yeah.  I'm trying to remember if there's a --

23  Q    Do you have any evidence of that?

24  A    -- he -- he offered that service.

25  Q    Okay.  Do you know what that comes -- where your source of

1  that information is?

2  A    It might be in --

3  Q    Was that from a confidential source?

4  A    Yes.

5  Q    Okay.

6        MR. WALL:  Thank you.

7        THE COURT:  Thank you, Agent Cleary.  You may step

8  down, sir.

9        THE WITNESS:  Thank you, your Honor.

10       THE COURT:  Ms. Van Marter, do you have more

11  testimonial evidence?

12       MS. VAN MARTER:  Yes, your Honor.  Mr. Hicks is going

13  to be call Agent Neirinckx.

14       MR. HICKS:  Do you want to start now, your Honor?

15       THE COURT:  It is just about eleven o'clock.  How much

16  more time are we going to need?

17       MR. HICKS:  Your Honor, there's -- I don't know that

18  we're going to spend but, maybe, 30 minutes on direct

19  examination with Agent Neirinckx.  There's some exhibits we want

20  to introduce.

21       THE COURT:  Use the microphone, if you would.

22       MR. HICKS:  I'm sorry, your Honor.  Your Honor, one of

23  the claims that the defendant made during his trial that he

24  never used these identifications for anything other than, you

25  know, gaining mailboxes and things like that.  And Secret

 1  Service has a long history with Mr. --

 2          THE COURT:  Okay.  But my question to you is how much

 3  time?  I'm trying to figure out the scheduling of this hearing.

 4          MR. HICKS:  Your Honor, I think it's going to be

 5  30 minutes to 45 minutes.

 6          THE COURT:  Mr. Wall, you have some people here that

 7  you wanted to --

 8          MR. WALL:  Yes, we do, your Honor.

 9          THE COURT:  And, roughly, how much time is that going

10  to take?

11          MR. WALL:  Oh, that's going to only take a few minutes

12  for each of them to speak.  I don't think that -- it's not going

13  to be lengthy at all.

14          THE COURT:  Well, we probably should take a 15-minute

15  recess right now.  We have something this afternoon.

16          THE COURTROOM DEPUTY:  1:30 change of plea.  We could

17  recommence at two o'clock here.

18          THE COURT:  We could what?

19          THE COURTROOM DEPUTY:  We come back to Kurt at 2:00.

20  We have a 1:30 change of plea.

21          THE COURT:  I was just -- we have a 1:30 change of

22  plea.  If we don't finish this, we can come back at 2:00, I

23  guess.

24          MR. HICKS:  All right.

25          THE COURT:  Are there any scheduling problems anybody

1  has?

2          MR. WALL:  I think I would be available at 2:00, your

3  Honor.

4          MR. HICKS:  We're available at 2:00.  I think

5  Ms. Van Marter's in your court, your Honor.  And I think she

6  has --

7          THE COURT:  For that change of plea?

8          MR. HICKS:  Yes.  And she has something in front of

9  the Magistrate that I'll handle for her.  And, hopefully, I'll

10  ask the Court to put me upfront.

11          THE COURT:  All right.  We've been here two hours.

12  Let's take a 15-minute recess.

13      (Court recessed at 11:02 a.m.)

14      (Court reconvened at 11:21 a.m.)

15          THE COURT:  Please be seated.  Mr. Hicks, I understand

16  you have a witness.

17          MR. HICKS:  Yes, your Honor.  I'd like to call Special

18  Agent John Neirinckx to the stand.

19          THE COURT:  Agent Neirinckx, if you would, please.

20      (JOHN NEIRINCKX, called by the Plaintiff, was sworn)

21          THE COURT:  Please be seated.  And how do you spell

22  your last name, Agent Neirinckx?

23          THE WITNESS:  Neirinckx, N E I R I N C K X.

24

25  /  /  /  /  /

1                          DIRECT EXAMINATION

2   DIRECT BY MR. HICKS:

3   Q    Would you please tell the Court what your present

4   occupation is.

5   A    I'm a Special Agent with the U.S. Department of Veterans

6   Affairs, Office of Inspector General.

7   Q    And how long have you been so employed?

8   A    Three years.

9   Q    And, prior to that, did you have any other federal law

10  enforcement assignments?

11  A    Yes.

12  Q    And what were your federal -- other federal law

13  enforcement?

14  A    I was employed with the United States Secret Service since

15  December, 1989.

16  Q    And, prior to your employment with Secret Service, did you

17  have any other law enforcement experience?

18  A    I was in the military police briefly.

19  Q    All right.  So, how long have you been in law enforcement,

20  sir?

21  A    Oh, approximately, 23 years.

22  Q    Now, does the United States Secret Service protect the

23  President and other protectees of the United States of America?

24  A    Yes.

25  Q    And did you have occasion, for example, to protect

1 Ronald Reagan after he left office?

2 A    I did.

3 Q    And how long did you do that for?

4 A    Approximately, three-and-a-half years.

5 Q    All right.  And, after your protection detail with

6 Ronald Reagan, did that end with President Reagan's death; or

7 did you leave before he passed away?

8 A    I left before he passed away.

9 Q    All right.  But, after you left California, did you come to

10 Spokane, Washington?

11 A    I did.

12 Q    And were you a Special Agent here in the Spokane resident

13 office of the United States Secret Service?

14 A    Yes.

15 Q    And when did that begin?

16 A    Approximately, 12 years ago --

17 Q    All right.

18 A    -- if I recall right.

19 Q    And, now, as a Secret --

20        THE COURT:  About 2000, then?

21        THE WITNESS:  Yes.  Right around there.  Yes, sir.

22 Q    (BY MR. HICKS)  As a United States Secret Service Agent, do

23 you have other responsibilities besides protecting the President

24 of the United States or other persons who need Secret Service

25 protection?

1  A    Yes.  As a Special Agent with the Secret Service, I

2  investigated counterfeit currency, false/forged treasury checks,

3  counterfeit identifications.

4  Q    All right.  And, as a result of that, did you have occasion

5  to could in -- become involved in an investigation of Wayde Lynn

6  Kurt?

7  A    I did.

8  Q    And, approximately, when did you start investigating

9  Mr. Wayde Lynn Kurt?

10  A    Approximately, January, 2002.

11  Q    And why did you start to investigate Mr. Wayde Lynn Kurt?

12  A    The Secret Service office here in Spokane received

13  information that A Economy Storage here in Spokane on Division

14  Street -- there was -- we received information from them that a

15  person by the name of Wayde Kurt had a storage unit there.  And

16  it was, actually, under a false name of Wayde Kurt Smith, I

17  believe.  And the -- Kurt had advised an employee at this

18  storage unit that he was moving a (sic) offset printing press

19  into -- into this storage unit.

20  Q    And had Mr. Kurt previously been involved in other

21  investigations by United States Secret Service into manufacture

22  of counterfeit currency?

23  A    Yes.

24  Q    And, approximately, how many other times had Mr. Kurt been

25  found in possession or -- or passing counterfeit currency?

1  A    At least two.

2  Q    All right.  And had he been -- to your knowledge, at that

3  time when you started investigating him, did he have prior

4  convictions for that?

5  A    Yeah.

6  Q    Felony convictions?

7  A    Yes.  In fact, he was on supervised federal release, I

8  believe.

9  Q    And, as a result of you having information that he -- of --

10 regarding an off -- or a printing press, had Mr. Kurt previously

11 used an offset printing press in manufacturing United States

12 counterfeit Federal Reserve notes?

13 A    He did.

14 Q    And, so, did that pique your attention into Mr. Kurt's

15 activities at that time?

16 A    Yes, especially since he was renting this -- or at least

17 signing in on the storage unit under a fictitious name.

18 Q    Did you have any reason to believe at that time that

19 Mr. Kurt still had in his possession or had -- knew the

20 whereabouts of counterfeit United States currency.

21 A    I'm sorry.  Ask that question again, please.

22 Q    At that point in time, did Secret Service still believe

23 that Mr. Kurt possessed or was hiding counterfeit currency?

24 A    Yes.

25 Q    And, so, was your investigation into Mr. Kurt -- was it

1    started to determine whether or not he was involved again in the

2    manufacture or the possession or dealing of counterfeit

3    currency, sir?

4    A    In my opinion, it was both.  We never -- almost never

5    recover all the counterfeit currency from any manufacturer that

6    I've ever worked in all my years with the Secret Service.  And,

7    so, that was always a concern that there's outstanding

8    counterfeit currency out there.  In addition to the fact that

9    anybody moving an offset printing press into a storage unit

10    under a false name, I was concerned that he may be considering

11    starting a new counterfeit operation.

12    Q    All right.  As a result of that, did you make contact with

13    his United States Probation and Parole officer here in Spokane,

14    Washington?

15    A    I did.

16    Q    And what was the purpose of that contact?

17    A    I wanted to get Ms. Kuest to amend his -- his release

18    conditions so that he was -- would not be allowed to possess an

19    offset printing press.

20    Q    All right.  Did you have -- as a result of that, do you

21    know if Mr. Kurt met with Ms. Kuest on that particular issue?

22    A    Yes.

23    Q    And do you recall what happened or what you understood

24    happened at that meeting?

25    A    Yes.  He -- he refused to sign the amendment.  And he --

1  he, what Ms. Kuest said, "stormed out of the office."  And we

2  followed him to his storage unit.

3  Q    And you actually -- Secret Service, actually, followed him,

4  then, to the -- was this the storage unit that he had in the

5  false name?

6  A    Correct.

7  Q    All right.  And did you make any observations of Mr. Kurt

8  at that time?

9  A    Yes.  We observed him go into the storage unit and take a

10 -- a black bag and remove it and put it in his van.

11 Q    All right.  Now, subsequent to -- to that, did the Secret

12 Service receive any information that Mr. Kurt might have a

13 stolen computer?

14 A    Yes, we did.  Go ahead.

15 Q    And, approximately, when was that in relationship to you

16 seeing him -- and just an approximate time -- taking the

17 material out of the storage unit that he had in a false name?

18 A    I would have to refer to my report if that's --

19 Q    Okay.  Now, before you refer to your report, we've given a

20 number of attachments to this Court.  And have I shown you --

21 prior to this hearing, have I shown you the attachments that we

22 turned over to the Court involving a false document

23 investigation that you were involved in involving Mr. Kurt?

24 A    Yes.

25 Q    And were you the case agent on those reports?

1  A    I was.

2  Q    And, as a result of being the case agent on those reports,

3  were you responsible for writing them, putting them all

4  together, and, then, presenting them to the United States

5  Attorney's office?

6  A    Yes.

7  Q    And have you had a chance, now, to review the attachments

8  that were submitted to the Court that I indicated to you we

9  filed on April 27th of 2012?  Did you have occasion to review

10  and look at those reports, sir?

11  A    Yes.

12  Q    Are they true and accurate reports of the investigation

13  that you did on Mr. Kurt?

14  A    Yes.

15  Q    And did the subsequent investigation reveal that Mr. Kurt

16  was manufacturing false identification documents especially --

17  A    That's right.

18  Q    All right.  Now, prior -- during the course of that

19  investigation, did you have occasion to contact other Secret

20  Service field offices and have them send to you their files on

21  the defendant, Wayde Kurt?

22  A    I did.

23  Q    And, as a result of that, did you have occasion, then, to

24  go over the information in those files that they had on

25  Wayde Kurt?

1 A    I did.  I reviewed the files.

2 Q    And did -- do you -- does Secret Service then keep those

3 files in the regular course of business at the location where

4 they're conducting the investigation?

5 A    That's correct.

6 Q    And the last time that you were aware of where these

7 documents were, were they with the United States Secret Service

8 office here in Spokane, Washington?

9 A    There was one file here in Spokane, and I believe there was

10 a file in Oregon.

11 Q    Okay.  And were there letters in those files that you

12 recognized as being written by the defendant, Wayde Lynn Kurt?

13 A    Yes.

14 Q    And did you have occasion to look at the Attachment B and

15 the other attachments in this case to determine whether or not

16 those were letters that you had actually received and that you

17 were aware of at the time you were conducting your investigation

18 into Mr. Kurt?

19 A    Yes.

20 Q    And how much opportunity -- how much opportunity did you

21 have to see the handwriting of Wayde Lynn Kurt?

22 A    Quite a bit from what was in the files.

23 Q    All right.  And did you also attempt to have Mr. Kurt give

24 a handwriting exemplar to that the Secret Service lab in

25 Washington, DC, could identify certain documents as having been

1  written by Wayde Lynn Kurt?

2  A    I did attempt that.  And, in addition, I did obtain his

3  employment records, his application from Goodwill Industries,

4  which is the main basis of my knowledge of his handwriting.

5  Q    So, you believed, at the time that you had that, that that

6  was Wayde Kurt's handwriting on these letters.  Is that correct?

7  And on other items that you submitted to the Secret Service back

8  in DC?

9  A    At the time I wrote these reports, I felt that I had a good

10 understanding of his handwriting, yes.

11 Q    And, when he -- when he was ordered to give you handwriting

12 by the Court, did he cooperate in giving that?

13 A    No.

14 Q    And did you, subsequently, stop because he wasn't

15 cooperating --

16 A    Yes.

17 Q    -- with providing handwriting exemplars?

18 A    That's correct.

19 Q    All right.  And, so, you gathered other things and sent

20 them back to the handwriting lab.

21 A    Correct.

22 Q    And you got a report.  And it indicated -- did it indicate

23 that the handwriting on numerous of those items was clearly

24 Wayde Kurt's handwriting?

25 A    Yes.

1  Q    And were there other items that they indicated they

2  believed was Wayde Kurt's handwriting but they needed additional

3  writing samples?

4  A    Yes.

5  Q    Now, during the course of that investigation and becoming

6  familiar with Wayde Kurt's handwriting, did you also make

7  efforts to track Wayde Kurt?

8  A    Yes, I did.

9  Q    And how did you make efforts to track Wayde Kurt?  What did

10 you do?

11 A    I installed a device called a Q-Logger, which is a GPS

12 tracking device, on his vehicle.

13 Q    And that's -- what you did was lawful at the time you did

14 it.  Is that correct?

15 A    That's correct.

16 Q    You didn't have a warrant, but it was in a public place;

17 and you put it on his vehicle.  Is that correct?

18 A    Correct.

19 Q    And, as a result of you doing that, did Mr. Kurt

20 subsequently get charged with the theft of government property,

21 sir?

22 A    Yes.

23 Q    Now, I'm not going to go back over what happened because

24 there was a trial in front of Judge Nielsen.  But, in any event,

25 you were the agent that was in charge of that case.

1  A    Correct.

2  Q    And I just want to bring something up here.  During the

3  course of that investigation, were there two times that Mr. Kurt

4  attempted to evade United States Secret Service and put the

5  public at risk?

6  A    Yes.

7  Q    And what were those two times, if you'd tell this judge?

8  A    Yes.  We were -- one time two agents from the Secret

9  Service office here in Spokane were surveilling him, and he --

10 there was a -- some kind of a confrontation in an alleyway where

11 it appeared Wayde Kurt saw that he was being followed by two

12 agents.  And he backed out of the alleyway and sped down the

13 street.  The agents pursued him; and he ended up going at a high

14 rate of speed, up even onto a sidewalk.  And the agents

15 determined that that was not safe for them to continue for the

16 public's sake.  And, so, they discontinued the surveillance.

17 Q    Now, you went and personally asked Mr. Kurt to return a --

18 the Q-Logger tracking device.  Is that correct?

19 A    That's correct.

20 Q    And did he use profanity towards law enforcement, you and

21 another agent, on that day?

22 A    He did.

23 Q    And did you tell him that you knew it was in the car

24 because you had a device that could prove that it was in the

25 car?

1  A    Yes.

2  Q    And did you tell him you were going to get a search warrant

3  now to recover --

4  A    Yes.

5  Q    -- that device?

6  A    Exactly.

7  Q    And what did he do?  Did he endanger the public at that

8  point in time?

9  A    Yes.  After I told him that I was trying to get a search

10  warrant -- in fact, I was on the phone at the time calling the

11  U.S. Attorney's office requesting a search warrant for the

12  vehicle -- and he got in his car and sped away down on Francis

13  at a high rate of speed.  We pursued him briefly and saw that he

14  was going too fast, in my opinion, for the safe -- safety of the

15  citizens.  And, so, we, also, determined to discontinue the

16  surveillance.

17  Q    So, I'm going to ask you:  As a result of that, did you

18  prepare a case report on May 28, 2004, relating to the theft of

19  the Q-Logger satellite vehicle tracking device?

20  A    Yes.

21  Q    And, on the third paragraph of that report, does it tell --

22  indicate why the defendant was being investigated by United

23  States Secret Service at that time on the very first page, the

24  third paragraph?

25  A    Yes.

1  Q    And -- and just tell the Court, if you could read that to

2  the Court real quickly.

3  A    He had written a letter to a convicted felon in which Kurt

4  appeared to be describing his involvement in the manufacturing

5  process of counterfeit currency and identifications.

6  Q    And, so, you're aware that this report was turned over to

7  his attorney by way of discovery.  Is that correct?

8  A    Correct.

9  Q    And, so, if Mr. Kurt were to testify at trial that he

10 didn't know what the investigation was about and why you had

11 placed the Q-Logger on, he would have been -- that would have

12 been a false statement because the Government had provided

13 information --

14         MR. WALL:  Objection, your Honor.  He can't testify --

15         THE COURT:  It's pretty leading.

16         MR. WALL:  -- whether someone else has testified --

17 Q   (BY MR. HICKS)  The Government provided information as to

18 why he was being investigated.

19 A    Yes.

20 Q    All right.  Now, in regards to that investigation, did you

21 obtain search warrants as a result of that investigation?

22 A    Yes.

23 Q    And, as a result of obtaining those search warrants, were

24 you able to recover counterfeit documents which had appeared to

25 be manufactured by Mr. Wayde Kurt?

1  A    Yes.

2  Q    And, in general terms, what were the types -- and are these

3  things covered in your report, sir?

4  A    They -- they are.

5  Q    For example --

6        MR. HICKS:  And I'll point this out for the Court.  In

7  Attachment A, I want to get the correct report for your Honor.

8  Q    (BY MR. HICKS)  You -- you got a search warrant for the

9  apartment.  Isn't that correct?

10  A    Yes.

11  Q    You got a search warrant for a storage facility.  Is that

12  correct?

13  A    Correct.

14  Q    The storage facility that you got the search warrant for --

15  was that in Mr. Kurt's name?

16  A    No.

17  Q    Whose name was it in?

18  A    Jarvis, I believe.

19  Q    Okay.  Now, in dealing with this report -- beginning on

20  Page 10 --

21        MR. HICKS:  Your Honor, if we look at -- it would

22  be -- I want to give the Court the correct page number.

23  Beginning on page -- your Honor, it's going to be Page 35 where

24  there's a discussion of what was seized by United States Secret

25  Service during that period of time.

1  Q    (BY MR. HICKS)  And, so, do you have -- are you looking at

2  Page 10 of your report of June 15th of 2004?

3  A    All right.  Yes, I am.

4  Q    And does it discuss some of the items that were seized from

5  Wayde Kurt during the time of the search warrants or the time of

6  his arrests?

7  A    The time of his arrest.  That's correct.

8  Q    And it deals with keys.  Is that correct?

9  A    Yes.

10 Q    And were they keys to post office boxes and locations in

11 names other than his own, sir?

12 A    Yes.

13 Q    And, as a result of your investigation, did you determine

14 whether or not he had used Washington -- falsely made Washington

15 State driver's licenses to get those and, also, other false

16 documents to get those mailboxes?

17 A    Yes, I did.

18 Q    Now, in regards to the other items that you seized, if you

19 go to the next page, Page 11/36, there's a series of items that

20 you seized from Mr. Kurt based upon a federal search warrant of

21 his residence.  And does it indicate that just above the list of

22 items at 222 South Howard Street?

23 A    Yes.

24 Q    Now, there's a whole list of items; and I don't want to go

25 over them all.  But there was -- was there a box with a shipping

1  label to a Samuel Yoder of 3327 Indian Trail Road, No. 215,

2  Spokane, Washington?

3  A    Yes.

4  Q    All right.  Now, these items that we're looking at -- and,

5  again, I don't want to go over them all.  Are these items that

6  are usually and customarily used in the manufacture of false

7  documents and also can be used in the manufacture of counterfeit

8  currency?

9  A    Yes.  Especially, down there at the bottom, there was an

10 original receipt for an AB Dick offset printing press.

11 Q    All right.  And there were other items that were there.

12      Now, did the Secret Service recover either five false birth

13 certificates or -- or were there false -- images on computers

14 seized from him of false birth certificates?

15 A    There was images on a computer that he had in possession of

16 five false birth certificates.  And, then, we also recovered at

17 least two counterfeit birth certificates.

18 Q    And, when you recovered these items, did it appear that

19 these items had Wayde Kurt's name on them?

20 A    No.

21 Q    They had other people's name, but did they have his

22 handwriting on them?

23 A    It appeared to be his handwriting, correct.

24 Q    All right.  Now, in regards to that, did you -- where --

25 did you recover false Washington State -- counterfeit Washington

1  State driver's licenses?

2  A    Yes.  Twenty-four of them.

3  Q    You recovered 24 of them.

4  A    Yes.

5  Q    Now, in recovering those 24, as part of the record when you

6  received them, did you initial the backs of them?

7  A    I did.

8  Q    And I'd like to put just a couple of these up here.

9        MR. HICKS:  And, your Honor, we're going to ask to

10 admit these as Government's Exhibit No. 2.

11 Q    (BY MR. HICKS)  We're just going to put two of them up here

12 now.  And do you know the picture on those?  Who that is?

13 A    Yes.

14 Q    Who was it?

15 A    The defendant.

16 Q    Wayde Kurt.  Is it the defendant, Wayde Kurt?

17 A    Yes.

18 Q    Now, were there 24 false Washington State driver's licenses

19 that had Wayde Kurt's pictures on them with false names?

20 A    Correct.

21 Q    And were there five of these driver's licenses that also

22 had false birth certificates associated with them?  And I

23 believe there's --

24 A    Yes.

25 Q    All right.  And did these also have counterfeited Social

1  Security cards associated with them?

2  A    Yes.

3  Q    And did they also have -- were there -- did you find false

4  high school documents of students -- alleged students during the

5  course of your investigation?

6  A    Yes.

7  Q    And who -- who -- do you recall them -- and look at your

8  report if you -- who -- who the false documents were.  And I

9  believe it's in your follow-up case report.

10  A    I know three of them that I investigated were three of the

11  twenty-four names that he had false identifications and Social

12  Security cards.  And I investigated them.  I spoke with the

13  schools -- the high schools regarding these high school

14  transcripts.  And none of these high school transcripts were

15  legitimate for the high schools.

16  Q    So -- but did they appear to be in Wayde Kurt's

17  handwriting?

18  A    Yes.

19  Q    And, so, Mr. Kurt had created false high school records.

20  A    Correct.

21  Q    All right.  And, then, combined them with other false

22  documentations.

23  A    Yes.

24  Q    Now, during the course of your investigation -- and we talk

25  about a -- when you go to the County clerks and they -- they

 1  have a device.  It's like a press --

 2  A    Yes.

 3  Q    -- where they press in the county.  Did Mr. Kurt have one

 4  of those Arbor presses like that --

 5  A    Yes.

 6  Q    -- that you located?

 7  A    It was a half-ton Arbor press.

 8  Q    And that's, generally, used by government officials?

 9  A    Yes.

10  Q    And for the purpose of what?

11  A    Embossing certificates.  And my investigation determined

12  that this Arbor press that we had recovered in a search warrant

13  had a seal on it from a recorder -- a recorder's seal that also

14  matched the embossed seal on a counterfeit birth certificate.

15  Q    Now --

16        MR. HICKS:  Your Honor, I want -- I want to admit for

17  the Court and hand up to the Court -- first show -- I'll hand

18  them to the agent first to show to the Court.

19  Q    (BY MR. HICKS)  And, first of all, were you able -- when

20  you seized these, did you put your -- write your name and

21  initials on the back of them?

22  A    Yeah.

23  Q    And, so, at the time you seized them during your

24  investigation of Mr. Kurt -- and -- and you were looking for

25  what at the time that you did your search warrants, initially?

1  A    The Q-Logger.  I was looking to get my Q-Logger back as

2  well as counterfeit identifications and/or possibly counterfeit

3  currency.

4  Q    And, so, did you have a chance to review 19 Washington

5  state driver's licenses with photos of Mr. Kurt that were

6  fraudulent -- fraudulent Washington license?

7  A    Yes.

8  Q    All right.  I'd like to hand them up and just have you

9  verify.  And, then, I'd like to ask you to hand them to the

10  Court.  And, after you've looked at those to make sure that

11  Mr. Kurt's photograph is on each one of them with another name,

12  could you just give the Court an idea of where your initials are

13  on the back of those?

14  A    My initials are in the lower right-hand corner.  It says,

15  "JN 5/17/04."

16  Q    All right.  Now, would you, please -- you don't need to put

17  them back in the envelope; but, if you could, hand them to the

18  Court so the Court, if the Court wants, to take a look at them?

19         THE COURT:  Yeah.  Thank you.  Did you say you --

20  you're offering this as Exhibit 2?  This envelope with these

21  documents in it.

22         MR. HICKS:  Yes, your Honor.

23         MR. WALL:  No objection.

24         THE COURTROOM DEPUTY:  Does that have a sticker on it?

25         THE COURT:  What?

1          THE COURTROOM DEPUTY:  Does it have a sticker on it?

2    Okay.

3          THE COURT:  Yes, it does.  Go ahead, Mr. Hicks.

4    Q    (BY MR. HICKS)  And, so, also, during the course of your

5    investigation, did you receive from earlier Secret Service

6    investigations photographs from their investigation with --

7    photographs of Mr. Kurt on false Washington State driver's

8    licenses?

9    A    Yes.

10   Q    And, so, that's even before your investigation in 2004 of

11   Mr. Kurt.  So, if you'd look up here, are you familiar with a

12   picture on the Washington State driver's license?

13   A    Yes.

14   Q    And who is that a picture of based upon your investigation?

15   A    Mr. Wayde Kurt.

16   Q    All right.  Does that have Mr. Wayde Kurt's name on it,

17   though?

18   A    No.

19   Q    And what about the Social Security card.  Is there a

20   similar Social Security card that goes with that identification?

21   A    It's a similar name, yes.

22   Q    And -- and was that part of the investigation by another

23   Secret Service agency prior to your investigation?

24   A    That's correct.

25   Q    But it came to your attention because you got the files.

1  Now, I'm going to hand you a couple of other ones.  Now, you see

2  a number of -- of these.  Were these also seized by Secret

3  Service prior to your investigation?

4  A    Yes.

5  Q    Do they show a younger Wayde Kurt?

6         MR. HICKS:  Can we zoom in on that a little bit?

7         THE WITNESS:  Yes.

8  Q    (BY MR. HICKS)  And do they have names other than

9  Mr. Kurt's names on those Washington State identifications?

10 A    Yes.

11        MR. HICKS:  And I don't know if you can zoom in.  Zoom

12 a little bit more.  See if we can see any dates on them.  I

13 don't know if we can.  Your Honor, I just don't know that we

14 can.

15 Q    (BY MR. HICKS)  But these were all sent to you by United

16 States Secret Service as a result of your requests of getting

17 files from Mr. Kurt.

18 A    Correct.

19 Q    So, he's been doing this for a long period of time, then.

20 Is that correct?

21 A    Yes.

22 Q    There's another -- there's another photograph here.  And

23 does this, also -- and this may be from the same investigation.

24 And, at this time, do you know whether it's from the -- the

25 original one?

1  A    It is from a previous investigation by the Secret Service.

2  Q    All right.  Prior to yours.

3  A    Correct.

4  Q    And is this something that would make you want to

5  investigate Mr. Kurt when you find out he's got a printing

6  press?

7  A    Yes.  I'm aware that he was a habitual offender.  And

8  counterfeiters, in -- in my experience, generally continue to

9  counterfeit even if they got out of jail.

10 Q    All right.

11        MR. HICKS:  Your Honor, I'd like to ask the Court to

12 look at these as Exhibit No. 3.  And I'm offering it as

13 Government's Proposed Exhibit No. 3.

14        THE COURT:  All right.  For the purpose of this

15 hearing.

16        MS. VAN MARTER:  May I approach, your Honor?

17 Q    (BY MR. HICKS)  Now, I know I'm going back and forth a

18 little bit here.  But, at the time of your investigation, did

19 you also recover false Social Security cards?

20 A    Yes.

21 Q    And that's documented in your report.  And, in that report,

22 did you -- and the report, again, that I'm talking about is your

23 report of June 15th, 2004.  And on -- if you'd look at Page 19

24 of that report --

25        MR. HICKS:  And, your Honor, I'm sorry I didn't write

 1 | down the number of that page.  I'll just --

 2 | Q    (BY MR. HICKS)  Is there a list of the false Social

 3 | Security?

 4 | A    Yes.

 5 | Q    -- cards?  And does it indicate -- if you could read that

 6 | portion that says, "On the same date, I received an email from

 7 | RA Robert Windham"?

 8 | A    Yes.  "On the same date, I received an email from [Resident

 9 | Agent] Robert Windham, Social Security Administration, Office of

10 | Inspector General, Spokane, WA," with his phone number,

11 | "regarding a review of the [Social Security Numbers] on the

12 | counterfeit Social Security cards seized from Wayde Kurt's 1988

13 | Plymouth Voyager van.  RA Windham stated after reviewing the

14 | numbers in the Social Security System database, he revealed the

15 | following information:"

16 | Q    In regards to Herbert Jarvis, what --

17 |      (Interruption by the reporter)

18 | Q    (BY MR. HICKS)  In regards to Herbert Jarvis.

19 | A    Yes.  This Social Security number matched -- matches this

20 | name.  However, the records indicate that Herbert C. Jarvis died

21 | January 6th, 2002.

22 | Q    And, then, there's an entire list of Social Security cards.

23 | Is that correct?

24 | A    Social Security numbers.  Yes.

25 | Q    Yes, Social Security numbers.  And what did the -- what

1  does it say about the following Social Security numbers?

2  A    ". . . Social Security numbers were issued by the

3  Commissioner of Social Security to individuals other than the

4  names shown."

5  Q    And, in regards to that, were these falsely made?  Were

6  these counterfeit Social Security cards?

7  A    Yes.

8  Q    And did you take and compare the false driver's licenses to

9  this list?

10  A    I did.

11  Q    Now, not all of these cards -- these false driver's

12  licenses were in Secret Service's file here in Spokane.  Does

13  Secret Service, when some of these things are sent back to

14  Washington, DC, do they maintain them back in Washington, DC,

15  for purposes --

16  A    Yes.

17  Q    And, so, you don't know where these other -- some of these

18  other ones are; for example, the Samuel R. Yoder identification.

19  A    Correct.

20  Q    Now, these -- I'm showing you these cards.  Are you

21  familiar with these cards?

22  A    I am.

23  Q    And did you receive them during the -- did you get these

24  during the same period of time?

25  A    Yes, I did.

1  Q    And did you also initial these on the back of these cards?

2  A    I believe I did.

3  Q    All right.  Now, if -- if I can turn it over -- and I don't

4  know if you'll be able to see it, but we'll hand them up for

5  that purpose.

6  A    Yes.  I see my initials on those -- on that card.

7  Q    So, do you remember seizing these from -- during the source

8  of your search warrants?

9  A    I do.

10 Q    All right.  And these -- what are these?

11 A    These are employee identification cards.  They're

12 counterfeit or fraudulent.

13 Q    And -- and do they -- again, on the back, do they bear the

14 signature that appears to be the writing of Wayde Lynn Kurt --

15 A    Yup.

16 Q    -- on the back?

17 A    Yes.

18 Q    And were these also -- do these names also match some of

19 the counterfeit identification Social Security cards?

20 A    Yes.

21 Q    All right.  Now, during the course of your investigation,

22 to what uses was Mr. Kurt placing these false identifications?

23 What did he do with them, in general?

24 A    Well, I know, on one of them, he registered a Winnebago

25 motor home with it.

1  Q    Was that on Mr. Jesse D. Vessy?

2  A    That's correct.

3  Q    And, so, he didn't just use it, then, for a mailbox --

4  getting a mailbox.

5  A    That's correct.

6  Q    And, so, he purchased the vehicle in a false name or

7  registered it in a false name.

8  A    Correct.  He also obtained the storage unit that that --

9  that we conducted the search warrant on.  And he did that in --

10  in -- Herbert Jarvis, I believe, was his name -- fake name.

11  Q    Okay.

12  A    So, he obtained a storage unit with a fake name.

13  Q    All right.

14  A    Boy --

15  Q    What about -- I want to ask you at length about

16  Mr. Samuel Yoder.

17  A    Yes.

18  Q    Was there a false birth certificate in the name of

19  Samuel Yoder?

20  A    Yes.

21  Q    Were there false high school records in the name of

22  Samuel Yoder?

23  A    Yes.

24  Q    Were there dental records created in the name of

25  Samuel Yoder when it was, actually, Mr. Kurt?

1  A    Yes.

2  Q    All right.  So, he created a whole new set of dental

3  records by using false Washington State identification --

4  A    Yes.

5  Q    -- and other false identification.

6  A    Correct.

7  Q    And we've -- that's part of the -- you've looked at that

8  and that's part of the investigation that we have here and is

9  that he created false -- basically, tried to create a false

10 person of himself, of who he was.  Is that correct?

11 A    The records indicate that his dental records definitely

12 were under a different name than his true name.

13 Q    And we've sent in -- we've put in some additional

14 documents.  And they're called -- in Attachment C.  And I want

15 to show you Attachment C -- part of Attachment C.  You've had a

16 chance to look at that --

17 A    Yes.

18 Q    -- previously.  And you've looked at the handwriting of the

19 person signing Attachment C as Samuel Yoder?

20 A    Yes.

21 Q    And is that handwriting on these documents that are filled

22 out -- are you familiar with that based upon your opportunities

23 to investigate Mr. Kurt?

24 A    Yes.

25 Q    For example, on this --

1          MR. HICKS:  This is Page 107, your Honor, of the

2   record of our filing.

3   Q    (BY MR. HICKS)  Is this -- is this Wayde Kurt's handwriting

4   on this document?

5   A    It appears so, yes.

6   Q    All right.  And does it also mention that same Occupation

7   and Employee (verbatim) "Swiftline Transportation"?

8   A    Yes.

9   Q    And does it give a -- a date of birth on there and things

10  like that?  So, this is a -- this entire package of documents

11  was -- Mr. Kurt was creating a totally different set of dental

12  records that were actually his but in somebody else's name.

13  A    Correct.

14  Q    And, then, also, he used false identification or he

15  indicated that he worked for a company that doesn't even exist.

16  Is that correct?

17  A    That's correct.  And, in fact, these records came from

18  Eastern Washington University's dental clinic.  And there was

19  a -- this was the second time he used false -- the Yoder name to

20  obtain dental records.  He also received dental records at a

21  private dental office.

22  Q    And -- and where was that at?

23  A    That was also in Spokane.

24  Q    All right.  And, when you first got the information back,

25  were -- were there, like, even pictures of his mouth and things

1  like that?

2  A    Yes.

3  Q    And could you tell by looking at the pictures of his mouth

4  whether he had his red beard?  You could see parts of his red

5  beard and that?

6  A    Yes.  I can't determine it was for sure Mr. Kurt's beard,

7  but it definitely was a red beard or mustache.

8  Q    So, did this concern you as an agent of the United States

9  Secret Service --

10  A    Yes.

11  Q    -- that he was creating a totally new identity?

12  A    Yes.

13  Q    And why does that concern a law enforcement officer who's

14  previously investigated somebody like Mr. Kurt?

15  A    I didn't know what his motive was at the time.  In my

16  experience, I -- I've worked both the protection side of the

17  house.  So, I didn't know if he was possibly using the fake

18  identity to obtain access to, you know, sites that our

19  protectees go to or if he was using them, possibly, to forge

20  checks and cash other people's checks.

21  Q    But you didn't find any forged checks or anything like

22  that.

23  A    No.

24  Q    Now, did you ever find -- did you find everything that you

25  thought Mr. Kurt had?

 1  A    No, I didn't.

 2  Q    And did you search -- even search other places where you

 3  had reason to believe he might have things?

 4  A    Yes.

 5  Q    And did you search Dean Ashworth's property, for example?

 6  A    Yes.

 7  Q    And had there been letters between he and Dean Ashworth

 8  dealing with counterfeit currency that you were aware of?

 9  A    Yes.

10  Q    And was that one of the reasons why you searched that

11  address?

12  A    Correct.

13  Q    Now, did you find any books up there or note any books of

14  interest up there?

15  A    Yes.  There was a book about counterfeiting.

16  Q    All right.  And, so, did you, at that time, believe that

17  there might also be an offset printing press based upon the

18  information that you had?

19  A    Yes.

20  Q    Did you ever recover that offset printing press?

21  A    No.

22  Q    And what happened?  Do you know what happened to that

23  offset printing press?

24  A    I still don't know.

25  Q    Did you attempt to recover an offset printing press?

1  A    Yes.  I looked for it.

2  Q    And how do you know that Mr. Kurt actually had one?

3  A    I found a receipt in his -- in his apartment for one.

4  Q    All right.  And, so, you looked for that and never were

5  able to recover it.  So, you don't always recover what criminals

6  -- everything that they do.

7  A    No.

8  Q    Now, in regards to these identifications, during the course

9  of your investigation, did you talk to any individuals about

10 whether or not Mr. Kurt had offered to sell them counterfeit

11 Washington State driver's licenses?

12 A    Yes.  I talked to two individuals that said that.

13 Q    And how much was he going to sell them for?

14 A    A hundred dollars if they had a certain security feature

15 and, I believe, 60 or $80 -- I'd have to refer to my record --

16 if they didn't.

17 Q    All right.  And he had offered to do that so he -- not only

18 was he manufacturing but he also offered to do that.

19 A    Correct.

20 Q    And did you -- during the course of the time that you were

21 involved with Mr. Kurt -- in letters -- did Mr. Kurt ever

22 indicate in letters that he had actually sent counterfeit

23 Washington State driver's licenses to people on the run and that

24 they worked?

25 A    I believe so.

1  Q    All right.  I want to put up on here -- and it's part of --

2  it's part of Attachment B.  And it starts at --

3       (Discussion off the record)

4  Q    (BY MR. HICKS)  Yeah.  And it's circled number "1" at the

5  top, and it's -- it looks like it should be around Page 87 or

6  86.  First of all, do you see the date on that?

7  A    Yes, I do.

8  Q    And what's the date on that?

9  A    January 1st, 1996.

10 Q    And is that in Mr. Kurt's handwriting?

11 A    It appears so.

12 Q    And is that -- does he -- what is he doing in this letter?

13 What's, basically, the subject of this letter?

14 A    Well, it appears he's writing to somebody else.  Again,

15 he's signing it "Wayde L. Kurt, your brother at Arms."

16 Q    Okay.

17 A    But he -- it appears that he was talking about some

18 identifications and possibly providing identifications to

19 somebody else.

20 Q    And is he talking about having sent up samples of

21 counterfeit?

22 A    Let me review that one more time.

23 Q    Yeah.

24      (Discussion off the record)

25 Q    (BY MR. HICKS) Okay.  Let me -- let me put the first part

 1  of the letter back up.  Look at that.  If you could read --

 2  that's pretty -- kind of a -- okay.  Can you read that first

 3  part after it says, "Dear Mac"?

 4  A    "I just received your letter from last week; Happy New

 5  Year.  I am sending two letters one with paper samples and one

 6  with plastic.  Make Sure and Send the plastic cards back as soon

 7  as you are through scrutinizing them."

 8  Q    All right.  Does he later go on to discuss phony

 9  identification in this letter?

10  A    Yes, it appears so.

11  Q    Okay.  Now, I want to put on Page 89 here.  And does it

12  talk about Mr. Kurt having sent -- and is this in Mr. Kurt's

13  handwriting again?

14  A    It appears so.

15  Q    And there's something underlined in red.  If you could,

16  read that to the Court, please.

17  A    "I sent my Washington Driver's Licenses down to his people

18  who are on the run but I can't get him to buy a hand held photo

19  copier so that we can get legitimate DMV numbers off people who

20  cash checks (I have family" -- something's behind the yellow tab

21  there.

22  Q    "Family" and "work cash registers"?

23  A    ". . . and friends who work cash registers who are ready to

24  copy everything."

25  Q    Okay.  Now, if you look at Page 89, first, is the -- is the

USA V WAYDE LYNN KURT - CR-10-0114-WFN & CR-11-0161-WFN    104
CONTESTED SENTENCING HEARING - DAY 1 - MAY 9, 2012
INDIVIDUALS IN SUPPORT OF DEFENDANT ADDRESS THE COURT

1    theme of the letter that he's attempting -- that Mr. Kurt

2    appears to be attempting to obtain money from the manufacture of

3    counterfeit currency?

4              MR. WALL:  Your Honor, I --

5         (Interruption by the reporter)

6              MR. WALL:  I'm sorry.  Your Honor, I hate to interrupt

7    but --

8              THE COURT:  Use the microphone.

9              MR. WALL:  I hate to interrupt, but Mr. Hicks has

10   taken a lot more than the 30 or 40 minutes he said he was going

11   to take.  I still have people here who want to speak to the

12   Court, and they've been here all morning.

13             THE COURT:  Well, then, why don't we interrupt this

14   and allow them so that they can go about their way.

15             MR. HICKS:  I have no problem with that, your Honor.

16   Thank you.

17             THE COURT:  Thank you, Agent.  That's fine, Mr. Wall.

18   Go ahead.

19             MR. WALL:  This -- I believe this will be relatively

20   short.  Your Honor, we have here Mr. Johnson and who spoke --

21   who testified at trial and wants to say a few words to the Court

22   on Mr. Kurt's behalf.

23        We have Lance Pounder here who also testified at trial and

24   wants to speak briefly to the Court.

25        With him are his father, Jim Pounder, and a friend of

1 Mr. Kurt's, Wayne Naplin (phonetic).  I don't know if Mr. --

2 Jim Pounder or Wayne Naplin (phonetic) are going to speak to the

3 Court, but they are here on Mr. Wayde's behalf.

4          THE COURT:  All right.  Go ahead.

5          MR. WALL:  So --

6          THE COURT:  Who do you want first?  Mr. Johnson?

7          MR. WALL:  Mr. Lance Pounder will speak first.

8          THE COURT:  Mr. Pounder.  You don't need to testify.

9 Just go ahead and use the podium and speak into the microphone,

10 if you would, please, Mr. Pounder.  And I remember you.  You

11 testified before.

12          PATRICK LANCE POUNDER:  Yes.  Lance Pounder.

13       (Interruption by the reporter)

14          PATRICK LANCE POUNDER:  P O U N D E R.

15          THE COURT:  And first name is Lance, L A N C --

16          PATRICK LANCE POUNDER:  Actually, my -- Patrick is my

17 first name.

18          THE COURT:  All right.

19          PATRICK LANCE POUNDER:  I go by my middle name.  I'm

20 sorry.  Patrick Lance Pounder.

21          THE COURT:  Go ahead, sir.

22          PATRICK LANCE POUNDER:  Okay.  Wade worked for me

23 starting in, roughly, '07.  Worked for me for three years.

24 During that time, he was a good, hard worker; always there on

25 time; stayed late; worked hard.  You know, always seemed to --

1  he was always honest.  Never -- I never caught him in anything

2  that he didn't -- he always was truthful; had access to

3  everything; and everything, you know -- had the keys to

4  everything.  Nothing ever disappeared.  Nothing.  He was a very

5  good worker.  He was always willing to help any of the other

6  employees on his off time doing -- fixing their car, just

7  helping them with anything they needed.  He'd always volunteer.

8      We had a black gentleman that worked for us.  They'd sat

9  (verbatim) and visit all the time.  I never saw any signs of

10  anything.  They seemed to get along fine.  He'd help another

11  black gentleman that we know fix his car.  All those type of

12  things.  I never have seen any of this -- never seen any sign of

13  him ever being a racist or any of this type of stuff.

14      But he was always willing to help anybody and -- and work

15  late; stay -- stay all through the night working on a piece of

16  stuff to get it ready for me.  And always calm, mellow.  He

17  seemed to be a good person.

18          THE COURT:  Thank you --

19          PATRICK LANCE POUNDER:  Thank you.

20          THE COURT:  -- Mr. Pounder.

21          ANTHONY JOHNSON:  My name's Anthony Johnson.

22  J O H N S O N.  Anthony standard spelling, A N T H O N Y.

23      I met Wayde a while back, and I've seen a lot of stuff here

24  already just today and the last time I was here.  And I've never

25  seen any of this -- this racist side of him.  You know, it --

1  the first time I ever even seen him raise his arm and do any of

2  this "Hail" stuff was in the videos I'd just seen this morning.

3       While other people in that video attempted to, what I

4  believe, kill me, I wouldn't a gotten out of there had it not

5  been for Wayde.  So, in my eyes, he's a good guy.  He's been

6  there to help people.  Never said, "No" to -- to helping anybody

7  that I've seen.  And I'm able to stand here on my own today

8  because of his actions.  Without them, I don't know if I'd even

9  be capable of standing here, let alone to breathe.  So . . .

10           THE COURT:  All right.  Thank you, Mr. Johnson, for

11  coming.

12           MR. WALL:  Your Honor, I -- I guess that's all we have

13  for the moment.  We did have another person, Lynn Paris

14  (phonetic), who was not able to be here this morning.  But, if

15  we are going to reconvene this afternoon, I will contact her to

16  see if she could be here.

17           THE COURT:  That would be fine.

18           MR. WALL:  She wanted to speak to the Court but was

19  unable to attend this morning.

20           THE COURT:  That would be fine.  Now, the question is:

21  Should we complete the testimony of Special Agent Neirinckx or

22  adjourn?  How much more --

23           MR. HICKS:  Your Honor, I think, if we adjourn, I'll

24  be able to --

25           THE COURT:  Okay.

1      MR. HICKS:  -- streamline some things for the Court.

2      THE COURT:  We're going to pick up, then, at

3  two o'clock.

4      MR. HICKS:  All right.  Thank you.

5      THE COURT:  Because we have a 1:30 matter.

6  (Court recessed at 12:12 p.m.)

7  (Court reconvened at 2:10 p.m.)

8      THE COURT:  Good afternoon.  Please be seated,

9  everybody.  Mr. Hicks, I think we were in the process of direct

10 examination with the agent.

11     MR. HICKS:  Yes, your Honor.  Could I make a --

12 provide some information to the Court that -- so that the Court

13 knows we're not going to call a witness on an issue because

14 we've agreed to it.

15     On the firearm, your Honor, the issue was -- that's been

16 presented to the Court is whether or not the base offense level

17 was 14 or whether it was 20.  We provided information to

18 Mr. Wall, and my understanding from Mr. Wall is that they're not

19 going to be arguing that it's 14; that they do agree that the

20 base offense level is 20.  And, if that's not the case, then,

21 we'll have Agent Cleary come back and present evidence on that.

22     THE COURT:  And that's the issue as to whether or not

23 it was a semiautomatic capable of --

24     MR. HICKS:  Holding --

25     THE COURT:  -- accommodating 15 or 30 rounds or

 1  whatever it was.

 2          MR. HICKS:  Fifteen or more rounds, yes.

 3          MR. WALL:  That's correct, your Honor.  I originally

 4  objected to that --

 5      (Interruption by the reporter)

 6          THE COURT:  Yes.

 7          MR. WALL:  Your Honor, I originally did file an

 8  objection to that because my recollection of what we had seen

 9  during the trial didn't show the clip being present at the time.

10  But I went back and reviewed more of the video, and I did see

11  that large chip.  So, we are not going to argue that point at

12  this time.

13          THE COURT:  All right.  Well, I appreciate that

14  because I'm, certainly, not an expert; and I wasn't sure.

15          MR. HICKS:  Correct, your Honor.

16          THE COURT:  Thank you.

17          MR. HICKS:  Your Honor, we'd like to have Special

18  Agent John Neirinckx come back to the stand.

19          THE COURT:  Yes.  Agent Neirinckx, you're still under

20  oath.  Step back and resume the stand, please.

21          MR. HICKS:  Your Honor, just for the record and to get

22  back to where we were at, we were discussing a letter that was

23  written by Mr. Kurt on January 1st of 1996, apparently, to -- it

24  starts off "Dear Mac," and we were going through some passages

25  there.

1    THE COURT:  Is that part of Exhibit A or B?

2    MR. HICKS:  It's -- it's at Page 87, your Honor.  It's

3    Attachment A, your Honor.

4    THE COURT:  87?

5    MS. VAN MARTER:  Or no.

6    MR. HICKS:  Yeah, I didn't write the attachment number

7    down again.  I'm sorry.

8    THE COURT:  That's B.

9    MR. HICKS:  Yeah.  It's Attachment --

10    MS. VAN MARTER:  B.

11    MR. HICKS:  -- B, and it -- it starts, I believe --

12    the one page that we have doesn't have a number on it.  It looks

13    like our copy got cut off.  So, it's either -- it looks like

14    it's at 87 is the page number, your Honor, from the -- that

15    we're going to be showing the Court at this point in time.

16    Okay.

17

18                    DIRECT EXAMINATION (continued)

19    DIRECT BY MR. HICKS:

20    Q    Special Agent Neirinckx, in order to move this along, we

21    sat over the lunch hour; and we highlighted some of the things

22    that we wanted to bring to the Court's attention.  Did you have

23    occasion to review this letter again?  And what is this letter,

24    in general terms, speaking about?

25    A    Counterfeit money.

1  Q    All right.  And we have a passage.  It just starts with a

2  large "NOW."  Could you read that into the record, please.

3  A    "NOW the $20 Fed notes, one is printed on special paper and

4  one on regular you can see the difference.  Any flaws that you

5  see are because my printer can't print any better, the image on

6  file is perfect."

7  Q    Okay.  And, then, we skip a small portion that it took

8  three full months to create these images.  And, then, go ahead.

9  A    "These images are worth multiple millions of dollars.  Also

10  I am sending you a sample of chemicaly (sic) treated paper 70%

11  hemp 30% cotton that the iodine counterfeiting pen only makes a

12  mark the same as genuine Fed notes on.  Also a dab of magnetic

13  ink on it for sampling."

14  Q    Now, just based upon your experience, what is this

15  counterfeiting pen, so that the Court's aware of it?

16  A    Well, it actually detects -- genuine currency is what it

17  actually detects.  It's a chemical in -- U.S. currency has a --

18  a bleaching agent in it.  And, basically, it detects an agent in

19  U.S. currency.  So, a nonbleaching agent paper will -- will show

20  a brown color.

21  Q    So, if you chemically treat it, you can -- what people do

22  is they chemically treat it or they use genuine currency to make

23  counterfeit and that will throw off detection pens.  Is that it?

24  A    There is things that you can treat paper with that will

25  give a -- a false negative to one of these counterfeiting

1   detection pens.

2   Q    So, is that what you believe is being discussed here --

3   A    Yes.

4   Q    -- is how to make better counterfeit so you can trick

5   people more?

6   A    Yes.

7   Q    All right.  We have another passage, and it's on Page 88.

8   And if you'll just, again, read the yellow highlight.

9   A    "I have showed all my samples to Dean but he wants the

10  product but doesn't want to finance any of the operation."

11  Q    Now, is this letter -- in general terms, is Mr. Kurt

12  attempting to get financing to manufacture counterfeit currency?

13  A    That's what I interpret it to be, yes.

14  Q    All right.  Let's go --

15          MR. HICKS:  We're going go to Page 89 now, your Honor.

16  Q    (BY MR. HICKS)  And why don't you start with the first line

17  there.  It's under -- it's also underlined in red, and that's

18  just an error that I made.  So, go ahead.

19  A    "I sent my Washington driver's licenses down to his people

20  who are on the run but I can't get him to buy a hand held photo

21  copier so that we can get legitimate DMV numbers off people who

22  cash checks."

23  Q    Now, let me ask you this:  The "him" he's referring to

24  is -- is who, if you recall?

25  A    Say that again.

1  Q    Is -- is he referring to Mr. Dean Ashworth when he's

2  talking about "him"?  He's -- or do you --

3  A    I'm not sure.

4  Q    All right.  Now, the next passage starts off with "I

5  don't."  Would you read that into the record.

6  A    "I DON'T HAVE ANY ACT" -- or "ACTION.  I'm flat broke

7  except for the $2,000 that just came in last week and I'm

8  leaving here tomorrow for my" -- I can't read that -- "and just

9  do the best half ASS job I can and finance myself.

10      "I have showed my sample to other white supremacists

11  (sic)" --

12  Q    Is that "separatist"?

13  A    ". . . seperatist (sic) who got greedy crazy and want 2

14  million in product just for the use of $6,500 for 7 days."

15  Q    All right.  We're going to -- that's on Page 89.  Now,

16  we're going to go to Page 90 and finish up on that.

17  A    "The best was $300,000 in product for 7 days or" -- it

18  appears "56" -- I can't make that out.  "$6,500."  Something to

19  that effect.  "Actually on" -- "actually an offer was made by a

20  group of JEWS they didn't want anything but to cover expenses on

21  the first batch and only take out increasing percentages as the

22  operation put out fire quality product such as the polyester

23  strip embedded in the paper etc etc (I can do that too but I

24  need $4,000 worth of equipment)  (I back dated the 20 to 1988

25  before the strip . . .)  The Jews wanted to equip the entire

 1  shop but they wanted to know where it was and have total

 2  scrutiny over production.  I'll make a deal with the Devel (sic)

 3  but not the Jews.  I have to admitt (sic) they did see the

 4  Potential in my talents.  And that is all I have right now.

 5      "I also have an extreme Political objective and that is why

 6  I work day and night like a driven man.  I am going to take over

 7  every computerized Data Base used by anyone to control me I am

 8  going to be a free man and so are my children.  That includes

 9  NCIC DMV FBI Etc Etc.  I don't care how many people I beat to

10  death to get the information I need, including any and all

11  Telephone Company personel (sic).  So If you are going to be

12  connected with me be forewarned I will not stop at blood.  I get

13  my hands on 15 million in gold bullion and their nightmare

14  begins.

15      "I know that my Washington driver's license cards are

16  working fine in California Cops have checked them and so far

17  everything passed inspection.  They get Banking accounts & PO

18  Boxes no problem.

19      "Here in this State I have used them only for getting Mail

20  Box Services Such as Mail Boxes Etc."

21  Q    All right.  Now, I want to go to Page 91.  And there's a

22  difficult area to read.  And what do you believe this says, if

23  you can see it?  Maybe I can hand it up.

24          MS. VAN MARTER:  Start here (indicating), and I'll

25  move it over.

1        THE WITNESS:  Say that again?

2        MS. VAN MARTER:  Go ahead and start here (indicating)

3   and I'll try and move it over.

4   Q    (BY MR. HICKS)  Where it's highlighted.

5   A    It says, "Must Burn the $20 samples."

6   Q    All right.  And is it signed by -- who?

7   A    "Wayde L. Kurt."

8   Q    And what else does he say there?

9   A    "Your brother at Arms."

10  Q    All right.  Now, did the Secret Service --

11       MR. HICKS:  And I'm going to Page 92 and 93, your

12  Honor.

13  Q    (BY MR. HICKS)  Did the -- did you also have occasion to

14  review another letter, which appears to have been written by

15  Mr. Wayde Kurt?

16  A    Yes.

17  Q    And there's a date on that, which is 6/9 of '96.  And

18  there's initials up there.  When these items are seized by

19  Secret Service, would they, generally, put a date on there of

20  the date of the seizure?

21  A    Typically, yes.

22  Q    And -- and you, yourself, would that be part of your

23  training when you seize documents?

24  A    Correct.

25  Q    And, so, this came -- appears to be something that was

1  seized in 6/9 of '96.  So, it would have been -- had to have

2  been written before that or sometime before that.  Is that

3  correct?

4  A    More than likely, yes.

5  Q    Okay.  Would you read the highlighted portions.

6  A    "I have a graphic arts shop put together but I am afraid it

7  was compromised.  I can't move it right now.  The press alone

8  weighs 1000 lbs.  It is another city far away and I pay $100 a

9  month rent.  I just made rent for this month and now I'm down to

10  a can of beens (sic)."

11  Q    All right.

12  A    "I need to be able to make up plastic cards.  I have a

13  series of legitimate numbers and name that will allow me to

14  travel down the road again without problems.  I <u>have</u> overcome

15  the fine gold holligram lettering."

16  Q    Now, what -- based upon your experience in investigating

17  these types of cases, what do you believe Mr. Kurt is referring

18  to when you read that -- when he's talking about "making up

19  plastic cards"?

20  A    Counterfeit identification cards.

21  Q    All right.  Now, let's see.  We go to the next page.  Okay.

22  We're going to go to Page 93 here, and could you read the

23  highlighted portion.

24  A    "In this state where the original is seen everyday, it [is]

25  only" -- "it only would be a problem with the most extremely

1  observant asshole.  These types of assholes seem to gravitate to

2  positions that cause problems for us.  however (sic) in the rest

3  of the 49 states where the original is not seen everyday or once

4  a month or maybe once a year, the risk would proportionate

5  (sic)" -- "proportionaly (sic) drop with the distance from this

6  state."

7  Q    And, then, there's another highlight.

8  A    "Your Brother at Arms."

9  Q    What do you believe he's talking about here based upon your

10 experience?

11 A    It appears that he's talking about using counterfeit

12 driver's licenses, possibly Washington State driver's licenses,

13 and the farther away from Washington he gets the harder it is to

14 have law enforcement or other people detect that.

15 Q    All right.  And, so, again, also in this letter, is he

16 soliciting -- trying to solicit money so that he could get

17 better printing equipment?  Do you recall this letter?

18 A    Yeah, I believe so.

19 Q    All right.  Now, one of the things that, during your more

20 recent investigation -- well, I'll go back to the 1997

21 investigation.

22        MR. HICKS:  And we're talking about, your Honor,

23 again, 72 and 73 and Attachment B.

24 Q    (BY MR. HICKS)  Could you take a look at this?  And we went

25 over this over the lunch hour.  Is it dated?

1  A    Yes.  This one appears to be dated 3/11 of '97.

2  Q    And does it appear to be Mr. Kurt's handwriting?

3  A    It appears so.

4  Q    And, on the last page, does it indicate -- are you familiar

5  with the handwriting and are you familiar with that "WK" at the

6  end there?

7  A    Yes.

8  Q    And how are you familiar with that "WK"?

9  A    I've seen that on a number of letters that have handwriting

10 appear -- that appears similar to Wayde Kurt.

11 Q    Now, the letter's addressed to -- and, if we'll go back to

12 the first page, it's addressed to a "Dean."  During the course

13 of your investigation, were you also investing an individual by

14 the name of Dean Ashworth?

15 A    I was.

16 Q    And why were you investing Dean Ashworth?

17 A    He had -- he was involved in a previous counterfeit

18 investigation by the Secret Service.  And he had a property

19 that -- or my investigation lead me to believe that there was

20 possibly counterfeit money or counterfeit identifications on

21 that Dean Ashworth property.

22 Q    And, so, you got a search warrant and you searched it; but

23 you didn't find any counterfeit currency.

24 A    That's correct.

25 Q    All right.  Now, why don't you read, again, the first

1  highlighted part, "I received a (sic) letter from Rocky . . ."

2  A    "I received the letter from Rocky last week it was good to

3  hear from him.  There was NO letter from you with it)  A serious

4  problem has come up and you must be warned."  I can't quite make

5  out -- there was part of it.  Okay.  "My sister Amber has a boy

6  friend.  And I used his name when I was arrested it was the name

7  on my driver['s] licsense (sic)."

8  Q    All right.  Then, if we go to the last page of this, would

9  you read that portion.

10  A    "Lonny needs as much encouragement as possible to hold out

11  during questioning with giving up."

12  Q    Do you believe he means "without giving up" or --

13  A    I do.

14  Q    All right.  Go ahead.

15  A    "I am not sure that I can give that encouragement.  If you

16  possibly can get her on the phone and talk to her about what is

17  going to happen and help her get her ideas straight and also to

18  have her keep you informed about any development (sic)--

19  developments," I guess.

20  Q    Now, as a law enforcement officer -- and is this -- is this

21  whole letter discussing the fact that people might be

22  cooperating against Mr. Kurt?

23  A    It appears so.

24  Q    And is he -- does he indicate a concern about that?

25  A    Yes.

1  Q    And does he want somebody to talk to a witness, does it

2  appear, in order to change -- in order to affect how they

3  testify?

4           MR. WALL:  Your Honor, I'm going to object again.

5  He's asking the witness to give opinion about what he thinks is

6  meant by this.  It seems for itself.

7           THE COURT:  Well --

8           MR. WALL:  I mean, I don't think he's provided any

9  foundation that he has any better idea of what this means than

10 anyone else reading this letter.

11          THE COURT:  Well, I'm going to overrule the objection.

12 He is a law enforcement Secret Service.  He's got a good deal of

13 experience.  And his interpretation of some of this material may

14 be helpful.

15 Q    (BY MR. HICKS)  Go ahead.

16 A    It does appear that the -- the writer is talking about

17 encouraging somebody to maybe change their -- their testimonial

18 or outlook or what their statements would be.

19 Q    All right.

20          MR. HICKS:  Now, I just have one -- one more letter,

21 your Honor, to go over and, then, a few quick questions here.

22 Q    (BY MR. HICKS)  One of the -- early on in your testimony,

23 you indicated that there was a letter that was involved in your

24 investigation.  And I'm putting up here this letter.

25          MR. HICKS:  And what pages are we on?  137, your

1  Honor.

2  Q    (BY MR. HICKS)  And are you familiar with this letter?

3  Have I asked you to go back over this on a couple of occasions?

4  A    Yes.

5  Q    And do you know who Dave Halsen is?

6  A    Yes.

7  Q    And who is Dave Halsen?

8  A    He was an inmate at the Coyote Ridge Correction Center in

9  Connell, Washington.

10 Q    And, in regards to Wayde Kurt, does this appear to be his

11 handwriting?

12 A    It does.

13 Q    And do you know if he was living at this address at

14 somewhere around the time, April 13th of 2003?

15 A    Yes.

16 Q    And did you -- you noted this letter in your report.  Is

17 that correct?

18 A    I did.

19 Q    And let's go to the next page, 1 -- 138.  And why don't you

20 read the first portion of that, please.

21 A    The part that's highlighted?

22 Q    Yes.

23 A    "Hey; sorry, I didn't answer your last letter before you

24 got this one off but I have really been scrambling to get my IDs

25 in order.  I ended up buying a new printer that I can print with

1  ultra violet inks that go on clear and only show up under black

2  light."

3  Q    Okay.  And why don't we go to the next one.

4  A    "I was working on some graphic art work when I notice that

5  there was a small distortion that looked circular and thought to

6  myself maybe I should look that this under black light and sure

7  enough there were 3 seals printed invisible except under black

8  light and that is how banks and so forth authenticate cards."

9  Q    Now, before we go any further with this, during the course

10  of the investigation, did Secret Service seize a computer from

11  Wayde Kurt that had images of birth certificates on it and,

12  also, images showing that -- those seals under black light?

13  A    Yes.

14  Q    And, so, that was on a computer.  And, based upon your

15  experience, had that computer been used to make forged and false

16  documents based upon what you know?

17  A    Yes.

18  Q    All right.  Now, let's go to the next passage here.

19  A    "I was working on some" -- oh, pardon me.  Farther down.

20  "I am sure you are aware that Osama Bin Laden's family has a

21  fortune made in the construction business and if you have been

22  paying attention you would also know that his own personal

23  fortune was made in setting up the Middle East with cell phone

24  companies.  And being of like mind and some what in his shoes it

25  gave me pause because I'm (sic) aware of a little niche that can

1  become an empire . . ."

2  Q    Okay.  Now, let's go -- because the Court has it in front

3  of it, too.  What else was down there?

4  A    "Way down south we would get our foot in the door and have

5  too much money behind us by the time we moved on the Western

6  World."

7  Q    All right.  Now, I wanted to look at the last page, 140.

8  And what does it say at 1 --

9  A    "Your friend Wayde Kurt a white witch of Asatru."

10  Q    All right.  Now, there were other letters; and we've

11  submitted those other letters.  Is that correct?

12  A    Correct.

13  Q    And I've told you I'm not going to go through all the

14  letters because the Court has them.

15  A    Yes.

16  Q    And all the letters that we've gone through they're -- they

17  appear to be -- the ones that they either have Wayde Kurt's

18  signature or some of them appear to be Wayde Kurt's.  There are

19  a couple that weren't Wayde's, though.  Is that correct?

20  A    Correct.

21  Q    But they were with letters that were seized at the time.

22  A    Yes.

23  Q    All right.  Now, during the course of your investigation --

24  and, again, did -- did Mr. Kurt -- was he in possession of any

25  computers that were not his?

1  A    Yes.

2  Q    How many computers was he in possession of that were not

3  his?

4  A    Two that I recall.

5  Q    And was one of the computers stolen?

6  A    Yes.  Possibly both of them.

7  Q    All right.  And the one computer -- let's talk about -- was

8  one of them a United States military computer that was stolen

9  from Fairchild Air Force Base?

10 A    I don't know where it was stolen from, but it did belong to

11 a lieutenant colonel out at the Air Force base.

12 Q    And was that recovered --

13        MR. HICKS:  And, again, Page 105 and 106, your Honor,

14 there's reports of this.

15 Q    (BY MR. HICKS)  But was that recovered after a surveillance

16 by the United States Secret Service on 10/02 of '02?

17 A    Yes.

18 Q    All right.  And the State issued a -- booked him on a

19 warrant on -- at that time.  Is that correct?

20 A    That's correct.

21 Q    Do you recall if that was a warrant out of Oregon that was

22 outstanding then?

23 A    Well, I want to say it was out of western Washington.

24 Q    Okay.  Now, what about -- he was also booked at that time

25 for possession of stolen property, if you recall?

1  A    I believe he was.

2  Q    All right.  Now, was there a second computer that was

3  either stolen or that he had possession of that he should not

4  have been in possession of that was actually -- was involved in

5  the Government in some way?

6  A    Yes.  There was an NEC computer that we recovered through,

7  I believe, one of the search warrants.  And I tracked down the

8  owner of it, or the previous owner of it, who said they'd

9  donated it to Goodwill.  And they did not expect it to be in

10 Wayde Kurt's possession.

11 Q    Did Wayde Kurt try to access anything on that?

12 A    Yes.  It appears that he tried to access the VA computer

13 database multiple times, but he was unsuccessful.

14 Q    All right.  Now, did you have any information that

15 Wayde Kurt was stealing documents from Goodwill?

16 A    Yes.

17 Q    And what was the information that you had?

18 A    I had a confidential informant that informed me that

19 Wayde Kurt had told him that he was stealing documents from the

20 Goodwill Industry when he was working there as a receiver of

21 proper -- donated property.

22 Q    Did -- did this confidential informant ever ask Wayde Kurt

23 why he was stealing documents from Goodwill?

24 A    Yes, he did.

25 Q    And did you put this in your report?

1  A    Yes.

2  Q    All right.  And what was the information that Mr. Kurt,

3  according to the confidential informant, indicated?

4  A    Kurt stated that, with this information, you can be anyone

5  anywhere.

6  Q    All right.  Now, during the course of your investigation,

7  were you concerned with whether or not Wayde Kurt was a white

8  supremacist at that particular point in time?

9  A    No.

10 Q    Did you have any information that -- anybody tell you that

11 he had white supremacist beliefs?

12 A    Yes, two people.

13 Q    All right.  And did you even note that or put that in your

14 report?

15 A    No.

16 Q    And why not?

17 A    My investigation was mainly concerned with the counterfeit

18 money and counterfeit identifications.

19 Q    And your -- your investigation was back in 2004.

20 A    Actually, you know what, I think I did put it in my report.

21 I made one note, I think, in my report about Wayde Kurt being

22 seen with a swastika medallion on his neck.

23 Q    Okay.  Now, did Mr. Kurt -- during your investigation and

24 from the time that you attempted to get the tracking device back

25 from him, did Mr. Kurt contact anybody and make any threats

1 involving bombs or anything such as that?

2 A    Yes.

3 Q    And what type of threats did individuals report to you that

4 he was making during your investigation?

5 A    Yes.  On April 14th of 2004, I interviewed a Don Solberg,

6 who worked -- who was a supervisor at Goodwill.  And he advised

7 me that Wayde Kurt had found my GPS tracking device on his

8 vehicle, and he showed Mr. Solberg this tracking device, which

9 was on the one -- I believe the passenger seat of Wayde's van.

10 And, at that time, Mr. Solberg said that he was very irate.

11 And, if I can quote from my report --

12 Q    Okay.  What page are you on in your report?  What date is

13 the date of the report?

14 A    It's May 28, 2004.

15 Q    Okay.

16 A    I -- I don't have a page number on my copy here.

17 Q    Okay.

18 A    But it starts off with "On 4/14/04."

19 Q    Okay.  Go ahead.  And what did Mr. Solberg tell you?

20 A    He said that ". . . Kurt was very irate at the time and

21 stated, 'If they want a war, they're going to get one.'  I know

22 where there are weapons, explosives, and an airplane, and I'm

23 going to make a fireball out of Spokane."

24      MR. HICKS:  Your Honor, for the record, that's,

25 actually, Page 97, for the Court's information, of the materials

1  that we submitted to the Court.

2  Q    (BY MR. HICKS)  Now, at that time, did you know that, in

3  the future, Mr. Kurt would be charged with any crimes involving

4  possession of firearms or there'd be any allegations of him

5  making threats?

6  A    No.

7  Q    Were you concerned about these threats?

8  A    I was.  Especially this one here.  That's why I noted it in

9  my report.  And that, also, is why I was trying to find him as

10  soon as I could.

11  Q    All right.  You were aware that -- and it's early on in

12  your report.  The first eight pages of your report.  You were

13  aware that Mr. Kurt had a firearm that was linked to a murder of

14  a six-year-old.  Is that correct?

15  A    Correct.

16  Q    And, as a law enforcement officer, is that something that

17  you keep in your mind whenever you're involved in enforcement

18  actions because somebody had an automatic weapon that was -- is

19  linked to a death of another person?

20  A    Absolutely.

21  Q    So, did you consider Wayde Kurt to be -- even years

22  afterwards to be a dangerous person?

23  A    Yes.

24  Q    And, so, is that why these threats were of concern to you?

25  A    Yes.

1  Q    And I believe that on -- in your summary of your

2  investigation of Wayde Kurt, that's the first paragraph of your

3  summary.

4  A    Yes.

5         MR. HICKS:  All right.  Your Honor, I have no further

6  questions of this witness.

7         THE COURT:  Mr. Wall.

8

9                        CROSS EXAMINATION

10 CROSS BY MR. WALL:

11 Q    Agent Neirinckx --

12 A    Yes.

13 Q    -- you were asked earlier in your testimony about putting

14 a -- I forget what -- how you termed it, but a -- a -- some kind

15 of tracking device on Mr. Kurt's vehicle?

16 A    Yes.

17 Q    Yeah.  And you were asked if that was lawful, and you said

18 it was lawful.

19 A    Yes, it was at the time.

20 Q    So, it's your -- in your opinion, anyone can put a tracking

21 device on anyone's car that's parked in a public place?

22 A    It was allowed at that time, yes.

23 Q    Is it -- it's not allowed any more?

24 A    Not to my --

25 Q    Under what law?

1  A    I don't believe so.  I believe there was a law change.

2  Q    What kind of law was changed?

3  A    To my knowledge that you now need a search warrant to put a

4  tracking device -- a GPS tracking device on a vehicle.

5  Q    Well, as an individual, I wouldn't need a search warrant to

6  do it, would I?

7  A    I -- I'm not an attorney.  I --

8  Q    Okay.

9  A    I wouldn't --

10  Q    So, you don't really know if it was lawful or not, do you?

11  A    Well, I was told that it was lawful.

12  Q    Okay.  Have you ever heard of the term "trespass of

13  chattels"?

14  A    No.

15  Q    Oh, okay.  So, do you have any knowledge whether or not

16  what you did might have been a violation of some kind of state

17  law or might have been unlawful in the civil sense?

18  A    I'm not aware of any unlawful action that I -- that I did.

19  Q    Okay.  You were asked a lot of questions about

20  identification cards that Mr. Kurt had made.

21  A    Yes.

22  Q    And do you have any evidence or did you uncover any

23  evidence that Mr. Kurt ever used any of those cards to commit an

24  offense against another person?

25  A    No.

1  Q    You testified that you were told by some individuals -- I'm

2  not sure that they were identified.  But you said some

3  individuals told you that Mr. Kurt had offered to provide them

4  false identification cards in exchange for money.  Correct?

5  A    Yes, correct.

6  Q    Did you uncover any evidence at all that he ever, actually,

7  provided a card to someone in exchange for money?

8  A    No.

9  Q    And, in fact, if he had done so with those particular

10 persons, they could have given you the card.  Correct?

11 A    Can you rephrase that, please?

12 Q    Well, if these people said it had been offered to them --

13 if he had, actually, given them a card in exchange for money,

14 they could have shown you the card or given you the card.

15 Correct?

16 A    That's correct.

17 Q    Yeah.  And they didn't do that.

18 A    No.

19 Q    No.  There was a fair amount of testimony about a number of

20 letters that you recovered in the course of your investigation

21 that were written by Mr. Kurt.  Correct?

22 A    I believe they were.

23 Q    One of those, in particular, involved a person by the name

24 of Lonny.  Do you know who Lonny is?

25 A    No.

1  Q    No idea.  And you read from a part of that letter.  If I

2  could find it, I will let you see it again.  Okay.  This is --

3  this is a portion of the letter.  And I believe you read from

4  the highlighted portion.  Can you see that?

5  A    Yes.

6  Q    Are you able to read it?

7  A    Yes.

8  Q    Okay.  Do you see anything in there where Mr. Kurt is

9  indicating he wants someone to change their testimony or change

10 their story?

11 A    Not directly, no.

12 Q    Anything that suggests that they should say one thing and

13 not another?

14 A    Yes.

15 Q    Oh?  Yeah, where do you see that?

16 A    Where it says, "encouragement as" -- "Lonny needs as much

17 encouragement as possible to hold out during questioning" --

18 now, "with giving up," but I read it to be "without giving up" --

19 "I am not sure that I can give that encouragement."

20    I certainly -- the way I read it, interpret it, that's the

21 way I interpret it.  Is that --

22 Q    You don't know what he meant by "holding out," do you?

23 A    I don't know for sure, no.

24 Q    So, you're speculating.

25 A    Based on my -- my knowledge, that's correct.

1 Q    You also read from portions of another letter, which I have

2 here; and I'll just put it up there so you can remind -- we can

3 be clear which letter it is we're talking about.  Can you see

4 that letter?

5 A    Yes.

6 Q    Okay.  And there's a reference to Osama Bin Laden here?

7 A    Yes.

8 Q    And you were asked about the part down at the bottom of

9 this page where it says, "Way down south we would get our foot

10 in the door and have too much money behind us by the time we

11 moved on the Western World."

12 A    Yes.

13 Q    Now, did you read the entire letter?  At some point, have

14 you reviewed the entire letter?

15 A    I did at some point.

16 Q    Okay.  So, in reviewing the entire letter, it was clear to

17 you that what he was -- Mr. Kurt was referring to there was an

18 -- an idea he had about setting up cell phone service in South

19 America.  Correct?

20 A    Correct.

21 Q    Yeah.  It had nothing to do with terrorism.

22 A    I don't know what he meant by moving "on the Western

23 World."

24 Q    Well, if he's talking about setting up a type of cell phone

25 service in South America and, then, after some time, having

 1  enough money to move "on the Western World," fair implication

 2  that he means to move his service to other parts of the world.

 3  A    That is -- that is a fair interpretation.

 4  Q    And you were asked some questions about some computers.

 5  One of the questions was:  Did he have -- Mr. Kurt have a

 6  computer that he should not have had?

 7  A    Yes.

 8  Q    And you said, "Yes."

 9  A    Yes.

10  Q    Was it illegal for him to have that computer?

11  A    It was stolen.  So, I would assume it would be.  Possession

12  of stolen property.

13  Q    Well, it would only be illegal if he knew it was stolen,

14  though, wouldn't it?

15  A    I'm not a lawyer, but I'm assuming that's correct.

16  Q    Okay.  Do you have any knowledge as to how he came into

17  possession of it?

18  A    No.

19  Q    You spoke about another computer that someone had donated

20  to the Goodwill.

21  A    Yes.

22  Q    And Mr. Kurt worked at Goodwill, didn't he?

23  A    Yes.

24  Q    Yes.  And, so, when you donate things to Goodwill, they

25  sell them, don't they?

1  A    Well, they donate them.

2  Q    Well, you donate to Goodwill; but Goodwill sells it.  Are

3  you aware of that?

4  A    Goodwill sells --

5  Q    They have a store that they sell --

6  A    Yes.

7  Q    -- their items out of --

8  A    Good will does --

9       (Interruption by the reporter)

10 Q    (BY MR. WALL)  You donate to Goodwill.  But Goodwill, then,

11 takes those items -- not all of them but they take some of those

12 items that they think are worth selling and they will sell them.

13 A    That's correct.

14 Q    So, if someone donates a computer to Goodwill, Goodwill may

15 take it and put it on the shelf and sell it to whoever comes

16 along and pays for it.

17 A    That's correct.

18 Q    All right.  Okay.  And Mr. Kurt worked there.  So, there

19 would have been nothing illegal about him buying a computer that

20 Goodwill put on the shelf.

21 A    Yes.  I stand corrected.  It's a possibility he did buy it

22 legitimately.

23 Q    Yeah.  And you spoke about several persons who told you

24 that they believe Mr. Kurt was a white supremacist or espoused

25 white supremacist beliefs?

1  A    Yes.

2  Q    Do you have any specific recollection of exactly what they

3  told you about in that regard?

4  A    I remember one person discussed that he wore a swastika

5  medallion.  I can't say that it's -- for sure the swastika is

6  tied to white supremacist.  But, in my education, it -- they're

7  -- they're very similarly tied.  That was one person.

8       Another person just discussed him vaguely, and I don't

9  remember the specifics about him having white supremacist

10 tendencies.

11 Q    Okay.  And, so, you don't know if they got that idea from

12 Mr. Kurt or from someone else.

13 A    Correct.

14 Q    You spoke specifically in your testimony about a person

15 named Don Solberg who indicated that Mr. Kurt had made some

16 statements to him after he found the GPS tracking device on his

17 car.

18 A    Yes.

19 Q    Correct?  Did Mr. Solberg say that these statements were

20 made directly to him, or was he repeating something that someone

21 else had told him Mr. Kurt said?

22 A    My recollection -- it's been a while.  But, in my

23 recollection, he was stating them -- he was saying, "I'm -- I'm

24 angry -- I'm angry at the time."  And he says, "If" -- and this

25 is Wayde Kurt saying the statements to Mr. Solberg.  But it has

1 been a while. It's --

2 Q    Okay. Did you make a specific report on that that would

3 refresh your memory?

4 A    No. This is the only report I have.

5 Q    All right. So, your memory isn't clear on exactly what the

6 basis of that statement was.

7 A    Well, according to my report, it appears that, when I wrote

8 this and based on the way I write, this -- this statement was

9 coming from Wayde Kurt, not from somebody else.

10 Q    That was, at least, your understanding at the time.

11 A    Yes.

12        MR. WALL:  That's all I have.  Thank you.

13        THE COURT:  Any redirect, Mr. Hicks?

14

15                    REDIRECT EXAMINATION

16 REDIRECT BY MR. HICKS:

17 Q    Now, just for clarification, some of these identifications

18 that were seized or that Wayde Kurt had, for example,

19 Mr. Jarvis, that was an actual identification, apparently, that

20 he had. And Mr. Jarvis was a real person. Is that correct?

21 A    Yes.

22 Q    And it was the same Social Security that Mr. Jarvis had?

23 A    Yes.

24 Q    Except that Mr. Jarvis was dead. Is that correct?

25 A    That's correct.

1  Q    And there's other reason to believe -- now, let me ask you:

2  When you looked at those Social Security -- excuse me, those

3  Washington driver's licenses and stolen Social Security cards,

4  did you try to determine how Wayde Kurt got that information?

5           MR. WALL:  Your Honor, this is beyond the scope of

6  cross, I believe.

7           MR. HICKS:  He said he never hurt anybody.

8           THE COURT:  Yeah.  Overruled.  We have to relax the

9  normal rules of evidence.  Go ahead.

10          THE WITNESS:  Can you restate it, please, Mr. Hicks?

11 Q   (BY MR. HICKS)  Did you have any -- what was your -- when

12 you were investing this, what type of conclusions were you

13 making as to where Wayde Kurt was getting these -- the

14 information to create these false Social Security cards and to

15 create these false Washington driver's licenses.

16 A    My investigation revealed he received this information from

17 stealing it from the Goodwill Industries Donation Centers.

18 Q    All right.  Now, there was, also -- wasn't there -- did --

19          MR. HICKS:  Well, excuse me.  I believe -- I'm sorry.

20 This is not the witness to -- to ask, your Honor.  I'll argue

21 that we've put it into evidence.  It was -- well, maybe -- no,

22 I'm mistaken.

23 Q   (BY MR. HICKS)  When Mr. Kurt was arrested, did he have an

24 identification of a woman in his possession, if you recall?

25 A    Yes.

1  Q    And was that a real person?

2  A    I believe it was.

3  Q    Did that person work in the federal -- in -- in -- was it a

4  federal employee, if you recall?

5  A    Yes, I believe it was.

6  Q    And -- and did you -- is it in your report that you

7  invested that and you, actually, went and talked to the

8  person's --

9  A    Yes.

10  Q    -- who's it was?

11  A    Yes.

12  Q    And it was a valid driver's license.  Is that correct?

13  A    I would have to refresh my memory on the report.

14  Q    All right.

15  A    But I believe so.

16  Q    And that person, actually, worked in -- in the Bankruptcy

17  Court.  Is that correct?

18  A    That's correct.

19  Q    Had you asked that person whether that person gave

20  permission for Wayde Kurt to keep the identification?

21  A    I believe I did ask that question.

22  Q    Did you show a picture of Wayde Kurt to that person?

23  A    I don't recall.

24  Q    Why don't you --

25          MR. HICKS:  Let me look -- let me look to refresh his

 1  recollection, your Honor.  It's in his report.

 2      (Pause in the proceedings)

 3          MR. HICKS:  Your Honor, I'm apologizing to the Court.

 4  It is in our memorandum, and it is identified in our memorandum

 5  where it is.  But I have not looked at that.

 6  Q   (BY MR. HICKS)  And do you have --

 7          MR. HICKS:  If I could just look a second because I

 8  did highlight it, your Honor.

 9          THE WITNESS:  I found the paragraph.

10  Q   (BY MR. HICKS)  Yes.  Is it on Page 13 of your report?

11  A   Yes, sir.

12  Q   And that report is your case report of June 15, 2004.

13  Without providing the name, at the time Mr. Kurt was arrested,

14  he had a person's personal identification in his possession.  Is

15  that correct?  The driver's license?

16  A   I need to go back a little bit to confirm that it was a

17  driver's license.

18  Q   But you went and you interviewed this person.  Is that

19  correct?

20  A   Yes.

21  Q   And, when you interviewed her, this person, did you ask --

22  try to find out what she had done or how the identification

23  could come into Mr. Kurt's possession?

24  A   Yes.

25  Q   And what was the information that you were provided at that

1  time?  Without naming the person.

2  A    Yes.  She stated that, on 3/9/2004, she donated some

3  personal belongings to Goodwill Industries located at the

4  Tidyman's Retail Store on North Cedar, Spokane, and that her

5  identification might have got accidentally mixed in among the

6  donated items.

7  Q    And did she indicate she remembered who was involved?

8  A    Yes.

9  Q    And did you show her a picture of Wayde Kurt?

10 A    I did show her a picture.

11 Q    And was -- was there any identification that she made?

12 A    Yes.  She positively identified Wayde Kurt as the person

13 receiving her donation at Goodwill.

14 Q    Now, is that 6401 North Cedar, Spokane, Washington -- was

15 that the same location where you had gone to recover the

16 tracking device?

17 A    Yes.

18 Q    So, it was a location that Wayde Kurt had been working at

19 for Goodwill Industries.  Is that correct?

20 A    Yes.  Correct.

21 Q    And the same place where the tracking device -- and did

22 this individual indicate whether or not she had personally given

23 Kurt permission to keep or use her identification?

24 A    I believe she said she did not give him permission.

25 Q    All right.  So, there were people -- actual people involved

1    here.  There were actual identities that were stolen from

2    Goodwill based upon your investigation.

3    A    It appears so.

4    Q    All right.

5         MR. HICKS:  I have no further --

6    Q    (BY MR. HICKS)  Oh, just for clarification.  The military

7    computer was not donated to Goodwill.  Is that correct?  Or was

8    that stolen?

9    A    It was reported stolen.

10        MR. HICKS:  All right.  I have no further questions.

11        THE COURT:  Recross, Mr. Wall?

12        MR. WALL:  Just a few questions, your Honor.

13

14                    RECROSS EXAMINATION

15   RECROSS BY MR. WALL:

16   Q    Agent Neirinckx, regarding your testimony that you believe

17   identification cards had been stolen from Goodwill, what's your

18   basis for that belief?

19   A    By this gal donating her information -- or donating items

20   to Goodwill and her identification showing up in Wayde Kurt's

21   possession.

22   Q    Well, let's assume that that happened.  How would her --

23   was -- was the identification you found in Wayde Kurt's

24   possession her actual ID?

25   A    According to my report, it was.

1  Q    Okay.  So, how would a person -- the ID of a person who

2  donated something to Goodwill end up in Goodwill's possession?

3  A    By accidently giving it to Goodwill amongst her personal

4  belongings.

5  Q    Okay.  And do you know what Goodwill -- did they -- did you

6  interview anyone to find out what they would normally do with

7  those items when they receive them?

8  A    I didn't.

9  Q    Okay.  So, you don't know if they threw them in the trash

10 or what they did.

11 A    That's correct.

12 Q    Okay.  So, you don't know if they were stolen.

13 A    That's correct.

14 Q    Okay.

15      MR. WALL:  Thank you.

16      THE COURT:  Let me ask, on that ID, is -- is --

17 Mr. Kurt plead guilty to CR-11-161, which is the false ID of

18 some elderly lady, apparently, with the initials CH.  Is that

19 the same ID we're talking about?  Or is that a different --

20      MR. HICKS:  No.  That -- that's in a different case,

21 your Honor.  This is -- this is in the 2004 case.

22      THE COURT:  Oh, okay.  Okay.

23      MR. HICKS:  This is in the 2004 case report, and the

24 other IDs were seized by the FBI during the firearms case in

25 2010.

1          THE COURT:  So, there's no relationship between the

2    Goodwill ID and the ID that is referred to, say, in Count 1

3    of --

4          MR. HICKS:  Right.

5          THE COURT:  Okay.

6          MR. HICKS:  That's right.  The other identifications,

7    your Honor, were all seized from -- that Special Agent Neirinckx

8    is talking about.  He hasn't talked about anything that was

9    seized in the FBI investigation.  All of these identifications,

10   the ones that we presented to the Court, those were all seized

11   in 2004 and -- when Mr. Kurt was working for Goodwill

12   Industries, your Honor.

13         THE COURT:  And the one we're talking about was,

14   apparently, located in 2010.

15         MR. HICKS:  No.  The one -- the Harvey -- excuse me.

16   The one that we're talking about right now that he just talked

17   about?

18         THE COURT:  No.  No, the one that is the subject of

19   the superseding indictment.

20         MR. HICKS:  Right.  That -- that was the -- that was

21   recovered in Mr. Pounder's shop.

22         THE COURT:  2010.

23         MR. HICKS:  In 2010.  So, this is -- this report is

24   about happenings that took place more than six years prior to

25   that.

1    THE COURT:  All right.  Did you finish your recross?

2    MR. WALL:  I finished, your Honor.

3    THE COURT:  All right.  Agent, you've completed your

4  testimony.  You may step down.  Thank you.

5    THE WITNESS:  Thank you.

6    THE COURT:  Any further testimony, Mr. Hicks or

7  Ms. Van Marter?

8    MR. HICKS:  Your Honor, we have no further testimony

9  for the Court to consider.  There are, of course, numerous other

10  items that we presented to the Court that we've chosen just to

11  allow the Court to review.  And we've stated in our memorandums

12  our reason why it's important for the Court to review those

13  things.

14    THE COURT:  Well, before we proceed, is there any

15  testimony that you plan to present, Mr. Wall?

16    MR. WALL:  Just from Mr. Kurt, your Honor.

17    THE COURT:  Well, do you want to proceed now?

18    MR. WALL:  Sure.

19    THE COURT:  Mr. Kurt, step forward.  And, then,

20  that -- my thinking is that, after all the testimony is in, then

21  we'll deal with the objections and, then, the recommendations.

22  That way.  Raise your right hand.

23    (WAYDE LYNN KURT, called as the Defendant, was sworn)

24    THE COURT:  Please be seated.

25

1                        DIRECT EXAMINATION

2    DIRECT BY MR. WALL:

3    Q    Mr. Kurt, you've sat through this morning and this

4    afternoon and heard the testimony.  And, so, I'm going to refer

5    some points to that testimony on the assumption that you recall

6    what was said.  If you don't, then, please let me know.

7    A    Okay.

8    Q    Regarding some of the testimony this morning concerning

9    your first contact with a group that's been identified as the

10   Vanguard Kindred, it's -- testimony's been given that, when you

11   first came into contact with those persons, that you directed

12   them to someplace where they could find minorities or persons of

13   color so that they could engage in some sort of confrontation or

14   assaultive conduct with them.  Do you recall that testimony?

15   A    I re -- I recall the testimony, yes.

16   Q    Is that testimony accurate?

17   A    No, it is not.

18   Q    Okay.  Can you tell us what happened when you first came

19   into contact with the -- those persons who were members of the

20   Vanguard Kindred?

21   A    Yes.  I was out and about on First Night downtown here in

22   Spokane, which is January 1st and right at midnight.  I was just

23   walking home in the snow.  And, as you know, there's lots of,

24   just like, block parties downtown on First Night.  Everybody's

25   celebrating New Year's Eve, essentially.

1    And I was right -- almost in front of my apartment.  And

2  it's kind of a steep little run there, and it was snow on the

3  ground.  And some people were kind of having trouble getting up

4  the street, and they had the windows rolled down.  And they were

5  shouting, "Hail, Odin" out the window at me.  And I said, "Hail,

6  Odin" back.  And they pulled over and kind of got off in the

7  snow ruts and jumped out and -- and wanted to know who I was, et

8  cetera, that sort of thing.

9    I told them that I had just been downtown at the various

10 block parties that are going on in front of every bar and every

11 parking lot there is.  It's pretty wild.

12 Q    Did -- did they ask you where they could find minorities or

13 persons of color?

14 A    No, they did not.

15 Q    Did you direct them to anything?

16 A    No, I did not.  I told them where I -- where I had just

17 come from.  They wanted to know where the party was, but I did

18 not direct them to any specific place or anything.  I just said

19 that I had just come from downtown, that there were parties all

20 up and down.

21 Q    Okay.  And you have -- you saw the video that was played of

22 a meeting that took place on January 10th, 2009?

23 A    Yes.

24 Q    And you're in that video?

25 A    I am in the video.

1  Q    Okay.  How -- how is it that you came to be at that

2  meeting?

3  A    After that initial meeting on First Night, just out there

4  on the sidewalk, they eventually just jumped in their car and

5  took off.  And they were -- you know, probably they shouldn't

6  have been driving because of the alcohol consumption.

7       They gave me a phone number to contact various members of

8  their Kindred.  They said that they belonged to a kindred and

9  wanted me to call them up, you know, within a couple of days.

10      And, eventually, I called a person known as Keegan VanTuyl.

11 And he invited me to a meeting that they were going to have at

12 Shep Kuester's house.

13 Q    And did you speak to Mr. VanTuyl about what was going to

14 take place at that meeting?

15 A    Not initially, no.  I told him that I was Asatru and that I

16 was looking for a kindred to join with.  And he said that --

17 that I should come to the meeting and -- and start meeting some

18 of the people.  And, if everything was good, then, that I could

19 become a member.

20 Q    Okay.  And did you speak with any other persons about that

21 meeting before going?

22 A    I may have called Jake Wilson.  I think that's the -- right

23 around that time I was -- I had called Jake Wilson.  I don't

24 remember who was first or second.  But I talked with him a

25 little bit about what they were doing as a group and that sort

1   of thing.

2   Q    Now, at that time, were you aware that any of the -- these

3   persons that you had met on First Night were skinheads?

4   A    No.  They did not say that they were skinheads, not until I

5   actually arrived at the meeting and met all of them for the

6   first time and was on film.

7   Q    Okay.  And did you anticipate when you got to the meeting

8   that there was going to be the kind of activity that went on

9   there that we see in the video?

10  A    No, I did not anticipate that.

11  Q    When -- on the video, you're asked to make a statement

12  about what you have done for your race?

13  A    Yes.

14  Q    Did you understand what was being requested of you at that

15  point?

16  A    Yes.  I knew what was being requested of me.  I didn't know

17  I was going to have a camera shoved in my face and asked that.

18  But, upon the question, I -- I was aware that I would need to

19  answer the question in front of the group.

20  Q    Did you have any concerns as to what would happen if you

21  refused to answer?

22  A    It would have been looked down upon very -- very much if I

23  had refused to answer.

24  Q    Okay.  Did you have any concerns for your safety at that

25  point?

1  A    It could have been ugly.  There could have been concerns

2  for my safety had I not answered the question.  Just the type of

3  atmosphere that was going on there wasn't what I had

4  anticipated.  I was there for Asatru and to join a kindred.

5       When I got to the meeting, Keegan kind of pulled me off to

6  the side and told me that this -- these people here -- many of

7  them are, in fact, skinheads.  And I said, "Oh, okay."  And he

8  said that he had -- was planning to start up a skinhead group

9  but that they were going to keep the skinhead part separate from

10 the -- the Asatru Kindred, the Vanguard Kindred, but that there

11 were visiting members of skinhead gangs and so forth.  And, I

12 said, "Okay.  Well, you know, I'll just kind of hang out," and,

13 "You know, I can handle myself."  And things proceeded to,

14 eventually, where the camera came out and was filming everybody.

15 Q    All right.  Did you, then, attend what's called a "blot"

16 after that?

17 A    A blot, yes, um-hum.

18 Q    A blot, okay.  And -- and you saw the video?

19 A    Yes.

20 Q    You watched that being played.  And are you familiar with

21 how a -- a blot is to be conducted according to the Asatru

22 religion?

23 A    Very familiar with -- with the proper way of conducting a

24 blot, yes.

25 Q    Had you been to blots prior to that one?

```
USA V WAYDE LYNN KURT - CR-10-114-WFN & CR-11-161-WFN
     CONTESTED SENTENCING HEARING - DAY 1 - MAY 9, 2012
                    W. KURT/DI - WALL
```

1  A    Many, many blots.  I am a gothi and a high priest in the

2  Asatru religion, and I am very familiar with the -- the ceremony

3  of the blot.

4  Q    Had you been to previous blots which -- which Nazi flags

5  were displayed?

6  A    No, I've never been at a -- at a blot that had Nazi flags

7  such as the one that's shown in the video.

8  Q    Have you ever been to a blot before where there were the

9  kind of white supremacist statements being made by the people

10 conducting the blot?

11 A    To be truthful, occasionally, over the years of being at

12 blots, occasionally someone will make an outburst like what you

13 see on the video.  However, the intensity and the amount of --

14 of the white supremacist-type gesturing and comments made and so

15 forth, no.  That is not a proper form to take with the blot at

16 all.

17 Q    And there was -- there were statements about your desire to

18 bring resources to bear on behalf of the Vanguard Kindred.  What

19 did you mean by that?

20 A    Oh, I was promoting the Vanguard Kindred.  If I'm going to

21 be a member, I would absolutely want to get them started, get a

22 place to meet on a regular basis, set up a fund, start all

23 different sorts of educational programs, and that sort of thing.

24 Absolutely.

25 Q    And would -- would any of that have anything to do with

1   white supremacy or any kind of violence against minorities?

2   A    Absolutely not.

3   Q    Did you at some point determine that you were not going to

4   continue with the Vanguard Kindred?

5   A    Yes, I did.

6   Q    When was that?

7   A    Shortly before Anthony Johnson was assaulted, I had made my

8   determination that I was going to separate myself.  However, I

9   did attend the -- the meeting there that night.  It's somewhere

10  in the vicinity of Trent and Fancher.  There was a house there

11  where the assault took place.  And, after that, I was done with

12  them completely and for good.

13  Q    After that incident with Mr. Johnson, did you continue to

14  have contact with Keegan VanTuyl?

15  A    I don't remember talking to him.  He may have called me on

16  the phone one time after that.  And I told him that I wasn't

17  going to be involved with them anymore.

18  Q    Were you ever asked to take over the leadership of that

19  group?

20  A    I believe he did ask me to take over the leadership of the

21  Vanguard Kindred in his absence.  He had been arrested on some

22  probation violation, if I remember correctly, when he had called

23  me and asked me.  I couldn't tell you the exact date that that

24  occurred.

25  Q    Did you agree to do that?

1  A    No, I did not.

2  Q    There's been a fair amount of testimony presented about

3  counterfeiting activities that you were involved in in the past.

4  And, so, do you recall that testimony?

5  A    Yes.

6  Q    Okay.  When was the last time that you actually produced

7  any kind of counterfeit U.S. currency?

8  A    Probably in 2005 was the last time that I actually printed

9  counterfeit Federal Reserve notes.

10  Q    What about after 1996?  Did you engage in any kind of

11  counterfeiting after that?

12  A    Yes.

13  Q    Okay.

14  A    Wait a second.  1996?

15  Q    Yes.

16  A    Oh, okay.  I'm thinking '86.  I'm sorry.  No, not after

17  1996, no.  1995.  I -- I didn't hear you.

18         MR. HICKS:  Your Honor, maybe I'm just confused.

19         MR. WALL:  Yeah, I -- I --

20         THE DEFENDANT:  I may have gotten --

21         MR. WALL:  Let me see if I can clarify that.

22         THE COURT:  Just a minute.

23         THE DEFENDANT:  -- the date wrong.

24         MR. HICKS:  I'm sorry.  I won't say anything.

25         MR. WALL:  I'll try to clarify.

```
             USA V WAYDE LYNN KURT - CR-10-114-WFN & CR-11-161-WFN
               CONTESTED SENTENCING HEARING - DAY 1 - MAY 9, 2012
                              W. KURT/DI - WALL
```

1  Q    (BY MR. WALL)  I believe that your answer to my first

2  question about the counterfeiting was that you had made

3  counterfeit in 2005.

4  A    Not 2005.

5  Q    Okay.  Was that correct or not correct?

6  A    That's not correct.

7  Q    Okay.  When was the last time you actually made counterfeit

8  currency?

9  A    1995.  I had my mind on a completely different date.  I'm

10 sorry.

11 Q    All right.  And had you -- have you gathered any materials

12 or done anything with the intent of making counterfeit currency

13 since 1996?

14 A    Since 1996.

15 Q    Yes.

16 A    No.

17 Q    There was some testimony about an offset printer.  You

18 heard that?

19 A    Yes, um-hum.

20 Q    Could that offset printer have been used to make

21 counterfeit currency?

22 A    If it's the one that they were speaking of that was at a

23 storage unit here in Spokane, A-One Storage or something like

24 that, no.  It's not -- it was for desktop-type publishing.  It's

25 just a tiny little desktop-type rotary offset press.

1  Q    Did you ever use that for trying -- trying to make

2  counterfeit currency?

3  A    No, I did not.

4  Q    Did you ever show any counterfeit currency to anyone around

5  2009, 2010?

6  A    No.

7  Q    Did you have any?

8  A    No.

9  Q    You were asked about some letters that you wrote to various

10 people.  One of them was a letter to a person named Mac.  Do you

11 recall that?

12 A    Yes.  I recall the testimony.

13 Q    And that letter was dated in 1996.  Do you recall writing

14 that letter?

15 A    Yes.

16 Q    Do -- what was the purpose of writing that letter to Mac?

17 A    I was just trying to get him on board to work with me in

18 distributing counterfeit.

19 Q    Okay.  And do you recall there was a reference to other

20 white separatists in that letter?

21 A    Yes.

22 Q    Were you referring to anyone specific by that?

23 A    No.

24 Q    Was there reason you made that reference in that particular

25 letter?

1  A    I was just trying to motivate him.  Nothing else.  There

2  was no white separatist person that I was referring to or white

3  separatist group.  It wasn't true.

4  Q    You also, in that letter, make some statements about having

5  discussions with people you refer to as "Jews."

6  A    Yes.

7  Q    Was that something that, actually, had happened?

8  A    No.  It never took place.

9  Q    Was there a reason why you made those statements in that

10  particular letter?

11  A    Mac had -- when I had first met him in the county jail

12  several years before had -- had some literature about Jews or

13  something like that and I was just playing to his -- what I

14  thought his preconceived ideas were about Jews.

15  Q    There was not testimony about this today I don't believe

16  but there's been testimony in the past and it's been put in

17  front of the Court with regard to sentencing a letter that you

18  wrote to a person that you, I believe, in trial identified as

19  Lynn Campbell -- or Crawford?

20  A    Oh, Lynn Crawford.  Yes.

21  Q    Do you recall that letter?

22  A    Yes.

23  Q    Okay.  And, in that letter, it makes reference to

24  Mr. Udseth being a confidential informant.  Correct?

25  A    Yes, um-hum.

1  Q    And, in that letter, you request that Mr. Crawford pass

2  that information on to HAC.  Who is HAC?

3  A    Harold Covington.

4  Q    Okay.  And, at that time, what was your connection to

5  Harold Covington?

6  A    I had read some of his books and literature over the years

7  and one of the books had been kind of recommended to me by

8  David Udseth.

9  Q    Okay.  And were you a member of any organization connected

10 with Mr. Covington?

11 A    David Udseth asked me to become a member of the Northwest

12 Front and begin sending in the $10 monthly donation.  I believe,

13 on his behest, I sent several letters to Harold Covington asking

14 for his newsletter and adding a $10 donation.

15 Q    Did you ever become a member of any organization associated

16 with Mr. Covington?

17 A    Harold Covington never acknowledged any of the letters I

18 sent to him.

19 Q    Okay.  Were you ever a part of anything called the

20 Northwest Front?

21 A    No.

22 Q    Did you ever have any plans of your own to start any

23 organization here in Spokane associated with the Northwest

24 Front?

25 A    Other than just making contact with David Udseth, no.  I've

1  never intended -- I have no interest in the Northwest Front.

2  Q    Was there a reason why you wanted Mr. Crawford to provide

3  information to Harold Covington about David Udseth?

4  A    Yes.  It was my understanding that David Udseth had been

5  over to visit Harold Covington and several of the people that

6  work with him.  And I wanted to warn Harold Covington that

7  David Udseth was a federal informant.

8  Q    Okay.  And how did you come to that understanding about

9  Mr. Udseth and his contact with Harold Covington?

10  A    I -- he told me about it in our conversations.  I don't

11  know if any of them are recorded or not.  But I think he sent me

12  a letter and several other things about that, yeah.

13  David Udseth sent the letters to me.  And I returned letters,

14  also.

15  Q    Okay.  And you are aware that the Government recorded a

16  number of conversations between you and Mr. Udseth.  Correct?

17  A    Oh, yes.

18  Q    Did you have conversations with Mr. Udseth that were not

19  recorded?

20  A    Yes.

21  Q    Okay.  And you've heard testimony, I believe, here today

22  about whether or not, in any of the recorded conversations,

23  there was any discussion between you and Mr. Udseth that he

24  wanted you to become the armorer for some organization

25  associated with the Northwest Front.  Do you recall that --

1  recall that testimony?

2  A    Yes.  David Udseth was claiming to be, like, the contact

3  lead man for the Northwest Front in the Spokane area.  And he

4  had told me that he had been over to visit the armorer of

5  Harold Covington over in the Seattle area.  And he wanted an

6  armorer here in the Spokane area so that he could have a similar

7  setup in his organization that he was putting together for the

8  Northwest Front here in Spokane.  He asked me to be that

9  armorer.

10 Q    Did you ever intend to become the armorer for that

11 organization?

12 A    No.

13 Q    Did you ever have any plans to blow up any federal

14 buildings?

15 A    No.  None.

16 Q    Did you ever have any plans to kill any political figures

17 of any kind?

18 A    None.  I've never even thought about any sort of

19 assassination, especially of President Obama.  If I may just

20 speak clearly, I -- I think that Barack Hussein Obama is the

21 best thing since Skippy peanut butter.  He's done more damage to

22 the United States than a thousand terrorists could ever possibly

23 do.

24 Q    So --

25 A    I just sit back and watch.  I don't have to do anything.

1  That's insane.

2  Q    All right.  So --

3  A    Sit back and watch it.  That's all I'm doing.

4  Q    I take it from that statement you don't agree with

5  Mr. Obama's politics.

6  A    Not in the sense that I think that he's doing what's best

7  for the individual man.  But, in the overall outcome, I think it

8  will work out quite nicely.

9  Q    Okay.  Did you ever conspire with anyone to blow up any

10  federal building?

11  A    No, never.

12  Q    Did you ever encourage Mr. Udseth to involve himself in --

13  in making explosives or anything of that nature?

14  A    No.

15  Q    Did you ever try to encourage Mr. Udseth to get involved in

16  any sort of plan to assassinate the President?

17  A    No.  Never.

18  Q    Did you ever have any intent to commit any kind of

19  terrorist act against the United States or anyone?

20  A    No, I did not.

21  Q    I want to ask you some questions about identification

22  cards.  You have plead guilty to making false identification

23  cards.  Correct?

24  A    Yes, I have plead guilty to that.

25  Q    And there's been testimony here today about your having

```
                USA V WAYDE LYNN KURT - CR-10-114-WFN & CR-11-161-WFN
                  CONTESTED SENTENCING HEARING - DAY 1 - MAY 9, 2012
                               W. KURT/DI - WALL
```

1  made identification cards as far back as in the 1990s.  Do you

2  recall that?

3  A    Yes.

4  Q    Okay.  Did you, in fact, make false identification cards in

5  the 1990s?

6  A    Yes, I have.

7  Q    Okay.  And what was your purpose of making false

8  identification cards?

9  A    So that I could move freely without being under Government

10 observation.

11 Q    Is that something that's important to you?

12 A    My privacy is very important to me, yes.

13 Q    Did you ever use any counterfeit or false identification to

14 commit any crime against any person?

15 A    No.  Never.

16 Q    Have you ever tried to access someone's bank account or

17 credit using a false identification card?

18 A    No.  The whole idea is absolutely abhorrent to me and I

19 would not even give my IDs to anyone for fear that they might do

20 it.

21 Q    Have you provided IDs to other people in the past?

22 A    I never have, no.  Never.

23 Q    Do you recall there's some testimony before the Court that

24 there were letters written by you in which you claim to have

25 done that?

1    A    Yes.

2    Q    Yes.

3    A    I have claimed to do so in the past in letters, but I never

4    did do it.

5    Q    Okay.

6    A    Not even once.

7    Q    You testified at trial when -- when asked whether or not

8    you'd used identification cards for anything other than opening

9    post office boxes.

10   A    Yes.

11   Q    Or, I think -- I can't remember what the other use was, but

12   there was one other thing that you had admitted to using them

13   for.  And you said that was, basically, all you had used

14   those --

15   A    Yeah.  I get library cards and -- and post office boxes.

16   Q    Library cards and post office boxes.

17   A    Yes, um-hum.

18   Q    And you heard testimony here today that, at least on one

19   occasion, you used a false identification to register a vehicle.

20   Do you recall that?

21   A    Yes, I did.

22   Q    Did you have that in mind when you were giving that

23   testimony at trial?

24   A    No, I didn't.  When I answered that question, I believed

25   that the thrust of the question was whether I had committed acts

1  of aggression toward other people, such as, cashing someone

2  else's check or damaging someone's credit when I answered that.

3  But I have used the IDs that I made, such as was presented to

4  register vehicles in a -- assumed name.

5  Q    Okay.

6  A    But I paid for the vehicle with good cash that I made by

7  hard work.

8  Q    Have you ever sold any identification to anyone?

9  A    No.

10 Q    False identification?

11 A    I've never sold any IDs or given them away to anyone.

12 Q    Okay.  Did you obtain identification cards or other

13 identification information when you were employed at Goodwill?

14 A    Yes.

15 Q    And how did you do that?

16 A    My job is to take in raw donations and sort through it and

17 toss all the garbage off in the garbage.

18 Q    Okay.

19 A    And --

20 Q    What were you instructed to do with pieces like

21 identification cards or something like that that might

22 accidentally -- or might be included in things that were donated

23 to Goodwill?

24 A    Anything that is not saleable, it's -- it's strictly --

25 they have it posted everywhere.  It's price or pitch, POP.  And,

1    if you can't put a price on it and sell it out the door, it goes

2    right in the garbage.

3    Q    Okay.  So, did you take items from Goodwill that otherwise

4    would have been placed in the garbage?

5    A    I threw them in the garbage, and I took them out.

6    Q    Okay.

7    A    That was my job.

8    Q    What was your purpose in doing that?

9    A    I use those as a template to create false identities.

10   Q    Did you ever do so with the intent of using those false

11   identities in a fraudulent way; that is, to access someone's

12   bank account or pose as another person in order to obtain

13   something you were not otherwise entitled to?

14   A    No.

15   Q    Did you ever, in fact, do either of those things?

16   A    No.  I have never used one to harm another person.

17   Q    There was some testimony regarding, at some point in the

18   past, you having been in possession of a firearm that was

19   associated with the death of a six-year-old.  Do you recall that

20   testimony?

21   A    Yes.

22   Q    Can you explain to the Court what that was about?

23   A    They had, at the trial for aggravated first-degree murder

24   in Snohomish County, Washington State, presented evidence

25   through expert testimony saying that ammunition found at my

1  residence matched up with ammunition from the scene of the

2  crime.

3  Q    Okay.  And what crime was this that we're talking about?

4  A    It was murder of a six-year-old boy, if I remember

5  correctly.

6  Q    Did you know this boy?

7  A    No.

8  Q    Had you ever had any kind of contact with him?

9  A    Never, no.  I didn't know any of the people involved.

10 Q    Were you involved in any way with his death?

11 A    No.  Absolutely not.

12 Q    Okay.  And, so, what kind of evidence was presented at the

13 trial?

14 A    They -- this -- they had expert witnesses, I believe, from

15 the FBI that got up and said that there was some sort of

16 spectrum analysis where they take the slugs from ammunition in a

17 box, like, from my apartment -- my house and ammunition from the

18 scene of the crime and they irradiate it in some sort of nuclear

19 reactor back in Quantico.  The FBI has one at their headquarters

20 or something.  And it produces some sort of spectrum fingerprint

21 of trace elements in the lead.  And they said that it matched up

22 with the lead from the scene of the crime to the lead in -- in

23 the ammunition box that was in my -- my house.

24 Q    And what happened with that?  That was a charge against

25 you.

1  A    That was a charge against me, yes.

2  Q    And what happened with that?

3  A    I was, eventually, acquitted by the -- by the jury.

4  Q    Okay.

5  A    Just as a counterpoint, since we're on the subject, I have

6  recently found out that the FBI has shutdown that nuclear

7  reactor and found out that that is complete junk science.  It

8  does not work for identification of ammunition from boxes.  It's

9  no longer in use.

10 Q    And, when was this that you were accused of this?  Do you

11 recall?

12 A    Back in 1987, I believe, is when I was arrested.  And I

13 went to trial in 1989.

14 Q    And what were you doing at that time?  Were you employed?

15 A    My employment was in logging.  I was a timber faller.

16 Q    And do you know how it is that you came to be identified as

17 being involved if you had no connection with the victim or

18 anyone else?

19 A    It was someone that I worked with who knew the man who

20 confessed to the crime.  And, as soon as I was accused of the

21 crime by this person that I had worked with occasionally, that

22 person was immediately released from jail.  The person who --

23 who confessed to the crime.

24 Q    Okay.  Did -- did your experience with that particular

25 matter leave you with any particular feelings about the

1  Government?

2  A    Yeah, it did.  I'll never forget.  Ever.

3  Q    And did you, in fact, have any kind of involvement in that

4  child's death?

5  A    What?

6  Q    Did you have any kind of involvement whatsoever in that

7  child's death?

8  A    None whatsoever.

9          MR. WALL:  That's all I have.

10          THE COURT:  Mr. Hicks?

11

12                      CROSS EXAMINATION

13  CROSS BY MR. HICKS:

14  Q    Mr. Kurt, every time there's incriminating evidence, it's

15  because you claimed you lied.  Is that correct?  Every time

16  there's evidence that hurts you, you say you lied about it.  It

17  didn't really happen or you weren't really doing that.  Is that

18  correct, Mr. Kurt?  Isn't that what you do?

19          MR. WALL:  Your Honor, I think the question is vague.

20  I don't think he can answer.

21  Q    (BY MR. HICKS)  Haven't you testified -- for example, when

22  we present letters where you're saying to people, "I need money

23  so I can do counterfeit currency," or where you're talking about

24  white supremacists or the Jews -- just like you did at trial --

25  every time there's incriminating evidence, you say you lied to

1  people.  Is that correct?

2          MR. WALL:  Your Honor, that's argumentative.

3          MR. HICKS:  It's --

4          THE COURT:  Well, answer the question.  And, if he is

5  not sure what you're referring to, you might have to be

6  specific.

7  Q    (BY MR. HICKS)  You said you lied about the Jews when you

8  wrote about the Jews in that one letter.  Is that correct?

9  A    I was being untruthful with the man so as to stimulate him,

10 yes.

11 Q    And you've come up now with your own version of what

12 happened.  And you were acquitted.  And we're not here to argue

13 about whether you're guilty or not.  But you were acquitted of

14 that.  Is that correct?  You were acquitted of the murder of the

15 six-year-old boy.  Is that correct?

16 A    That is correct, yes.

17 Q    And, at the time of your arrest, you had two automatic

18 firearms.  Is that correct?

19 A    I don't recall two.

20 Q    Oh.

21 A    There was one.

22 Q    Mr. Kurt -- you know, your version, Mr. Kurt, is that they

23 forensically matched the bullets.

24 A    Yes.

25 Q    The official Secret Service version, which I don't have all

1  the reports here, Mr. Kurt, is -- and it's even on a report of

2  the agent on Page 1 -- is that the MAC11 machine gun was

3  forensically identified as the weapon, Mr. Kurt.  You put your

4  twist on everything, Mr. Kurt.  Is that correct?

5          MR. WALL:  Objection, your Honor.

6          THE COURT:  Just ask the questions out -- straight

7  out, Mr. Hicks.

8  Q    (BY MR. HICKS)  I'm asking you the question:  Isn't it true

9  that the MAC11 machine gun was identified as being used in the

10 murder?

11 A    No, I don't believe it ever was.

12 Q    Wasn't this just a random killing, though, too, where

13 nobody knew anything who had killed the boy to begin with?

14 A    I believe the father confessed to the killing upon his

15 arrest.

16 Q    Okay.  Let's move on to something else.

17      (Discussion off the record)

18          MR. HICKS:  Yeah.

19 Q    (BY MR. HICKS)  And -- and it -- well, you know, there was

20 a machine -- there was also a ski mask, which was similar to the

21 homicide, found in your truck.  Is that correct, too?  Did they

22 talk about that at the trial?  A ski mask that they found in

23 your truck.  Did they introduce it in evidence against you at

24 trial?

25 A    I don't -- there -- there was a ski mask that was found on

1  the premises where the murder was committed, I believe.

2  Q    Yeah.  I'm going -- I'm going to go to some other things

3  here.

4      Mr. -- Mr. Kurt, you saw him with the hammer and you saw

5  them during this blot, this religious ceremony, talk about

6  "niggers."  Is that correct, sir?

7  A    Yes.

8  Q    And you saw him go another way, and you saw him talk about

9  "beaners."  Is that correct?

10 A    That is correct, yes.

11 Q    Now, does a "nigger" refer to black people?

12 A    I believe it does.

13 Q    And, so, the reason people call people "niggers" is because

14 they're whites and they believe they're superior, at least that

15 group.  That's how they believed.  Is that correct?

16 A    It is a derogatory term toward black people, yes.

17 Q    And "beaners."  Is that a derogatory term against Hispanic

18 people?

19 A    That's my understanding; that it is a derogatory term, yes.

20 Q    You never heard it before in prison or anyplace else.  You

21 know it is.  Right?  Is that correct?  You know it is.

22 A    I've heard the -- the term "beaner" before, yes.

23 Q    And "chinks" are what?

24 A    I believe they're referring to people of oriental heritage.

25 Q    And you -- didn't you testify at trial, Mr. Kurt, that the

1  blots were solely about religion.  The VK blots were solely

2  about religion.

3  A    No.

4  Q    You didn't testify --

5  A    They were supposed to be.

6  Q    Mr. Kurt, you go -- and this is on videotape, Mr. Kurt.  Is

7  that correct?

8  A    Yes, it is.

9  Q    And you saw the videotape.

10  A    Yes.

11  Q    And you saw that portion of the videotape where Mr. Wilson

12  came up to you and said to you that you had, in effect -- and

13  I'm not quoting it word for word -- pointed out where the

14  niggers and Jews were and you sat there with your beer bottle

15  nodding your head in agreement with them.  Is that correct?

16  A    Yes.

17  Q    And you were lying then?

18  A    I was going along with -- with their program, yes.

19  Q    Mr. Kurt, you never said, during your jury trial, that you

20  were afraid of these people, did you, sir?

21  A    As long as you're playing the game, you don't have anything

22  to be afraid of.

23  Q    Mr. Kurt, this starts at around four o'clock or something

24  like this.  And, then, this religious ceremony -- which has

25  nothing to do with white supremacy.  Is that correct?  Because

1  that's why you wanted to be with the VK because they had nothing

2  to do with white supremacy.

3  A    I was told that there wasn't going to -- there was going to

4  be a separation between the Valhalla Bound Skinheads and the

5  religious portion of the Vanguard Kindred.  Yes.

6  Q    And how many of these blots did you go to after this first

7  one, Mr. Kurt?

8  A    Several.  I don't -- I don't remember an exact number.

9  Q    Did they do the same thing at these?  Do the same thing?

10  A    Not as intense as what was in that video but there -- there

11  were occasional outbursts of that nature, yes.

12  Q    When you arrived there, Mr. Kurt, were you in handcuffs?

13  Or were they restraining you when you arrived there, Mr. Kurt?

14  A    Oh, no.  Not at all.

15  Q    Did you see the Nazi flags there when you arrived?

16  A    No.  They -- they put them up, I think, while we were

17  preparing the area for -- for the blot.  We all arrived kind of

18  together.

19  Q    You were aware they were there, though, weren't you?

20  A    After they put them up, yeah.

21  Q    And you were -- so, you're there.  We don't have a picture

22  of you there, but you're there for the pre-blot.  Is that

23  correct, also?

24  A    At the -- at the apartment are you talking about?

25  Q    No, excuse me.  I'm sorry, Mr. Kurt.

1  A    I -- I'm not sure what you mean by "pre-blot."

2  Q    The blot -- there's some activity before the blot ceremony.

3  This white supremacist, Mr. Keegan VanTuyl, gets up and says,

4  "Hail, Odin," and all that malarkey.  But you're there and you

5  were there before that started.  Right?

6  A    Yes.  You prepare the area for -- for the blot, yes.

7  Q    And you saw them --

8  A    Certify --

9  Q    Did you see them put up those Nazi flags?

10 A    Yes.

11 Q    And did you see them, Mr. Kurt, put up the National

12 Socialist Movement flags, Mr. Kurt?

13 A    I saw them put up flags with -- with swastikas on them that

14 appeared to be things that I've seen in -- in Nazi-type

15 literature and so forth, yeah.

16 Q    All right.  And you saw all of this.  You didn't leave, did

17 you, Mr. Kurt?

18 A    No, I did not.

19 Q    Because you were afraid of them, Mr. Kurt?

20 A    No.  I wanted to join a legitimate kindred.

21 Q    And, so, it didn't bother you that they were talking about

22 "niggers" and all the -- those derogatory terms?  It didn't

23 bother you because you -- it was more important to belong to a

24 kindred?

25 A    I was hoping that the two factions would settle themselves

1  out.  This was my first meeting with these people.  I didn't

2  know who was who.  I'm not going to throw the baby out with the

3  bath water just because the bath water's dirty.  And there

4  was -- there was elements that would not be in the -- in the

5  ceremony that would not be permissible in a proper Asatru

6  setting, but I can work with people.

7  Q    Oh, you're going to change Keegan VanTuyl's belief --

8  beliefs?

9  A    I didn't say Keegan VanTuyl.

10  Q    Okay.  Other people?

11  A    Yes.  There were some people there that were, actually,

12  some pretty nice people that really weren't going along with

13  Keegan VanTuyl's program.

14  Q    Who there was not going, "Heil Hitler"?  Who there was not

15  talking about white supremacy?  Tell me about that.  Or who

16  wasn't there encouraging it by their presence there, sir?

17  A    I would be glad to -- to tell you exactly who.  As time

18  went on --

19  Q    I'm talking about that meeting that we saw -- on videotape

20  that we saw.  You never saw that video before, did you,

21  Mr. Kurt?

22  A    No.  I was there.  I didn't have to see it.

23  Q    So, you're a quick study in making up lies and saying --

24          MR. WALL:  Objection, your Honor.

25          THE DEFENDANT:  No.

1    THE COURT:  Sustained.

2    THE DEFENDANT:  As I said, as time went on, I found

3 out, as I expected, that there were people that were much more

4 mellow and actually wanted to have a kindred.  Mr. Kuester and

5 his wife.  There was a young man there by the name of Donald,

6 very young man, that was in the video going "Heil Hitler" and

7 everything else.  He -- he was -- actually wanted to have a

8 proper kindred.  There were various other members.

9    As I suspected, there would -- I would be able to filter

10 out some of the -- the better elements and -- and produce a

11 proper kindred; try to get rid of all the racial epithets and so

12 forth.

13 Q    (BY MR. HICKS)  In your testimony on Page 13, the question

14 is, "And I think there was some testimony earlier during this

15 trial about people being hammered in at a blot."

16    And your answer is, "Yes."

17    "Can you explain what that involves?"

18    And I believe your answer was, "Any time a new member

19 wishes to join, typically, they are to simply stand outside the

20 circle and observe and see how it goes a few times.  And then

21 eventually, when they are ready to join -- and anybody can come

22 and observe.  They can -- you can invite anybody (sic) -- anyone

23 of any race to observe."

24    Were you trying to give the jury the impression at that

25 time that anybody could come to these things after what you saw?

1  Could a black person come to these things?

2  A    Not to Keegan VanTuyl's blot ceremony.  Absolutely not.

3  Q    But you were there at these blot ceremonies, and that's

4  what you were talking about is the blot ceremonies; that people

5  could come and watch them.  And what about some Asian people?

6  Do you think they'd be comfortable there?

7  A    Absolutely not.  You need to --

8  Q    What about Hispanic people?

9  A    No.  They needed to clean that up.  That was wrong.

10  Q    So, isn't that kind of misleading that anybody can come?

11  A    No, it is not.  That is the proper way to conduct an Asatru

12  ceremony.  Anyone can come and observe.

13  Q    You know --

14  A    I've been to lots of -- of them over the years.  And the

15  one that I participated in there with Keegan as the Master of

16  Ceremonies was not correct.

17  Q    You know, one of the things that you said is that there

18  were a lot of unrecorded conversations between you and -- and

19  the confidential informant.  Did you -- do you have any notes of

20  that?  Did you ever provide any information?  Did you ever give

21  anything to your attorney?  Did you ever keep any records of

22  those conversations?

23  A    I thought that's what confidential informants were supposed

24  to do.  I don't have any notes of that.

25  Q    Yeah, you don't have them.

1  A    Absolutely not.

2  Q    You talked about this armorer.

3  A    Actually, I might have.  Just a moment.  I believe I

4  recorded one of those conversations.

5  Q    Hum?  Well, where is the recording?

6  A    Find out what in the world was going on with -- with

7  Mr. Udseth.

8  Q    Where is the recording?

9  A    It's in a little silver digital recorder that looks like a

10 cell phone.

11 Q    When was it recorded?

12 A    It was one of the -- the prior meetings that I'd had with

13 him at a little Asian restaurant.  And I don't remember the

14 exact date, but it was prior to the recordings that were

15 presented at trial.

16 Q    Is --

17 A    I tried to get my attorney to get those on -- on discovery

18 so that we could show what was said.  And I don't know that the

19 little recorder ever -- ever turned up.

20 Q    All right.  Did you -- what did you discuss on that tape?

21 A    I believe I told him that -- that I was apprehensive about

22 having anything to do with guns, and it was somewhat of a

23 different conversation there.  I believe his girlfriend was

24 there, also, Carma Blalock; but, you know, I don't have it with

25 me.

1  Q    Well, you testified on a number of occasions about these

2  meetings at these restaurants; but you never told the jury, did

3  you, that one of them was recorded, did you?

4  A    No.  I didn't have the recorder.

5  Q    You didn't have the recorder, but what would prevent you

6  from telling the jury that one of these was recorded?

7  A    It never was asked me.  You're the one who asked me.

8  Q    Well, you told your attorney, didn't you?

9  A    I sure did, yeah.

10 Q    But you never -- you testified, didn't you?  And you never

11 said anything at all about there was these recorded

12 conversations.  You had these meetings.

13 A    I'd love to have the little recorder.  Let's get it.

14 Q    Okay.

15 A    I want it.

16 Q    You know --

17 A    I want another trial.  Let's do this again.  I'm -- this is

18 insane.  I -- I'm ready.  Let's have another trial.  This is

19 practically another trial here but -- you know.

20 Q    Mr. Kurt, one of the things that you said is that --

21 A    Hopefully I get my chance.  Excuse me.

22 Q    One of the things that you discussed on -- you said that it

23 was very important for Mr. Udseth that you be his armorer.

24 Wasn't -- wasn't that something that was really important?

25 A    To Mr. Udseth, yeah.

1  Q    Yeah.  And, yet, in hours and hours of tape recordings, you

2  never discussed that?  During those days, you never -- the word

3  "armorer" is never mentioned?

4  A    I don't recall that being mentioned after the first couple

5  of meetings at the little restaurant, no.

6  Q    But you -- you tell him you got these guns, right?  Didn't

7  you tell him you got these guns?

8  A    I told him that I had gotten the guns that he wanted me to

9  get involved with, yeah.

10 Q    All right.  And, so, anyway, on these tapes, you can talk

11 about anything, like, killing the President of the United States

12 because he's a nigger; but you can't talk about something so

13 important to him that being -- you being his armorer?

14         MR. WALL:  Again, that's argumentative, your Honor.

15         MR. HICKS:  No.

16 Q    (BY MR. HICKS)  Can you -- could you discuss --

17         MR. HICKS:  I'm sorry.  I'll let the Court rule.

18         THE DEFENDANT:  I don't know what the question is.

19 I'm sorry.  I'm --

20         THE COURT:  Well, ask the question.

21         MR. HICKS:  I will, your Honor.

22         THE COURT:  You're getting very argumentative.

23         MR. HICKS:  Yes, your Honor.  I'll ask the question.

24 Thank you.

25         THE COURT:  We are plowing a lot of ground that has

 1  been plowed before.

 2         MR. HICKS:  Yes.

 3  Q    (BY MR. HICKS)  Now, Mr. Kurt, you talked about killing the

 4  President of the United States because he was a nigger.  Is that

 5  correct?

 6  A    I don't remember the exact wording, but I never said that I

 7  was going to kill the President of the United States.

 8  Q    He needs to be killed?  But the -- the tape does speak for

 9  the -- the transcript speaks for itself, doesn't it?

10  A    Yeah.  The transcripts speak for themselves.  Mr. Udseth

11  had given out quite a few pamphlets and passed them around, even

12  to me, about President Obama being, you know, a terrible

13  President.

14  Q    Did you -- did you discuss that in front of the jury

15  before?  Did you testify to that in front of the jury?

16  A    I don't recall saying about that in front of the jury.

17  Q    Did you know, when you became involved with the Vanguard

18  Kindred, that the FBI had an informant in the group?  When you

19  were at that blot --

20  A    Okay.

21  Q    -- did you know that the FBI had an informant in that

22  group?

23  A    Oh, no, huh-uh.

24  Q    So, you didn't know there was -- when you were talking to

25  other people in the group but not being recorded, did you know

1  that the FBI had an informant in the group?

2  A    No, I did not know.

3  Q    Did you -- what was the name you first used with this --

4  the Vanguard Kindred?

5  A    Wayde Kurt.

6  Q    Did you ever use the name Wayde Bennett?  Wayde Zane

7  Bennett?

8  A    No, never.  Not ever.

9  Q    Okay.  Did you ever provide false identification to

10 Ben Bargiel?

11 A    No.  I never provided him with false identification, but I

12 did print up a Social Security card with his correct Social

13 Security number with his correct name on it.  It wasn't a false

14 identity.

15 Q    So, you gave him a false identification document, which was

16 a Social Security card.

17 A    The -- the paper and everything was mine, but the number

18 and the information on the -- on the card was his correct number

19 and his correct information.

20 Q    And did you get that --

21 A    I verified that very carefully.

22 Q    Did you have authority of anybody to do that --

23 A    No.

24 Q    -- in Government?  Okay.  Now, did you ever discuss that

25 you could get counterfeit currency for people in the Vanguard

1  Kindred?

2  A     No.

3  Q     Did you ever indicate or show money to Mr. Udseth or others

4  which you represented was counterfeit currency?

5  A     Absolutely not.

6  Q     All right.  Now, during this period of time that this was

7  alleged to have happened, you didn't know that there was an

8  informant.  Is that correct?

9  A     That is correct, um-hum.

10  Q     Sir, you keep on saying that you wanted people to know

11  who -- that the CI was an informant.  And, in the case of

12  Covington, I, again, believe today that you said you wanted him

13  to know so that they couldn't do any harm to him.

14  A     I wanted him to know he could do whatever he wanted with

15  the information.

16  Q     So, you -- you were attempting to interfere with the FBI's

17  investigation, if there was one?

18         MR. WALL:  Objection, your Honor.

19         THE DEFENDANT:  I have no idea whether he was under

20  any sort of investigation otherwise.  For all I know, he may

21  have already known that he was a confidential informant.  I have

22  no way of knowing.

23  Q     (BY MR. HICKS)  Mr. Kurt, how many years have you been in

24  prison for your crimes?

25  A     I -- I can't tell you the exact amount of years.  Probably

1  17 or 18 years.

2  Q    And, during that period of time, do people who are snitches

3  or informants, who are told that they're informants, do they get

4  injured or assaulted because of that, sir?

5  A    I have never injured or assaulted anybody who was an

6  informant.

7  Q    I'm not asking you, sir, if you ever did.  I'm asking if,

8  based upon you being in prison, based upon you being in jail, if

9  you tell somebody in jail that somebody's a snitch and that they

10  snitched you off, that that person could get seriously injured

11  or harmed based upon your years in prison and your years in

12  jail?

13  A    That it could happen?

14  Q    Yeah.

15  A    Yeah, it could happen.

16  Q    And --

17  A    I've never seen it happen.

18  Q    It could happen.  But you know it can happen because people

19  in custody don't like snitches, do they?

20  A    Absolutely not.

21  Q    And you knew that at the time you were putting out all this

22  information.  Is that correct?

23  A    I knew that, yes.

24  Q    Now, this letter that you attempted to get out of the

25  county jail; you attempted to get that out of the county jail

1  before the trial.  Is that correct?  Exhibit --

2  A    I don't remember the exact date.

3  Q    Well, you hadn't gone to trial yet, had you?

4  A    I don't believe I'd gone to trial yet, no.

5  Q    Okay.  Mr. Kurt, you took people's identification from out

6  of Goodwill materials.  Is that what you're saying?

7  A    I took it out of the garbage, yes.

8  Q    Do you know if these identifications were still valid or if

9  they had been mistakenly placed?

10  A    I have no way of knowing.  They were donated.

11  Q    They were donated.

12  A    Yes.

13  Q    So, I could -- if my identification comes in by mistake,

14  you consider that donated.

15  A    You're the one who put it in there.  Then, it's donated.

16  It's a donation station.  It says it right on the -- right on

17  the side.

18  Q    So, you -- you have -- don't believe that there's anything

19  wrong with that, Mr. Kurt.

20  A    No.

21  Q    So --

22  A    It doesn't bother me, no.

23  Q    So, if somebody loses a wallet, based upon the way you

24  think, you can pick it up and it becomes yours.  And, then, you

25  can use it for any criminal purpose that you want.  Is that

1  correct?

2  A    If somebody loses a wallet, I would give it back to them.

3  Q    What's the difference if somebody loses his identification?

4  Why don't you give it back, Mr. Kurt?

5  A    They donated it.  Don't put anything in a donation station

6  that you don't want to donate.  If you donated it, it's donated.

7  Q    So, your -- your bosses would approve of the public being

8  aware that, if you accidentally placed your identification in

9  there, that the convict that's working there can take it and use

10 it for whatever reason he wants?

11         MR. WALL:  Objection, your Honor.  He's asking to

12 speculate about what someone else would think.

13         THE COURT:  Well --

14 Q    (BY MR. HICKS)  What -- what was --

15         MR. HICKS:  I'm sorry.

16         THE COURT:  You're asking if your boss would approve

17 of it.  Would your boss approve of that?

18         THE DEFENDANT:  I've never asked my bosses.

19         THE COURT:  Next question.

20 Q    (BY MR. HICKS)  Mr. Kurt, you've previously used Washington

21 State identification as false identification during -- at -- at

22 times you were arrested.

23 A    One time, yes.

24 Q    And I believe that, during the trial, you said that you

25 couldn't use them because they were, you know, of poor quality.

1  A    Um-hum.

2  Q    And which was that?  Was that the Rushton one?

3  A    Yes.

4  Q    And, when -- when you were arrested by the Medford Police

5  Department, you -- you also gave false identification.  Is that

6  correct?

7  A    I couldn't tell you if I'd used a false identification for

8  that.  I -- I don't remember.

9  Q    Did you --

10  A    I really don't.

11  Q    Did you have a stolen car at that time?

12  A    I was in a vehicle that I was charged with unauthorized use

13  of, yes.

14  Q    Stolen car.

15  A    If you want to call it that.  That isn't what I was charged

16  with.

17  Q    Did you steal it?

18  A    I plead guilty to using a vehicle unauthorized, yes.

19  Q    Nobody gave you permission to use it?

20  A    That's what the charge is.

21  Q    All right.  And, Mr. Kurt, at the time, you had a

22  high-speed chase with police, didn't you, at that time?

23  A    Yes, there was a high-speed chase.

24  Q    And you were attempting, prior to that high-speed chase, to

25  get a false Oregon identification.  Is that correct?  Is that

1  what brought the police to your attention?

2  A    It was at a -- a camera shop or something, if I remember

3  correctly.  It had --

4  Q    The question is:  Were you attempting --

5       (Interruption by the reporter)

6            THE DEFENDANT:  It was at a camera shop that had to do

7  with a photograph of a -- of an Oregon state ID on a --  on a

8  roll of film.

9  Q    (BY MR. HICKS)  And you were attempting to have a false

10 Oregon identification.  Is that correct?

11 A    It could be used for that.

12 Q    And, during that chase, you backed into a police vehicle.

13 Is that correct, sir?

14 A    No, I did not.

15 Q    Did they fire a shot at you, sir?

16 A    One of the officers fired a shot in my direction, I

17 believe.

18 Q    So, did they just run into you or something?

19 A    Yeah, they did.

20 Q    And you attempted to continue to get away.  Is that

21 correct?

22 A    I drove away, yes, after they made contact.  There was

23 about six inches of snow on the ground in a snowstorm.  And

24 there was, like, three snowplows go -- pull across the freeway.

25 Q    Okay.

1  A    And they come up behind me so fast they just slid in the

2  snow until they bashed right into me.

3  Q    You saw the lights, didn't you?

4  A    They had the lights on just right at the last second, yeah.

5  Q    Knew they were the police.

6  A    Yes.

7  Q    And you knew, later on, that there were the -- that it was

8  Secret Service.  And you took off in traffic and created a

9  traffic hazard then, too, didn't you?

10  A    Yes.

11  Q    And you saw Secret Service again.

12  A    Not a traffic accident.

13  Q    But there wasn't a traffic accident.

14  A    No, there was no traffic --

15  Q    But you created a hazard, you said.

16  A    I took and -- and drove through the traffic to get away,

17  yes.

18  Q    And -- and you did that in a second time with Secret

19  Service.  Is that correct?

20  A    I did it twice.

21  Q    And, so, while you're doing this, you're endangering the

22  public.  Is that correct, sir?

23  A    Not any more than just driving through traffic every day.

24  But I did take and disobey the traffic laws, yes.

25  Q    Now, during this -- you know, we went to this 2004 report

1   with all those false identifications.  And, in 2004, when this

2   was taking place, were you on supervised release?

3   A    Yes, I believe I was.

4   Q    You were on supervised release.

5   A    Um-hum.

6   Q    And, while you were on supervised release, were you

7   supposed to -- did -- did you have financial conditions of your

8   supervision at that time that you couldn't purchase vehicles and

9   things like that without first getting permission of the U.S.

10  Probation office?

11  A    I don't remember the exact wording.  Something about not

12  opening up a -- a line of credit without first getting

13  permission.

14  Q    So, you --

15  A    Something to that effect.  I don't remember the exact

16  wording.

17  Q    Did you use Vessy identification in order to prevent the

18  U.S. Probation office from knowing that you were involved in a

19  financial transaction?

20  A    No.

21  Q    That wasn't the purpose?

22  A    No.

23  Q    What was the purpose, then?

24  A    I didn't open up any line of credit.

25  Q    What was the purpose in you using a false name in

1  registering a vehicle?

2  A     So that I will be free of you.

3  Q     Okay.

4  A     Some day I will.

5  Q     Okay.

6  A     Even if it takes me to the grave.  You can't follow me

7  there, can you?  I value my -- my privacy.  I don't commit

8  crimes.

9  Q     You don't commit crimes, and you get convicted of being a

10 felon in possession of firearms?

11 A     Yes.

12 Q     Didn't you unlawfully possess firearms, sir?

13 A     Yes, I did.

14 Q     And isn't that a crime in the United States?

15 A     That's what you term it.

16 Q     Now, manufacturing counterfeit currency.  Is that a crime

17 in the United States?

18 A     That's what you term it, yes.

19 Q     It's not a crime for you?

20 A     It's not a crime for me.

21 Q     So, what we're dealing with here is the world according to

22 Wayde Kurt.

23 A     I'm the master of my own life.

24 Q     And, so, you can do whatever you want.

25 A     So long as I harm no one.

1  Q    Will you ever change, Mr. Kurt, where you were follow the

2  laws of the United States or the State that you're in, Mr. Kurt?

3  Will you ever change?

4  A    Will I ever change.

5  Q    Yes.

6  A    I don't know if I ever need to change.  If I need to

7  change, I'll change.

8  Q    If there's nothing wrong with making counterfeit Social

9  Security cards, so, you'll continue to make them, won't you?

10  A    No.  I didn't say that I would continue.

11  Q    Okay.  Now, Mr. Kurt, you've been in prison for a long time

12  over the years and that hasn't deterred you from future criminal

13  conduct.  Is that correct, Mr. Kurt?

14  A    I don't commit crimes.

15  Q    So, nothing you've done has been the commission of a crime.

16  A    That is correct.

17  Q    I believe you earlier, during your -- the trial, said you

18  didn't believe in identifications of people?  Something to that

19  effect?

20  A    I don't recall saying that.

21  Q    Why do you feel you have the right it take other people's

22  identification, Mr. Kurt?

23  A    I don't take other people's identification.

24  Q    I have identification that says I'm Earl Hicks.  Do you

25  feel you could use my identification however you want, Mr. Kurt?

1  A     I don't want to use your identification.

2  Q     Is it something personal?

3  A     For me?

4  Q     Yeah.

5  A     Yes.  I don't want to use other people's IDs.

6  Q     You used the ID of a dead person, didn't you?

7  A     A dead person that has passed away and deceased.  I've used

8  people who have been deceased.

9  Q     And you did that in 2004 and you did that again in 2010.

10 Is that correct?

11 A     I -- it could be, yeah.

12 Q     Wasn't Mr. --

13 A     I've used a deceased person's identification.

14 Q     Wasn't Mr. Hubert dead?

15 A     I believe so.

16 Q     And -- and you even got a credit card in his name, didn't

17 you?

18 A     No.  I never got a credit card.

19 Q     Well, who -- who -- what credit card did you use when you

20 purchased that stock?  I thought you purchased stock with a

21 credit card.

22 A     No.  A debit card.

23 Q     Oh, a debit card.

24 A     Yes.

25 Q     And it wasn't in Wayde Kurt's name.  It was in somebody

1  else's name.  Right?

2  A    I don't recall exactly.  It could have been in Hubert's

3  name.  It could have.  I -- I don't recall.

4  Q    "Could have."  It was, wasn't it?

5  A    It could be.  I -- I don't recall.  It wouldn't bother me

6  to use his name with a debit card.

7  Q    And, so, you could walk away from making payments and,

8  then, this information could, then, get back to his family that

9  somehow somebody was using his identification.  Is that correct,

10 Mr. Kurt?

11 A    Do you know what a debit card is?  It's one where you put

12 money upfront so that there is no debt.

13 Q    Um-hum.

14 A    All the money was up front.  So, any money drawn off of it

15 was already there.  Absolutely no credit was involved.

16 Q    But that's okay to use people's identification.  Why would

17 you keep --

18 A    Deceased person.

19 Q    -- a woman's -- why would you keep a woman's identification

20 in your wallet?  A valid identification?

21 A    I couldn't even tell you.  I may have picked it up at some

22 point and stuck it in there.  I have no idea.  I don't remember.

23 Q    So, go to Goodwill at your peril because an -- an ex-con,

24 like, Wayde Kurt, who's working there might take anything.

25          THE COURT:  That's not a question, Mr. Hicks.

1              MR. HICKS:  I'm sorry, your Honor.

2    Q    (BY MR. HICKS)  Mr. Kurt, the meeting where Mr. Johnson was

3    injured.

4    A    Yes.

5    Q    Do you remember that meeting?

6    A    Um-hum.

7    Q    Now, at the time that Mr. Johnson was there, was he bald

8    headed at that meeting?

9    A    His hair was shorter than it was today.

10   Q    Was it closely cropped or bald?

11   A    I believe it was closely cropped.  I -- I don't recall if

12   it --

13   Q    Like the skinheads?

14   A    Huh?

15   Q    Like the skinheads?

16   A    I -- I couldn't -- I don't really remember his exact

17   hairstyle.  I couldn't tell you.  It was shorter than it was

18   today.

19   Q    Now, Mr. Kurt, one of the conditions of your supervised

20   release was that you weren't supposed to hang out with felons.

21   Is that correct?

22   A    Yes, that is correct.

23   Q    Do you think there's an exemption for religious purposes,

24   Mr. Kurt?

25   A    I believe there is, yes.

1  Q    And, so, you knew Keegan VanTuyl was a previously convicted

2  felon.  Is that correct?

3  A    Eventually I found out that he was, yes.

4  Q    Mr. Kurt, skinheads.  Do they commit crimes?

5  A    I couldn't tell you that specifically.  I have heard of

6  skinheads that had committed crimes.

7  Q    Well, if they're --

8           THE COURT:  What's the relevance --

9           THE DEFENDANT:  But not every skinhead commits crimes.

10          THE COURT:  Excuse me.  I'm not sure but what we're

11  going a little bit off track as to the relevance of the --

12          MR. HICKS:  Yes, your Honor.

13          THE DEFENDANT:  I don't understand the question.

14          THE COURT:  -- issue that's before us, and that's the

15  appropriate sentence for this defendant.

16          MR. HICKS:  Yes, your Honor.  And the issue of the

17  appropriate sentence deals with the -- his associations, your

18  Honor.

19          THE COURT:  Well, you already covered --

20          MR. HICKS:  And -- and -- and, your Honor, I -- I

21  appreciate the Court's position.  Maybe I'm just going to finish

22  up this way.

23  Q    (BY MR. HICKS)  The tape-recorded conversations.  You had

24  an opportunity to see the -- those.  Is that correct?  The

25  transcripts.  Is that correct?  The tapes that were played at

1  the trial.

2  A    Oh, okay.  I -- I've read the transcripts, yes.

3  Q    And did you read the unredacted transcripts?

4  A    I believe so.

5  Q    And did you have any problems or did you ever present any

6  information that those were inaccurate, sir?

7  A    That they were not correctly transcribed --

8  Q    Yes.

9  A    -- from the recording?

10 Q    Yes.

11 A    I don't recall making any objections right at the moment.

12 They were very lengthy.

13 Q    And, so, when -- when you were talking --

14 A    I don't -- I don't remember.

15 Q    I'm -- I'm sorry, Mr. Kurt.  I -- I -- I'm not anticipating

16 when your answer's over.  I apologize.

17 A    I don't know what the question is exactly.

18 Q    So, when you were discussing that you were a desperate old

19 man and that you had to do something, that was -- that was

20 accurate transcript.

21 A    That was accurately transcribed.  I believe it was, yes.

22 Q    All right.

23 A    I -- I didn't, actually, hear that -- the recorded

24 conversations.  I only read the transcripts.

25 Q    All right.  And, when you read them, you didn't have any

1   problem with them.  You thought they were accurate and complete?

2   A    For the most part.  I couldn't -- I couldn't tell you.

3   They were -- there was hundreds of pages.

4           MR. HICKS:  Your Honor, thank you very much.  Thank

5   you, Mr. Kurt.

6           THE COURT:  Mr. Wall, redirect?

7           MR. WALL:  Just a few questions, your Honor.

8

9                   REDIRECT EXAMINATION

10  REDIRECT BY MR. WALL:

11  Q    Mr. Kurt, you'd testified a couple times -- you said you

12  don't commit crimes.  Correct?  You've said that?

13  A    That is correct.

14  Q    But you have, in fact, plead guilty to crimes in court.

15  Correct?

16  A    I've plead guilty to violations of federal statutes.  That

17  is absolutely correct.

18  Q    Okay.  And you've also been convicted of violations of

19  federal statutes that make certain conduct crimes.  Correct?

20  A    At trial, yes.  That is correct.

21  Q    And, so, you have had consequences for engaging in conduct

22  that was defined as criminal.  Correct?

23  A    Yes.

24  Q    And you understand that the conduct you engaged in was

25  defined as criminal, at least for the ones that you had pleaded

1   guilty to.  Correct?

2   A    The Government definition of that is, yes, that it was

3   criminal.

4   Q    Do you have any intent in the future to produce counterfeit

5   currency?

6   A    No.  I have not done so since 1995 or '96, right around in

7   there.  Fifteen years ago.

8   Q    And when were you first prohibited from owning or

9   possessing firearms?

10  A    Back in 1989 or '90 -- no, wait a second.  Probably --

11  around '92 or '93 I think I had a felony conviction in federal

12  court --

13  Q    Okay.

14  A    -- at that point.

15  Q    And were you -- between then and the incident that lead to

16  the charges that we're here for today, were you ever arrested

17  for being a felon in possession of a firearm?

18  A    No.  This is the first time.

19  Q    Did you ever have a firearm in your possession?

20  A    No.

21  Q    Okay.  Did you believe it was a crime to have a firearm in

22  your possession?

23  A    I knew that it was a violation of federal statutes.  Yes.

24  I knew that.

25  Q    And was there a reason why you didn't possess a firearm

1  during that period of time?

2  A    Because I did not want the punishment that would come from

3  having a firearm in my possession.

4  Q    Do you intend to make any false identifications as that's

5  defined under federal law?  Do you intend in the future to

6  produce any false identifications?

7  A    Oh, in the future?  No.

8  Q    Okay.  Do you intend in the future to possess firearms if

9  you're restricted from possessing them?

10  A    No.

11  Q    Why not?

12  A    Because I am a restricted person under federal statute.

13  Q    Okay.  And what about producing identification cards?  You

14  don't personally believe that should be criminal.  Correct?

15  A    I don't personally believe that that is a criminal act.

16  No, I do not.

17  Q    Is there any reason why, then, you wouldn't do that in the

18  future?

19  A    Because, under federal statute, it is illegal.

20  Q    Okay.  And you're aware that other acts are illegal under

21  federal law.  Correct?

22  A    *Ad infinitum*.

23  Q    Okay.

24  A    I believe there's entire libraries of books, walls of them,

25  stacked to the mountains high of federal statutes that

1   everything you can possibly imagine is illegal.

2   Q    And some of those things you don't believe are, in your

3   mind, criminal acts.  Correct?

4   A    When there's no actual victim that can take the stand, yes,

5   that is correct.

6   Q    Does that mean that you intend to violate those laws?

7   A    No.  It does not mean that I intend to violate the law.

8   Q    Okay.

9   A    I do not agree with these laws, but I will not violate

10  them.

11          MR. WALL:  That's all I have, your Honor.

12          THE COURT:  Did you have any recross, Mr. Hicks?

13          MR. HICKS:  No, your Honor.

14          THE COURT:  All right.  You may step down.  Anything

15  else, Mr. Wall?

16          MR. WALL:  No, your Honor.  Your Honor, not as

17  testimony.  But Mr. Kurt has a written statement that would be

18  something he would -- was going to speak to the Court from.

19          THE COURT:  Well, I always give the defendant the

20  opportunity to speak to the Court.

21          MR. WALL:  And I understand that, your Honor.  But I

22  was just raising this now because the time is getting late, and

23  it's somewhat lengthy.  And I would prefer, I think, at this

24  point if we could just submit it so it becomes part of the

25  record and maybe have Mr. Kurt give a short summary of what's in

1  the statement rather than read the --

2          THE COURT:  Well, I don't want to cut him short.  Now,

3  I recognize it is 4:20.  This has gone on a lot longer than I

4  anticipated.  And this is what we have left to do:  I have to

5  rule on the objections that you filed on behalf of Mr. Kurt,

6  Mr. Wall.  That probably shouldn't take too long.  There may be

7  some discussion as to some of them, but I don't anticipate it

8  will take too long.

9      I want to give you plenty of opportunity to address the

10 Court with your reasons as to what the appropriate resolution

11 should be; the same to the Government, either Ms. Van Marter or

12 Mr. Hicks; and give Mr. Kurt ample opportunity to articulate his

13 feelings with the Court.

14     So, I would not be surprised if we don't have enough time

15 to take care of all that tonight.  We have a nine o'clock.  I'm

16 willing to start in the morning at either 7:30 or eight o'clock

17 here to finish up.

18     Now, what I might do right now is give -- at least the

19 inclination I have as to the rulings on your objections.  We

20 have enough time for that.  And, over the night, if you feel

21 there's something you want to say on the record about that, we

22 can do that.

23     What's the reaction of all of you coming back, at the

24 latest, at eight o'clock?

25         MS. VAN MARTER:  Your Honor, I have conflicts that

 1  early in the morning.  I will not be able to be here at

 2  eight o'clock.  I don't know if the Court has any other time

 3  tomorrow to finish this.

 4          THE COURT:  Well, I'll ask Ms. Knutson.

 5      (Discussion off the record)

 6          THE COURT:  How about from 9:30 to 11:00?

 7          MS. VAN MARTER:  That's fine, your Honor.  Thank you.

 8          MR. WALL:  I -- I -- I believe I'm available at that

 9  time, your Honor.  So, that should be fine.

10          THE COURT:  Well, okay.  Let's do it that way, then.

11  Would you like to hear my thoughts on the objections now or

12  would you rather wait until in the morning?

13          MS. VAN MARTER:  Yes, your Honor.

14          MR. HICKS:  Yes, your Honor.

15          THE COURT:  Hear them now --

16          MS. VAN MARTER:  Yes.

17          MR. HICKS:  Yes, your Honor.

18          THE COURT:  -- or in the morning?

19          MR. WALL:  Now.

20          MS. VAN MARTER:  Now.

21          MR. HICKS:  Now.

22          THE COURT:  All right.  You can hardly wait, huh?

23          MR. HICKS:  Right.  Thank you, your Honor.

24          THE COURT:  The Government has no objections to the

25  content of the Presentence Report.  And I'm referring to the

1  Presentence Report that was prepared by Ms. Petretee.  And that

2  report is dated March 29th of this year.

3      The first four objections, Mr. Wall, deal with the

4  information that is set forth in Paragraphs 12, 13, 14, and 20

5  of the PSR.  Now, that -- I've read all that.  I think it's

6  appropriate background information.  Ms. Petretee received it

7  from what she determined to be reliable sources.  Background

8  information of this type is appropriate to be included in

9  Presentence Reports.  I overrule that objection.

10      Your Objection No. 5 deals with the information contained,

11  primarily, in Paragraph 47 and 48 regarding statements of

12  witness tampering.  Now, let's look at that.  And that's under

13  the heading of the "Adjustment for Obstruction of Justice."  I

14  feel that there was obstruction of justice by Mr. Kurt.  There

15  is the information that's contained in the letter.  There's an

16  attempt to inform others that are not in custody of the fact

17  that Mr. Udseth is acting as a CI.  That is clearly an attempt

18  to intimidate and discourage that person.  I think it's a proper

19  conclusion.

20      Your next objection, No. 6, has to do with the acceptance

21  of responsibility or lack of acceptance of responsibility.

22  Acceptance of responsibility -- we're dealing now with the

23  firearms charge -- is almost always not given in a situation

24  where the defendant elects to go to trial.  There can be

25  exceptions to that where somebody is challenging a particular

1   law.  But, when you go to trial and you're disputing the facts

2   of the case and denying your guilt, acceptance of responsibility

3   is not to be given.  So, I overrule that objection.

4        No. 7 deals with Paragraph 55, the "Base Offense Level."

5   And, if I understand, Mr. Wall, we talked about that a few

6   minutes ago.  Your original objection was aimed at the

7   definition of the firearm that was involved.  I think you told

8   me a little while ago that you received information that would

9   indicate that the base offense level of 20, based on the type of

10  firearm or firearms involved, is proper.

11           MR. WALL:  Your Honor, it has to do with whether there

12  was a large capacity magazine either attached to the weapon or

13  close by.  And it does appear that, on the video, there was such

14  a magazine present at the shoot.

15           THE COURT:  All right.  Well, then, I read that to

16  mean -- and that was going to be my determination -- that that,

17  then, qualifies; that semiautomatic firearm capable of accepting

18  a large-capacity magazine.  And, of course, the defendant,

19  Mr. Kurt, was a prohibited person having been convicted of

20  felonies in the past.  So, the base offense level is appropriate

21  as Ms. Petretee set out in that paragraph.

22       Objections 8 and 16 deal with the four-point enhancement.

23  I'm going to overrule that objection for this reason:  That

24  there was a lot of evidence, primarily in the form of

25  transcriptions of conversations that Mr. Kurt was involved in,

1  in which he went into some detail about plans to commit what

2  would certainly be referred to as "terrorist acts."  There was

3  going to be a final determination.  There was reference to

4  nuclear material.  There was reference to killing or harming or

5  implying that the President should be killed.  There was never a

6  specific plan as to exactly what was going to be done.  But

7  there were so many references to it in so many conversations

8  that it was clear that, in his mind, preparations were being

9  made to commit that type of a -- what would be referred to as a

10  "terrorist" or a "violent act," doing harm.  Even indicated that

11  it was going to be such a severe act that, if he ever got

12  caught, he'd be eligible for the death penalty.  There were

13  other references along that line that made it clear that he had

14  this plan in mind that he was working toward.

15      Now, the next objection, No. 9, deals with Paragraph 58,

16  which involves the 12-point enhancement.  I'm going to sustain

17  that objection.  Twelve points is a dramatic increase in the

18  calculation of the advisory guidelines.  That would require

19  clear and convincing evidence.  It could be argued that there's

20  nothing to corroborate other than what Mr. Kurt said.  And I

21  alluded to that in sustaining the prior four-point enhancement.

22  I think, because that 12 points is extremely -- has an extremely

23  disproportionate effect on the sentences, that the Court would

24  not be exercising its authority properly.  So, I'm going to

25  sustain your objection to that, Mr. Wall.

1     Your next objection, No. 10, has to do with the two-point

2   enhancement for obstruction of justice.  I already alluded to

3   that a moment ago.  I think the two-point enhancement is

4   correct.  He admitted at trial that he tried to obstruct the

5   witness, the letter that I referred to a moment ago.  I also

6   feel that Mr. Kurt's testimony at trial in many instances was

7   false testimony.  It was untrue.  I went into some detail, if I

8   recall, with that observation at the time we discussed whether

9   or not the jury should be instructed as to the entrapment

10  defense.  I felt that the scheme that Mr. Kurt testified to was

11  a total fabrication.  I think the two points for obstruction

12  that occurred in Paragraph 60 are proper.

13     You object to the offense level in Paragraph 61 as being

14  40.  I sustain your objection and take the 12 points off.  It

15  should be a 28 and not a 40.

16     Your Objection No. 12.  Now we're dealing with Group 2.

17  The last series of objections in the Court's discussion has to

18  do with the firearm charge.  Now we're dealing with the false

19  identification charge that Mr. Kurt plead guilty to.  And,

20  Mr. Wall, your objection deals with the two-point enhancement.

21  First of all, the base offense level correctly starts at 6 and

22  there's 2 points added because the offense involved theft of the

23  person of another.

24     Now, the individual's name on the ID that Mr. Kurt used to

25  open that Post Office Box was a living person.  Apparently, from

 1  what I understand, an elderly lady.  She -- it was her

 2  identification.  She denied knowing Mr. Kurt, denied giving him

 3  the authority to have it.  He shouldn't have had it.  I -- I

 4  think that constitutes theft from the person of another in

 5  justifying the two-point enhancement.

 6      Your Objection 13 I've already dealt with, which is the

 7  obstruction of justice.

 8      Objection No. 14 deals with 3 points that are added to

 9  criminal history under Paragraph 126.  I'll overrule that

10  objection.  He was charged with stealing Government property.

11  We went to trial.  The jury convicted him.  He served his time.

12  He gets three points.  I know Mr. Kurt doesn't believe it was a

13  crime, but that's been dealt with.  That's history.  The three

14  points are properly counted.

15      Objection No. 15 seems to indicate, Mr. Wall, that there's

16  some issue you're taking with -- let's see.  Paragraph 169.

17  That's his salary while working at the Lance Pounder Excavation,

18  if I understand it.

19          MR. WALL:  Your Honor, I think this has to do with

20  whether he was technically working or was an employee and at

21  what time that ended.  I don't think it's a major issue, but it

22  was just a matter -- Mr. Kurt had been -- it was the kind of job

23  that he wasn't, necessarily, working always the same hours.  It

24  was sometimes seasonal.  And he had been injured, and he was not

25  working at certain times.  But our position was he was still

1   technically an employee.  I think the Government took a position

2   that he wasn't -- he actually had -- his -- he wasn't working at

3   the time and that's -- I think that's what that's about.

4            THE COURT:  Well, if I understand it correctly,

5   Ms. Petretee, in Paragraph 169, indicates that she spoke to the

6   bookkeeper out there.  And he was earning -- whether he was

7   earning regular hours or was injured and was off makes no

8   difference.  I'm not going to make a finding on it because what

9   you've said is accurate.  It's not going to affect sentence one

10  way or another.

11           MR. WALL:  I don't think so.

12           THE COURT:  Ms. Petretee, did you stand up?  Do you

13  want to say something about that?

14           MS. PETRETEE:  No.  You're right, your Honor.  The

15  bookkeeper did verify the information provided.

16           MR. WALL:  Okay.

17           THE COURT:  Well, I'm going to leave it as is.  As I

18  indicated, if you and Mr. Kurt feel it's technically not totally

19  correct, I think it's close enough.  It's not going to affect

20  sentencing.

21           MR. WALL:  I agree, your Honor.

22           THE COURT:  And your Objection No. 17.  Apparently,

23  you never made an Objection 16.  I'm not missing one.  It's just

24  you skipped the 16.

25           MR. WALL:  No.

1    THE COURT:  Dealing with Paragraph 194, the

2    observation we have on that is we're not exactly sure what

3    you're objecting to.

4         MR. WALL:  Are you speaking of No. 17, your Honor?

5         THE COURT:  No. 17, which references Paragraph 194.

6         MR. WALL:  Okay.

7         THE COURT:  Which says that the defendant had been a

8    member of the Vanguard Kindred, which was an Odinist, white

9    supremist group until the summer of 2009.

10        MR. WALL:  Your Honor, the -- the basis for that

11   objection was simply that we have -- as has been apparent here

12   today, we have objected all along to the Government's

13   characterization of the Vanguard Kindred as being a white

14   supremacist group.  We understand there were people in that

15   group, when Mr. Kurt became involved with them, that held those

16   beliefs.  But Mr. Kurt never believed that's what the group,

17   called the Vanguard Kindred, was about.  And the Government has

18   continued to, we think, put those two groups together -- the

19   Valhalla Bound Skinheads and the Vanguard Kindred -- and treat

20   them as if they were one.  But we think the evidence is clear

21   they were not.

22        And the Kindred, as it's referred to -- as Mr. Kurt has

23   testified to more than once, Kindred refers to the religious

24   aspect of the Odinism.  It has nothing to do with white

25   supremacists.  And, so, it was just the characterization that

1  we --

2          THE COURT:  Okay.  Well, I think that we could add

3  another sentence to it and say that Mr. Kurt denies that

4  Vanguard Kindred is a white supremacist group.

5          MR. WALL:  That would be fine, your Honor.

6          THE COURT:  And I say, again, that the information

7  contained in Paragraph 194, or however it's worded, is not going

8  to affect sentencing.  I make no finding of it.

9      And Objection No. 18 you're referring to Paragraph 196.

10         MR. WALL:  That's simply the calculation.

11         THE COURT:  That's the calculations.  Overrule that

12  objection.

13      I think that covers all the objections -- formal written

14  objections filed by either party.  I'll ask each of you,

15  Mr. Hicks or Ms. Van Marter, are there any other aspects of the

16  Presentence Report that you feel should be called to the Court's

17  attention?

18         MS. VAN MARTER:  No, your Honor.  I did want to just

19  correct one thing.  The -- the charges before the Court -- the

20  secondary charges regarding the fake identification.  There were

21  two separate identifications.  Claire Bermudez (phonetic), who's

22  a real person, that involved the false Social Security cards.

23  And Charles Hubert's identification, who is now deceased, was

24  the one that opened the -- the Post Office Box.  And I just

25  wanted to make sure.  I think the Court just accidentally

1  transposed, and we probably added to confusion by adding

2  additional identities to the record.

3          THE COURT:  I did.  But one of the people's whose ID

4  is referenced is still living.

5          MS. VAN MARTER:  That is correct.

6          THE COURT:  And that person -- that's a female.

7          MS. VAN MARTER:  That's the female.  Correct, your

8  Honor.

9          THE COURT:  And, if I remember correctly, she denied

10  knowing the defendant and denied ever giving him authority to

11  have in his possession or using her identification.

12          MS. VAN MARTER:  Her Social Security card.  That is

13  correct.  Yes, your Honor, and her identification.

14          THE COURT:  All right.  Now, any other objections to

15  the content of the Presentence Report, Mr. Wall, other than what

16  we've talked about?

17          MR. WALL:  No, your Honor.

18          THE COURT:  Now, I'll ask, Mr. Kurt, did you have a

19  chance to read the Presentence Report?

20          THE DEFENDANT:  I have read it, I believe, yes.

21  Pretty much.

22          THE COURT:  Well, you're not sure?

23          THE DEFENDANT:  Yes.  Yes, we did.  Mr. Wall went over

24  it with me.

25          THE COURT:  Now, do you have any objection to the

 1  content of the Presentence Report other than what we've talked

 2  about this afternoon?

 3          THE DEFENDANT:  No.

 4          THE COURT:  All right.  We'll adjourn, then, until --

 5  didn't we agree it was going to be 9:30?  Is that what we said?

 6          MR. HICKS:  Yes, your Honor.

 7          THE COURT:  All right.  9:30.  And what we'll do is

 8  hear, Mr. Wall, your recommendations; the Government's

 9  recommendations; hear from you, Mr. Kurt; and we'll resolve the

10  matter.

11      (Court adjourned at 4:45 p.m.)

213

1                          **GENERAL INDEX**

2                                                        **PAGE**

3   Contested Sentencing Hearing - Day 1, May 9, 2012..... 2

4   Government presents witnesses........................ 3

5   Individuals in Support of the Defendant Address the
    Court...............................................
6                                                        104

7   Stipulation on Base Offense Level................... 108

8   Defendant presents witnesses........................ 145

9   Court's Oral Decision Re: Objections to Presentence
    Report..............................................
10                                                       202

    Reporter's Certificate.............................. 214
11

12                          **WITNESS INDEX**

    **PLAINTIFF WITNESSES:**                            **PAGE**
13  JOSEPH M. CLEARY          DIRECT BY MS. VAN MARTER   3
                              CROSS BY MR. WALL          44
14                            REDIRECT BY MS. VAN MARTER 57
                              RECROSS BY MR. WALL        64
15
    JOHN NEIRINCKX            DIRECT BY MR. HICKS        70
16                            DIRECT BY MR. HICKS (CONT'D) 110
                              CROSS BY MR. WALL          129
17                            REDIRECT BY MR. HICKS      137
                              RECROSS BY MR. WALL        142
18
    **DEFENDANT WITNESSES**                             **PAGE**
19
    WAYDE LYNN KURT           DIRECT BY MR. WALL         146
20                            CROSS BY MR. HICKS         167
                              REDIRECT BY MR. WALL       197
21

22                          **EXHIBIT INDEX**

    **NO.    DESCRIPTION**                              **ADMITTED**
23
        No Exhibits Admitted During This Hearing
24

25

214

                    C E R T I F I C A T E

     I, RONELLE F. CORBEY, do hereby certify:

     That I am an Official Court Reporter for the United States
District Court for the Eastern District of Washington in
Spokane, Washington;

     That the foregoing proceedings were taken on the date and
at the time and place as shown on the first page hereto; and

     That the foregoing proceedings are a full, true and
accurate transcription of the requested proceedings, duly
transcribed by me or under my direction.

     I do further certify that I am not a relative of, employee
of, or counsel for any of said parties, or otherwise interested
in the event of said proceedings.

     DATED this 18th day of July, 2012.


                              /s/ Ronelle F. Corbey

                         RONELLE F. CORBEY
                         Official Court Reporter
                         Spokane County, Washington