1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )     No. 10-CR-114-WFN
                              )         11-CR-161-WFN
vs.                           )     May 10, 2012
                              )     Spokane, Washington
WAYDE LYNN KURT,              )
                              )     Transcript of:
          Defendant.          )     Sentencing Hearing - Day 2
_____ )     **Corrected Transcript**

BEFORE THE HONORABLE WM. FREMMING NIELSEN
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Earl A. Hicks
                            Stephanie A. Van Marter
                            Assistant United States Attorneys
                            P.O. Box 1494
                            Spokane, WA  99210-1494

For the Defendant:          Richard D. Wall, Attorney at Law
                            221 West Main, Suite 200
                            Spokane, WA  99201

Official Court Reporter:    Debra Kinney Clark, RPR, CSR
                            United States District Courthouse
                            P.O. Box 700
                            Spokane, WA 99210
                            (509) 458-3433

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

# Errata Sheet

Case Name:    USA v. Wayde Lynn Kurt

Case Number:  10-CR-114-WFN and 11-CR-161-WFN


The following correction(s) has been made:

The original transcript listed only Cause No. 10-CR-114-WFN and was only filed in that cause. Both cause numbers should have been listed, and the transcript should have been filed in both causes.


by:___Debra Clark_____        Date:_July 18, 2012_____
        Official Court Reporter

2

1          (May 10, 2012; 9:35 a.m.)

2          THE COURT:  This is the continuation of the sentencing

3    hearing.  If I remember correctly, when we finished yesterday,

4    the Court dealt with the objections.  Mr. Kurt indicated that he

5    had reviewed the pre-sentence report prepared by Ms. Petretee;

6    had no further objections beyond those which were discussed.

7      I think now we're ready to have you, Mr. Wall, share your

8    thoughts as to the appropriate resolution of the case.  I'll

9    ask -- oh.  Excuse me.  Ms. Van Marter?

10         MS. VAN MARTER:  Your Honor, I just have a few

11   housekeeping matters, if that would be all right to address

12   first.

13     First, we wanted just to make sure for the record that

14   government Exhibits 1, 1-A, 2, 3, and 4, which were sentencing

15   exhibits, were formally admitted for the Court's consideration,

16   along with Attachments A through E, that were submitted with the

17   sentencing memorandum.  And I think we neglected to confirm that

18   on the record yesterday.

19         THE COURT:  Well, I remember some of them we

20   specifically said were admitted.  But they should all be made

21   part of the record for this specific sentencing hearing.

22         MS. VAN MARTER:  Thank you, Your Honor.  And then the

23   second issue, only because we're a bit thinking forward, during

24   Mr. Kurt's testimony, there was reference by Mr. Kurt to a

25   recorded conversation with the confidential source that occurred

3

1    prior to the government's recordings of contact between Mr. Kurt

2    and the CS.  So as a matter of record, at this point, we would

3    like to formally request any copies, any reports, or notes from

4    Mr. Wall or his investigator relative to that claim by Mr. Kurt.

5            THE COURT:  Well, there was reference to a little

6    silver recording device.  Mr. Wall, do you know anything about

7    that?

8            MR. WALL:  Your Honor, as you probably are aware, this

9    was a pretty complex case.  It involved a lot of investigation

10   on our part, primarily to locate witnesses that we wanted to

11   call at trial.  Mr. Kurt and I did have some brief discussions,

12   and my memory is not 100-percent clear on this.  It's somewhat

13   vague.  But I do recall him saying that there should have been

14   at least a partial recording of some of the conversation he had

15   with Mr. Udseth.  But we could not locate the device that he was

16   talking about.  It wasn't identified in any of the items taken

17   in any of the searches.  And when we did get materials back from

18   the government from one of the searches that was done, it was

19   not there.  So basically, it seemed to us it was kind of a dead

20   end.  We didn't have any way of locating it or knowing what

21   happened to it, and we were focused on other matters as well.

22   But I do recall there was a discussion about that.

23       I don't have any investigator notes.  I don't have any

24   notes of my own about those discussions.  And I -- we still

25   don't know what might have happened to that device.  It may

4

1    still be somewhere, but we don't know where it is.

2            THE COURT:  Well, if you don't have it, you can't

3    produce it.

4        Ms. Van Marter, I think that ends that issue.

5            MS. VAN MARTER:  Thank you, Your Honor.

6            THE COURT:  So, Mr. Wall, your thoughts as to the

7    appropriate resolution of the case.  We'll then hear from the

8    government.  And then, Mr. Kurt, you indicated you had a letter

9    you wanted to read, or you can proceed however you choose.

10            MR. WALL:  Well, Your Honor, the Court's already

11    ruled, I understand, on the objections.

12            THE COURT:  Yes.  We did that yesterday afternoon.

13            MR. WALL:  Right.  And so just for the record, we --

14    we disagree with the Court's ruling with regard to the two-level

15    enhancement for obstruction of justice.  I think the Court cited

16    two bases for that, and we disagree with those bases.

17        And then the four-level enhancement for possession of a

18    firearm in connection with another offense -- we don't believe

19    that there's any evidence that Mr. Kurt committed any other

20    offense or was in the process of committing any other offense in

21    connection with the possession of the firearms.

22        Mr. Kurt will give a statement, Your Honor, that goes to

23    what we believe is appropriate acceptance of responsibility.

24    And I think you also ruled that you would not give that 2-level

25    reduction.  And I believe the Court indicated that that was

5

1    because the Court's belief was that because the case went to

2    trial, that was not available to Mr. Kurt.  I believe we have

3    cited case law to the contrary, Your Honor, that even

4    specifically says if you put on an entrapment defense, which is

5    what his defense was, that a defendant can still be eligible for

6    that.  And I believe this is one of those cases that qualifies,

7    and I'll explain why.

8         Mr. Kurt never denied -- and he will articulate this for

9    the Court again -- he never denied that he committed the offense

10   that he, in fact, knowingly possessed firearms.  His defense was

11   simply that his reasons for doing so were to protect other

12   persons or that he believed he was helping to protect other

13   persons and that he was asked to do so by the confidential

14   informant, who was an agent of the government.  It's his belief,

15   and it was our position at trial, that that's -- that can, if

16   the jury accepts it, qualify as an entrapment defense.  But he

17   has not, in essence, denied the government's case that he, in

18   fact, possessed the firearms.  The -- I believe the law is clear

19   that you can go to trial, you can put on a defense but still

20   accept responsibility; and I believe that Mr. Kurt has done

21   that.

22        To the extent that his testimony differed from what the

23   government presented, Your Honor, it was primarily with regard

24   to his motivation for doing what he -- what he admittedly did.

25   And I don't believe -- even if the Court didn't accept that

6

testimony, I believe that the jury should have been allowed to
make that decision.  And regardless of whether they accepted it,
I still think that Mr. Kurt has demonstrated acceptance of
responsibility.  He has not claimed that someone forced him to
do this, that he was placed under some extreme duress, that he
was threatened in any way.  He admitted that he made the
decision to do it.  He just claims that it would not have
happened but for the actions of the government and that he did
not have a predisposition to do it, which I think is clearly
established by his history.  He had been a restricted felon for
20-some years, and he's been arrested many times.  He's had
numerous contacts with law enforcement officers.  So in all that
time, he was never found in possession of firearms, only on this
one occasion, which I think is a pretty strong indication of a
lack of a predisposition to engage in this conduct.  So we still
believe that he should have been given a 2-level reduction.

Other than that, Your Honor, I know that the Court did not
find Mr. Kurt's explanation credible.  I would just indicate
that I've sat here and heard all the testimony both at the trial
and both at this sentencing hearing.  And I would suggest that
Mr. Kurt's explanation of what happened is really the only
explanation that makes any real sense here, and let me tell you
why.

The government has tried to portray Mr. Kurt as this
terrorist, who has been scheming for 20 years to take violent

7

1  action against the United States government in support of some

2  beliefs in white supremacy; and that's based upon the statement

3  that he makes on that tape -- on the video.  And I think that

4  anyone looking at that video objectively can see that Mr. Kurt

5  is kind of almost in the position of a deer caught in the

6  headlights.  He's got a camera in his face.  He's in a room of

7  people who are all saying what they have been doing in terms of

8  attacking minorities or taking violent action against someone.

9  And he says:  I've been spending every waking day of my life for

10 the last 20 years doing -- what -- nothing -- but somehow

11 advancing the cause that you all here are espousing.  It's the

12 most vague hyperbole that you can imagine.

13      If he'd actually been doing something, he would have said

14 what he had been doing, like everyone else did.  He would have

15 said I have developed plans to do this, or I have actually done

16 these things.  He doesn't say anything like that because he

17 doesn't have anything he can say.  But he knows he has to say

18 something in the context of where he is.  As he indicated, you

19 don't need to be afraid of these people as long as you're

20 playing their game.  But if you don't, you could be subject to

21 what happened to Mr. Johnson because he didn't play their game.

22 He insisted on wearing red laces when they felt it was not

23 appropriate for him to do so.  So I think that tape itself shows

24 that in that situation, he was simply doing what he thought was

25 necessary to do at the time.

8

1        But the other thing is that there is no evidence at all,

2   other than Mr. Kurt's own statement on that tape and the things

3   he said to Mr. Udseth, that he ever did anything.  He has been a

4   counterfeiter, and he has paid for those offenses.  And he has

5   committed other offenses that he has paid for.  But there is not

6   one scrap of evidence that he has ever done anything in the

7   nature of planning, conspiring, or actually engaging in any kind

8   of terrorist activities whatsoever.  There is zero evidence of

9   that.

10       If the government's theory in this case were true, there

11  would be something.  Mr. Kurt has been subject to constant

12  surveillance for many years.  Every place that he -- when he was

13  arrested on this charge, his place of work was searched, his

14  residence was searched, a place where he had stored his personal

15  items was searched.  Nothing was found that would indicate he

16  had ever been involved in any kind of terrorism.  So it just

17  defies logic to say that's what he's been doing, but there's

18  zero evidence of it.

19       This is kind of one of the arguments that I sometimes hear

20  that makes me both cringe and laugh at the same time.  When the

21  prosecution doesn't have evidence of something, then they argue

22  to the court or the jury that, well, the lack of evidence just

23  proves what a clever criminal we have and that you should

24  believe he did -- the defendant did these things, but they're so

25  good at it that they don't leave any evidence.  I mean, you

9

1  know, that's an argument that should just not even be allowed in

2  court, if you ask me.  But they sometimes make that argument,

3  and it's not a logical argument.  It makes no sense.

4       So I think it's clear here that Mr. Kurt is not a white

5  supremacist.  He has never been involved in actively promoting

6  white supremacy.  If you viewed the video of that -- the blot --

7  the blot that was shown, yes, there are people at that meeting

8  saying things about white power and expressing things that to

9  most people would be shocking.  Mr. Kurt, when he speaks, speaks

10  only about the religion -- about the Asatru religion.  That

11  tells you something.  If he was at any point a believer in these

12  ideals and a proponent of those ideals and actively engaged in

13  promoting those things, he would have spoken up then, wouldn't

14  he?  In what other context would he have spoken up and expressed

15  those ideas?  That would have been the perfect place for him to

16  do it, but he didn't.  And so it makes no sense to believe that,

17  really, that's what he's about or that's what he's ever been

18  about.  So I think that theory of the case just doesn't fly.

19  The evidence doesn't support it.

20       So then why else would he did have done what he did with

21  regard to Mr. Udseth?  If he was really somebody who's been

22  involved in white supremacy and skinhead groups for 20 years, he

23  would have known much more about these groups and how to get in

24  contact with them than Mr. Udseth could ever have known.  As far

25  as Mr. Kurt knows or as far as we know, Mr. Udseth was just sort

10

1  of a -- one of the taggers-along with the people who were really

2  the leaders of the Valhalla Bound Skinheads and the Vanguard

3  Kindred.  That was Mr. Keegan and Dan Wilson.  Mr. Udseth was

4  not a leader.  He was a follower.  The idea that someone with a

5  long history of being involved in white supremacy and terrorist

6  activities would follow Mr. Udseth doesn't make any sense.  It's

7  nonsense.

8         Now, Mr. Kurt's explanation for what he did may seem

9  implausible to you or to me or to someone who has not lived his

10 life or doesn't have his feelings about the government that he

11 has, doesn't have his perspective on life.  But I think when you

12 listen to his testimony, it makes perfectly good sense, from his

13 point of view.  You or I or someone else might have thought,

14 well, you call the police.  You get the police involved in this.

15 But that's not Mr. Kurt's way.  So his alternative was to try to

16 do what he thought he could to protect Mr. Johnson and

17 Ms. Howell.  And yeah.  It may seem silly or stupid to other

18 people.  But from him, in his perspective, it makes sense.

19 Otherwise there's no logical explanation for why he would have

20 done what he did.  So again, whether you find it credible or

21 not, I think that's at least an arguable point.  I mean, it's

22 not black and white.

23        And I don't believe there's any evidence that Mr. Kurt ever

24 perjured himself.  The government has tried to bring up what I

25 would call kind of hyper-technical points of, oh, you said this;

11

1  but you said it slightly differently during the trial.  And

2  Mr. Kurt responded in most of those cases, well, yeah, I wasn't

3  really specifically asked that question, which was an

4  appropriate response; or in the context of when the question was

5  asked, I believe my answer was truthful.  And they haven't

6  really shown that he said anything that they can prove is not

7  true.  They just don't buy his story, and I understand that you

8  don't buy it either.  But there's a difference between listening

9  to someone's testimony and not accepting it in whole or in part

10 and saying the person perjured themselves or obstructed justice.

11 I don't believe the fact that a person gets on the stand in

12 their own defense but are not successful in presenting that

13 defense means that they obstructed justice or that they perjured

14 themselves.  Otherwise everyone who goes to trial and testifies

15 in their own defense would automatically being committing

16 perjury, and it would mean it would be very difficult for people

17 to get on the stand and take -- and defend themselves.  So --

18 and that seems to be what the government is suggesting, and I

19 think that's an inappropriate way to view Mr. Kurt's testimony.

20     So everything considered, Your Honor, we believe that a

21 sentence in -- an appropriate sentence would have been a

22 sentence within the standard range, without the enhancements

23 that the Court has imposed, and with a credit for acceptance of

24 responsibility.  And I honestly right now don't have at my

25 fingertips what that would be, but it would be -- it would be at

12

1   a level of -- offense level of 18 and whatever his -- the Court

2   determines his criminal history category would be.

3           THE COURT:  Well, the criminal history category is

4   calculated by Ms. Petretee as Roman number V.

5           MR. WALL:  Yes.  I understand.

6           THE COURT:  And I'm not aware that -- well, you did

7   take issue with it in one objection because you challenged

8   3 points that were added to the criminal history as a result of

9   the conviction that he received for stealing government

10  property.

11          MR. WALL:  Right.

12          THE COURT:  And I overruled that objection.

13          MR. WALL:  I understand.

14          THE COURT:  So I think it stands at a criminal history

15  of V.  Now, if you say the proper base offense level calculation

16  is 18, that comes up with a range of 51 to 63 months.  In your

17  memo, if I recall, you suggested somewhere of 21 to 27 months.

18          MR. WALL:  And that was because at that point, we were

19  uncertain about the 6-level increase for the large capacity

20  magazine, which -- which took this from a 14 to a 20.  And I

21  realize that at this point, to sentence him to somewhere between

22  51 and 60 months would be a departure from what the Court is

23  going to calculate as the guideline range.  But I would ask the

24  Court to take this -- several things into consideration.

25      Of all the evidence that the government has amassed about

1   Mr. Kurt over the years, they have essentially been able to turn

2   this man's life inside out.  They have investigated him to the

3   nth degree, and maybe justifiably so.  We certainly don't take

4   the position that there was anything wrong with the FBI or the

5   Secret Service investigating Mr. Kurt.  He didn't like it.  He

6   doesn't like having the government investigate him.  But we

7   don't take the position that that's improper in any way.  But

8   considering the extent to which he has been investigated and the

9   government has been able to delve very deeply into his life,

10  there's really no evidence whatsoever that Mr. Kurt has ever

11  done anything to intentionally harm anyone.  There just isn't.

12          THE COURT:  Well, in the context of violence.

13          MR. WALL:  In the context of violence.  There's no --

14  there's no evidence whatsoever that he ever committed a theft

15  against any person.  All of his conduct has been in relation --

16  has basically been a fight between him and the United States

17  government.

18      And I realize there can be different views of

19  counterfeiting and how that impacts individuals.  It certainly

20  doesn't necessarily impact any specific individual.  It can, or

21  it may not.  But Mr. Kurt's belief was that he was not hurting

22  individuals by doing that.  He may have believed he was damaging

23  the government.  But he has never stolen from anyone.

24  Admittedly, the government admits he's a very talented producer

25  of false identifications.

14

1          THE COURT:  He admitted that.

2          MR. WALL:  Yeah.  And Mr. Kurt has admitted that.

3      What do 99 percent of the people who are able to do that

4   use those for?  For financial gain at the expense of other

5   people.  Mr. Kurt never did that -- ever.  As he testified, he

6   uses those things because he likes his privacy.  And he believes

7   that he can protect his privacy by using assumed names for

8   things like getting post office boxes and doing other

9   activities.  But there's not one shred of evidence that he ever

10  used those identifications to commit a crime against any person,

11  to steal from any person, or even from a bank or any

12  institution.

13      So in considering the § 3553 factors, Your Honor, what we

14  have here is a man who, at least since the time when he was

15  accused of a murder that he claims he had nothing to do with,

16  has been in a running battle with the government.  I think

17  obviously, though, at his age, he is not the same person he was

18  20 years ago.  There is zero evidence that since he was

19  convicted of forgery back in 1996/97 that he has engaged in any

20  kind of -- I'm sorry -- counterfeiting -- that he has done any

21  counterfeiting or has any intent to do any counterfeiting.  No

22  counterfeit has been found on him.  No instruments that could be

23  used to counterfeit were ever found.  So that's history.  That's

24  long-ago history.  He is no longer and has not been engaged in

25  that kind of conduct for a long time.

1     He has pled guilty to the offense of unlawful production of
2 an identification device, and he's accepted responsibility for
3 that; and the government has agreed to make a particular
4 recommendation on that, which we ask the Court to follow.  But
5 in terms of his danger to the community, I would suggest there
6 is very little, if any.  The people that know Mr. Kurt know him
7 to be an honest, hard-working, trustworthy, nonviolent person.
8 These are the people that have known him in daily life for
9 years.
10     Ms. Paurus was not able to be here to speak directly to the
11 Court, but her letter talks about her dealings with Mr. Kurt --
12 how he never expressed the slightest indication toward violence
13 or racism; that he was always very respectful of people.  He was
14 involved in a group called the Intenders, which is basically a
15 kind of positive thinking, positive approach to life type of
16 group.  This is not the kind of thing that a terrorist does or
17 someone who wants to hurt other people does.  So I think his
18 danger to the community is very low, if there's any danger at
19 all.
20     I'm sure the government is going to argue that he is likely
21 to commit further offenses because he does not believe that
22 certain things should be classified as crimes, and he testified
23 to that on the stand.  I would assume that that raises some
24 concerns for the Court.  But again, I think what the Court needs
25 to do is look at how he's actually lived his life when he was --

1   since he was last released from prison.  And what he did was to

2   work -- you know -- save his money; stay to himself, for the

3   most part; tried to get involved in a group that he thought

4   would be a religious group, and that ended up with him being

5   here today; but really, just tried to live his life the best he

6   could and tried to stay out of the spotlight of the government

7   to the extent that he could.

8       I believe Mr. Kurt has matured a lot over the years.  He is

9   now -- I don't want to call him an old man because I think I'm

10  older than he is.  But he is -- he is a mature person at this

11  point.  I think from his testimony -- and I think he will tell

12  the Court that he has come to understand that despite his

13  differences with the government and his disagreement with the

14  government of the United States about certain matters that

15  continuing to simply ignore what the law is will not serve him

16  in any way.  It will not protect his privacy.  It will only land

17  him back in prison; and he's too old for that, and he knows it.

18  So I think the likelihood of re-offense is extremely low as

19  well.  So based on those factors, Your Honor, we would ask that

20  you sentence him to something under 60 months for this offense.

21      One other thing I do want to address briefly, Your Honor,

22  is that I'm somewhat troubled by the way the government has

23  approached this case.  It seems to me that it almost borders on

24  asking the Court to punish someone for their beliefs.  Even

25  though I think it's clear Mr. Kurt does not believe in the

1    things that the government claims he believes in, even if he

2    were to espouse some beliefs that this Court disagrees with, I

3    think that's an inappropriate consideration for sentencing

4    purposes.

5          THE COURT:  Well -- and I agree with that.  And I have

6    stated to others that you can be a white separatist or

7    supremacist and believe that.  That's fine.  That's not a

8    violation of the law.  And I will say I don't agree with those

9    positions.  But that's not a part of the punishment unless

10   they're acted upon in some way, and I understand that.

11         MR. WALL:  And again, I think the evidence is clear he

12   doesn't necessarily believe -- he doesn't believe in white

13   supremacy, Your Honor.  But even if he did, there's no evidence

14   he has ever acted on those beliefs in the way the government has

15   tried to suggest.

16       And just lastly, Your Honor, I want to just bring this up

17   briefly.  I know the Court has ruled on this.  But with regard

18   to the conviction for the theft of government property, I don't

19   expect that the Court is going to change its mind on that; and I

20   understand that.  But I want to raise it just because I think

21   this is a -- this is an issue that, to me, as an attorney, is

22   important.  It's not just Mr. Kurt's belief that what he did was

23   not a crime.  That's my belief as well.  And he and I have

24   discussed this at some length.  And yes.  I'm a defense

25   attorney, and so I have a perspective.  I understand that.  But

1  I have run this same scenario by a number of people --

2  non-lawyers, and specifically non-lawyers.  And when I run that

3  scenario by a non-lawyer, every single one of them says there's

4  no way that can be theft.  There's no way I stole something that

5  someone put on my car, without my permission, even if I refuse

6  to give it back.  And if that's the way average people view this

7  type of situation, then if the law says differently, there's a

8  problem because the law is supposed to reflect society and what

9  people believe is right and wrong.

10      Now, they might agree, well, maybe I should give it back.

11  Maybe I don't really have a right to keep it in the sense that

12  it belongs to me.  But it isn't a theft.  There's a difference

13  between maybe being civilly liable to return something and

14  actually committing a crime, because crimes are much different.

15  Much different.  The consequences are so much different.  So I

16  would just ask the Court to consider that, if not -- whether it

17  affects this case or not, to consider that for the future

18  because I think it's an extremely important issue that -- what I

19  don't like to see is people being convicted of something that's

20  a crime that they had no reason to believe or should have had no

21  reason to believe it was a crime when they did it.  And I think

22  that's exactly the case here, and, in fact, that it's not a

23  crime.  But -- and that's all I wanted to say about that, Your

24  Honor.

25      We would ask that you depart downward based on the reasons

19

1  that we presented.  And Mr. Kurt, I think, will be making a

2  statement.  Thank you.

3        THE COURT:  Thank you, Mr. Wall.

4     Now, what I'd like to do is have the government share its

5  thoughts as to the appropriate resolution so that when Mr. Kurt

6  speaks, he will have had the opportunity to have heard

7  everything that's been said.  Is it going to be you, Mr. Hicks,

8  or Ms. Van Marter?

9        MR. HICKS:  Your Honor, the first thing I want to do

10 is I want to thank the FBI, Agent Cleary, and the people at the

11 Joint Terrorism Task Force for investigating this case and doing

12 the responsible thing in protecting the people of this country

13 against people like Mr. Wayde Kurt.  I want to thank them, Your

14 Honor, because they acted when they had no other choice but to

15 act.  They investigated when they had no other choice but to

16 investigate.

17    And the thing that is so surprising to me is that Mr. Kurt,

18 who espouses that he has this great interest in privacy, Your

19 Honor, always commits crimes and always does things so that law

20 enforcement will be looking at him.  When he's on supervised

21 release, he violates supervised release.  When he's -- no matter

22 what he's doing, he's committing crimes, Your Honor.

23    Now, I want to go back.  I want to just answer one thing

24 really quickly because I -- Your Honor, I want to talk about

25 that conviction, and I'm going to be brief.  There are

20

1  alternative means of committing the crime.  And you gave an
2  instruction -- and I was the trial lawyer on that -- on
3  alternative means of committing the crime.  Not only did you
4  give an instruction on that, but you also gave an abandonment
5  instruction and that if the jury believed that Mr. Kurt truly
6  believed the property was abandoned that they could take it into
7  account in his intent.  So you gave an abandonment instruction
8  in that.
9      Now, you can -- you can steal, purloin, or convert to your
10 own use.  Your Honor, what type of a person, when the Secret
11 Service comes out to you and says you have our property, we know
12 you do, give it back to us, please, and we will not charge you
13 with a crime if you give it back -- the crime -- he was not
14 charged with doing -- until after -- the date was after he took
15 it because they asked for it back.  He sped away at a high
16 speed, put the public in danger; and that's what that case was
17 about, Your Honor.  And then he lied to his attorney because --
18 you didn't allow a defense of legal advice by an attorney
19 because he never told his attorney that Secret Service came out
20 and asked for it back.  And that jury was of ordinary people,
21 and they were given the option.
22     Mr. Wall and Mr. Kurt, this is not the world according to
23 you.  This is a world based upon laws.
24     Now, Your Honor, first of all, I want to address another
25 issue that was raised.  This -- there's no way that this can be

1   an offense level of 18.  And the reason for that is is that,

2   first, the base offense level is 20; and then 2 points are added

3   because there were more than three firearms.  So that's 22.  You

4   subtract 2 from 22.  It does not become 18.  It remains 20.  All

5   right?  And so what happens, Your Honor, is that the guideline

6   calculation -- Counsel is in error.

7        Your Honor, I want to start off because -- the government's

8   position -- because we had these documents; and they had been

9   provided in discovery to the defense, Your Honor, when they

10  fabricated this defense.  And I just want to read a few things

11  because it's what we've -- these things we provided to Your

12  Honor, but I think it's important to read them into the record

13  so that when we discuss some of these matters --

14       First of all, Mr. Kurt yesterday said that he no longer

15  associated with -- words to the effect that he left the Vanguard

16  Kindred after the assault on Anthony Johnson.  But, very

17  interestingly, the confidential human source, who was involved

18  in this organization, indicated having a conversation with

19  Mr. Kurt on 5-17-09 -- this confidential human source.  And it's

20  143 and 144 of the materials that we've provided you, Your

21  Honor -- those pages.  "On 5-17-09 Wayde Kurt told [the]

22  captioned CHS that he retained a large sum of . . . US currency

23  that he had made prior to going to prison the last time.  He

24  told the CHS that if the CHS wanted proof, he could talk to

25  Dave Udseth and Carma Blalock.  Kurt stated that he had

22

previously shown Dave and Carma $10,000 in counterfeit US
currency.  This $10,000 is a portion of the total sum he
retained.

"Kurt stated . . . he needs two additional guys for a 'job'
that he is planning."

"Kurt stated that he has full access to all areas of his
employer's business.  He stated that he has codes and keys for
everything."

Now, very interestingly, during the tape-recorded
conversations, Mr. Kurt had claimed that he was firing his .357
into a bulldozer and -- inside of there and that he had access
to that, and he could go in there and do whatever he wanted in
there, and that even his employer -- and he referred to him, by
the way, as his ex-employer -- I'll refer to him as my
ex-employer -- called him up sometimes at 1:00 -- called him up
and said:  What are you doing in there at 1:00 in the morning?
Those are Mr. Kurt's words.

Then, Your Honor, this malarkey, this total fabricated
thing about Anthony Johnson -- what did Mr. Kurt say about that
on 7-12 of '09, not knowing that he was speaking to a
confidential informant?  Excuse me.  I think I got my days mixed
up.  No.  We go back to 5-17-09.  First, if you look at that,
the confidential informant reports that "Kurt had a discussion
with Shep Kuester about a recipe for 'napalm.'"  All right?  And
"Kurt stated that Vantuyl wanted to firebomb the residence of an

1  unnamed rival skinhead."  And "Vantuyl asked Kurt about how to

2  build a device to carry out this fire bombing.  Kurt did not

3  know of any positive steps by Vantuyl to follow through on this

4  bombing."

5      Now, Your Honor, then Mr. Kurt discussed with this

6  confidential human source -- and this is not our CI.  This is

7  not Mr. Udseth.  This is a confidential human source for not the

8  Seattle division of the FBI, where this agent (indicating) works

9  for; but this is the Salt Lake division of the FBI who had the

10 confidential human source in there.  And when you look at what

11 he said and you look at some other things, that confidential

12 human source was reliable.  And what he says is -- Kurt first

13 gives an explanation of what happened at this.  "Kurt stated

14 that a few days before Vantuyl was arrested for a probation

15 violation, Kurt and other VK members were at the residence of

16 Vantuyl."  And they talk about it.  And then they talk about

17 there was this fight, and it's the Anton fight.  And who Kurt

18 said was involved in the Anton fight here -- and we discussed

19 that a little bit yesterday -- was -- he said that it was

20 Church, Bargiel, and Keegan VanTuyl.  He doesn't say Udseth was

21 involved in it.  And I think you should consider that, Your

22 Honor, because this is proof that he did perjure himself on the

23 stand.  This is proof.  You can give this the weight that you

24 want to, Your Honor; but you then can look at other things in

25 the case, not take smidgens and tidbits, like defense counsel

24

1   wants you to, and make this a wonderful person who is being

2   persecuted by the police.

3        But in any event, "Wayde Kurt then interviewed and

4   convinced them not to stab Anton.  He stated that if they killed

5   him, they would all be witnesses and would surely get caught.

6   Church then cut the red laces off of Anton's boots.  Anton's leg

7   was cut in the process."

8        Now, why is that important, Your Honor?  Because this

9   entire defense is based upon the fact that he wanted to help

10  Anthony Johnson, protect him from these people.  At that point

11  in time, there's clear evidence -- and the reason I'm presenting

12  this to the Court -- because this issue of should -- did he

13  fabricate this story?  Did he lie on the stand?  It's clear.

14  It's clear.  And you heard yesterday.  Every single time he's

15  confronted with evidence against him, he says:  I lied to

16  somebody.  I lied to them.  I lied to them for this purpose.  I

17  lied to them for that purpose.  And if you don't think a person

18  like that didn't lie on the stand -- the fake crying on the

19  stand, and all of that.  And he doesn't mention that Anton,

20  shaved bald, red laces, skinhead, or skinhead associate -- he

21  never mentions that.  Wants to mislead people about that.

22       But in any event, so what happens is is he says he's giving

23  him assistance, in effect, to save his life, which you can never

24  figure out how come if he was so badly injured, why didn't

25  Mr. Kurt go out and get in the car with him?  Why doesn't he

1    assist him if he's so badly injured?  Because he wasn't worried

2    about Anton.  He's worried about -- he's on supervised release.

3    He already knows the FBI is investigating them.  He's at a

4    location involved in probably illegal activity because they're

5    there why, Your Honor?  What's the evidence in the case?  The

6    testimony in the case is they were there because this woman was

7    having trouble getting rid of two people who were living there,

8    and they were all going to go over there and make a bunch of

9    noise and create some issues there so potentially those people

10   would move out.  You bring a bunch of animals like them over

11   there, and maybe they'll move out.  Mr. Kurt testified -- he

12   didn't use the term "animal," but he testified as to why they

13   were there.  It had nothing to do with religion.  Nothing to do

14   with it at all.

15       And to phony up a story that you were only associating with

16   the VK for religious purposes when you're talking about

17   counterfeit money with them, you're talking about napalm -- and

18   there's other things there, Your Honor; and I can't go over them

19   all, and I don't think the Court wants to hear me go over them

20   all.  All right?  And when you see that -- saw that video

21   yesterday -- oh, that video.  And you know, Your Honor,

22   sometimes I appreciate so much that you cut me off when I'm not

23   asking a question because I'm a little upset over something.

24   But even that video, where he's asked by Wilson, Your Honor,

25   he's asked by Wilson, who says -- Wilson says to him:  Yeah.

1  You know.  That -- that nigger got away, in effect, is what he

2  says.  And then he says:  But we -- but we got a new brother, in

3  effect.  We got Wayde.  And we asked Wayde -- we asked Wayde

4  where the niggers and Jews were, and Wayde pointed it out.  And

5  what did you see in that video?  Wayde there with his bottle of

6  beer, shaking his head, smiling.

7      You know, Your Honor, I'm telling this Court we exercised

8  tremendous restraint in this case because we did not want to

9  prosecute Mr. Kurt for his beliefs.  But when you put your

10 beliefs in issue and you hide behind them so that you can commit

11 crimes, of course we're going to question whether or not this is

12 about your beliefs or if this is about you hiding behind your

13 religion.  And Mr. Kurt himself, in his testimony, said there

14 are people who hide behind the Asatru religion.  And

15 Keegan VanTuyl and Mr. Udseth discussed that, and we presented

16 that in the materials.  They discussed the fact that they were

17 going to set up an official church so that they could associate

18 with each other and so that they would look official while they

19 were doing other things.  And, you know, that's what it's all

20 about, Your Honor.

21     Mr. Kurt -- you know, it's -- there was one other thing,

22 Your Honor, that I came across, which was interesting, because

23 in one of the letters, Mr. Kurt says:  You know, I just joined

24 this group -- you know -- this religious group.  And then what

25 he says is it's just a bunch of good old white boys.  Here it

1   is.  Page 79.  And, Your Honor, it's got Wayde Kurt's initials

2   right on it.  "I joined the Odinist/Asatru Kindred that meets

3   here in the chapel.  It's just a bunch of good old white

4   boys" -- "good old white boys getting together to talk about the

5   legends of old."

6        How do you -- Your Honor, he's not being persecuted by the

7   government for any religious belief whatsoever.  He's not being

8   prosecuted for any of his beliefs.  And -- you know -- we didn't

9   put in there -- we didn't put in there the fact -- what he said

10  about President Obama being a nigger and stuff like that, Your

11  Honor.  We kept that out so that we wouldn't prejudice him on a

12  felon in possession of firearms case.  Now, we did put in

13  passages where he discussed wanting to kill the President of

14  the United States; and we put in there passages where he

15  discussed -- you know -- an explosion or some event that would

16  be larger than in Oklahoma City and that people would die and

17  that it would be a suicide mission.  We put that in there, Your

18  Honor.

19       Now, Your Honor, sometimes I very respectfully disagree

20  with this Court.  And I want to tell this Court that I accept

21  your ruling on the 12 points.  But I think there's clear and

22  convincing evidence that he was going to do something, and it is

23  in regard to an act of terrorism.  And I'm going to leave it

24  there.  And I know that it's more -- and, Your Honor, I'm not

25  being -- I would just say, Your Honor, that I want to protect my

1  record on that, Your Honor.

2         THE COURT:  Sure.  No.  And you should.  And you have

3  a right to disagree with me.  But I -- I feel strongly that it

4  would be inappropriate to add the 12 points, particularly in

5  view of the fact that I added the 4 in the prior paragraph.  You

6  know, it might even be argued it could be double counting or a

7  duplication.  And I didn't say that yesterday, but you just --

8  what you said reminded me.

9         MR. HICKS:  Yes, Your Honor.

10         THE COURT:  And I -- I understand your position.

11         MR. HICKS:  Your Honor, because -- one of the most

12  difficult things in these cases, which is maybe the thing that

13  maybe Counsel is objecting to, is -- one of the most difficult

14  things in these cases is that the FBI has a policy of preventing

15  these things from happening; and it has to be that way.  You

16  can't let things happen and then investigate them.  You couldn't

17  allow for a large explosion and then investigate it.  You

18  couldn't do that stuff.  You just can't do it.  And so they did

19  what they did, Your Honor; and that's not about his beliefs or

20  anything like that.  That's intervening.  That's doing what you

21  have to.

22     Remember, Your Honor, Agent Cleary yesterday said he

23  started -- you know.  This concept of constant surveillance of

24  Wayde Kurt -- he's not under constant surveillance, Your Honor.

25  He wasn't under constant surveillance while he was on supervised

1  release.  He wasn't under constant surveillance.  He wasn't

2  under surveillance until he was suspected of crimes.

3      You know, there was a letter I read in relationship to --

4  to the case; and one of the things that it said was that -- and

5  it was after he had taken the tracking device and we found some

6  letters.  One of the guys says:  You know, you're smarter than

7  the average bear.  Don't worry.  The Feds won't get you on this

8  one, basically is what it said.  And -- you know -- I

9  immediately thought about Yogi Bear -- you know -- and Boo-Boo.

10 And -- because I want to tell you this.  Mr. Kurt -- he brags

11 about this.  And this is important, Your Honor, when we look at

12 what kind of a sentence should he get?  He brags about certain

13 things -- how good of a counterfeiter he is.  But, you know, I

14 let him brag about that.  But every time the police come across

15 some counterfeit, they immediately say:  Oh.  Counterfeit

16 currency.  Oh.  He doesn't hurt anybody by passing this

17 counterfeit currency.  It's discovered all the time, right away.

18 What he's much better at are the false identification cards.

19     But in any event, Your Honor, what happens is Mr. Kurt

20 doesn't understand how he creates his own destiny.  Mr. Kurt,

21 for example, would not have been on supervised release had he

22 just given back the tracking device to the United States Secret

23 Service when he was asked.  Non-criminal people would do that.

24 Mr. Kurt is a perpetual, perpetual criminal.  And I don't care

25 how minor he might consider it, he's a perpetual criminal.

30

1       Your Honor -- and I want to go back to this because -- it's

2  Page 147, just for the Court.  And I'm not going to go over

3  everything here.  It said:  On 7-12, "Wayde Kurt met with the

4  captioned CHS."  And again, it's the one out of -- and notice

5  that 5 -- the one was a 5-19 date, where he's meeting with the

6  confidential human source, who is in that group.  He's planted

7  in that group.  And he doesn't associate with them any more.  He

8  told you that yesterday.  You know.  I was going to quit that

9  group, and I didn't have anything to do with it afterwards.  And

10 just -- "Kurt told the CHS that 'we already have been rolling'

11 in reference to his currency counterfeiting operation.  He

12 stated that he has made a run of counterfeit currency and put it

13 into circulation.  This occurred in the recent past, probably

14 within the last month."

15      "Also, the US Secret Service contacted Kurt to return some

16 property seized during his . . . counterfeiting case."

17      The date of this -- I'm familiar with this date because

18 from the earlier case, Your Honor, due to my illness, I was not

19 able to follow through and prosecute him on that 2004 stuff.

20 And so what happened is during this time period, I said to

21 Secret Service:  I'm not -- we -- I can't go forward with this

22 any more.  We're past the statute of limitations.  We have a

23 statute of limitations issue.  Give him his property back.  And

24 wow.  Kurt's talking about it to this confidential human source.

25 How reliable is this confidential human source?

1      And he talks again -- if you look at it, he talked to him

2   about "he recently hiked into Canada illegally to meet with his

3   Canadian partners in his counterfeiting operation." Gee. You

4   know, Your Honor -- and maybe I'm -- I have certain principles

5   and things that I think that the Court should consider.

6      First of all, all of the people that Mr. Kurt had talking

7   on his behalf didn't really know Wayde Lynn Kurt. He went to

8   certain meetings or he worked for them for a little bit of time

9   and stuff like that. You can't talk about being a racist in

10  front of Mr. Pounder, who hires people of color. You can't go

11  to another group and tell people how you truly feel. You're not

12  going to discuss with them openly plans -- you know -- calling

13  the President of the United States a nigger. You're not going

14  to talk about blowing up a building openly in front of them.

15  You know? And you just aren't going to do that.

16      But, you know, the reason we provided you with all the

17  information we did is because intertwined in all these

18  investigations are certain themes. There's a theme of violence.

19  There's he's going to do something to the government. He told

20  you yesterday he doesn't like the government since that there.

21  And, you know, Your Honor, he was acquitted of that. The

22  purpose of our -- of that conversation has nothing to do -- I'm

23  not asking the Court to punish him for anything to do with

24  something he's acquitted of. He's acquitted of that. But what

25  is of importance, Your Honor, is that there were two firearms

1  that he had that were automatic back then.  And that's when his

2  life of crime begins, and it's rather serious.  And there's

3  consequences as a result of his life of crime.

4      And it wasn't as Mr. Kurt told you that it was about the

5  bullets matched.  They forensically matched the gun.  And, Your

6  Honor, maybe Mr. Kurt was wrong on that; but I think the

7  government just had to tell you that based upon something that

8  he had done, he had manufactured a firearm that could fire fully

9  automatic.  There were certain consequences.  And why is it in a

10 Secret Service report?  Because that's a general report that

11 goes to the agents so that if the agents come upon Mr. Kurt,

12 they know that he's previously had automatic weapons.  And

13 that's how they operate.  So none of this is intended for

14 Mr. Kurt to be punished for anything that he's acquitted of,

15 Your Honor.  Not at all.

16      Now, there really has to be a disagreement in this case on

17 what constitutes action, Your Honor.  And what defense counsel

18 basically says is:  All he did was talk.  All he did was talk.

19 You know, he didn't just talk, Your Honor.  He just did not

20 talk.  He took action, Your Honor.  And, you know, he lied

21 about -- to you because it's not supported by the tape

22 recordings, Your Honor, that were admitted into evidence.  He

23 lied to the Court.  He should not get acceptance of

24 responsibility.  He lied about when he got the firearms.  He

25 lied about who purchased -- you know -- about Mr. Udseth had him

33

1   purchase the loader.  He's now trying to say that he never even
2   made any ammunition with the loader, which is false.  All of
3   these things -- he lied about this armorer stuff.  It's nowhere,
4   anywhere, on the tape.  And as I said yesterday, if you're
5   willing to talk about killing the President of the United States
6   because he's a nigger, but the most important thing as to what
7   you're doing with the confidential informant is you're going to
8   be an armorer for him and that's why, you know, you wanted to
9   get these guns, why don't you ever talk about that?  Why is it
10  my gun?
11      Why is it, Your Honor, that the FBI -- when the CI first
12  becomes an informant, what they do is they send him out.  And
13  when they send him out, they don't put tape recordings on.  They
14  don't record the conversations at first.  And the CI comes right
15  back and tells them the information, and he tells them this
16  information about Kemp, all right, and -- and his association
17  with Kemp.  And so lo and behold, we find out that there was
18  that association.  Now, how does Udseth know all of that stuff
19  if he's not told about it?  And he reports it back.  Okay?
20      The next thing is is Udseth tells them at that second
21  meeting that he's told him he's got a firearm.  And that's not a
22  tape-recorded meeting.  But he comes back and he tells them.  He
23  tells people: Mr. Kurt's got a firearm.  He told me he's got a
24  firearm.  All right?  Tape record.  Wire him up because that's a
25  crime.  We want to see what's going on.  And lo and behold,

1   Mr. Kurt has a firearm, just like he said.  He told him --

2   described it and everything.  But what he wants you to believe

3   is that, oh, we talked about that before.  We talked about that

4   before.  It doesn't make sense.

5        Your Honor, again, I've gone over here; and it's so

6   difficult, Your Honor, in this case to narrow down everything

7   and to discuss all the lies of this defendant.  But just think

8   in these general terms, Your Honor.  And the reason I'm talking

9   about this is because when there's this obstruction -- you know,

10  I've been doing this for 31 years; and this is the first time I

11  heard a judge say to a defendant you lied when you testified, or

12  I don't believe your testimony.  And judges I know sometimes

13  don't believe some of the things that defendants say.  This is

14  the first time.  I've been in your courtroom before where you've

15  disagreed with arguments, and you don't say:  That's something

16  false.  You know.  You lied about it.  What you say is:  Well,

17  the evidence contradicts your position.  I've been before you

18  many times, Your Honor.  I've been before many other -- all the

19  other judges here, and that's how they handle it.  So I'm

20  suspecting that this Court feels strongly in that regard.  And

21  so -- and I don't think it's about anything that Mr. Kurt did,

22  other than he falsified a defense.

23       We turned over all of these reports.  And it's so

24  interesting how everything is explained away.  And it's so

25  interesting how even if when you have -- you know, did he give

1  that jury the impression, Your Honor -- just thinking back, your
2  recollection of this because you're the judge that's going to
3  sentence.  Did he give that jury the impression that these
4  Vanguard Kindred meetings -- that they were going to be
5  separate, and the Vanguard Kindred was only religious?  That's
6  the impression he tried to get across to this jury.  Did he ever
7  talk about that meeting with the chinks, the niggers, and the
8  beaners?  He went to that meeting.  Boy.  He just didn't recall
9  what we had recorded -- what was recorded that was in our
10 possession, Your Honor.
11      And that's another thing.  Your Honor, what is he saying
12 when he does not believe that people are listening to him?  And
13 I'm going to discuss this and say this, that when Mr. Kurt first
14 goes to the Vanguard Kindred and he sticks with them for a
15 while, you know, he could have left at any time.  From that
16 first meeting, before they go to that blot, that ceremony, he
17 sticks -- you know.  He's in there, and they're saying all of
18 these things.  They're holding the statute of Hitler.  There's
19 all these Nazi flags everywhere.  And now he's telling us
20 that -- wow, now that you see that, I've got to make this up.  I
21 couldn't leave because I was afraid of these people who I never
22 knew before.  And I hadn't known that they committed violent
23 acts before, but I'm afraid of them.  And then what happens is
24 he goes to this meeting, and they put up Nazi flags and do all
25 of this stuff.  And does he leave?  If it was truly about

36

1   religion, as he tried to get this jury to believe, is it

2   reasonable that he would stay there and then continue to go to

3   their meetings and then continue to associate with members of

4   the Valhalla Bound Skinheads?

5        And this is what happened, Your Honor.  The Vanguard

6   Kindred was bringing too much heat to it.  That's what happened.

7   So what he found was the dumbest one, who had previously brought

8   a firearm to the meeting.  And when I say this about Mr. Udseth,

9   his reading level is like the fourth grade, Your Honor.  That's

10  his reading level.  And so no.  Mr. Udseth was not in charge.

11  And if you listen to the tapes, it's not Udseth who is in

12  charge.  He's creating conversation.  And Mr. Udseth -- and I

13  remember in closing argument Counsel saying, well, why does

14  Mr. Kurt need Mr. Udseth?  And it's in the tape.  Udseth's legal

15  to have guns; Mr. Kurt's not.  That's what he said in the tape

16  when nobody was listening.  And so if the police pull you over,

17  they're your guns.  They're not mine.  All right?  Because I'm

18  illegal.

19       And then the other thing, Udseth had property where they

20  could go out and they could shoot.  And he's concerned.  Does

21  Keegan VanTuyl and these other people know where this is at?

22  Because by that point in time, Your Honor, he recognized the

23  peril of hanging out with this group.  And he thought that

24  Udseth was safe.  Udseth is an avowed white supremacist.  He

25  told you that.  He's been his whole life.  He testified to that.

1   From a young age.  And, you know, if you're not going to tell

2   that to Mr. Pounder, you're not going to tell that to other

3   people, but you're going to him.

4        So, Your Honor, I just -- and I'm going to talk real

5   quickly here, and then I'm going to go back to some issues

6   because I know the Court has a time period.

7        Remember, we talked about that, that he's not going to

8   stand by and let this happen.  He's been many years in federal

9   prison.  He's a desperate old man.  And remember, the agent

10  talked about that.  Without reading that all back to the Court,

11  it's --

12            THE COURT:  I remember it.

13            MR. HICKS:  -- 207 and through that.

14       And, you know, the FBI has to act.  And, you know, there's

15  this thing here that there's no sense of reality with Mr. Kurt.

16  There's no sense of reality.  So he's not smarter than Yogi

17  Bear.  And, you know, his avowed enemy -- and I -- and I marked

18  a bunch of things from the transcript, Your Honor; and I'm not

19  going to read them to you.  He's -- all of these things that he

20  said, all of these things that he did, and all of these things

21  that he tried to justify -- and we've got the letter.  You know,

22  he specifically said he never tried to get in touch with

23  Keegan VanTuyl before, until we confronted him with the letter.

24  And then what he did is said:  Oh.  Well, that -- you know.

25  Really, I wanted my attorney to contact him, or something stupid

38

1  like that.  And I'm sorry when I say that, Your Honor; but it's

2  really stupid.

3       And he had never used the identification for anything other

4  than getting library cards and -- what else?  You know?  Post

5  office boxes.  Was that a lie, Your Honor?  And that was his

6  story until we brought up:  Oh.  You got this card in this dead

7  person's name, and then you used it to buy what?  A stock for

8  his gun.  And in that -- in the evidence, he talks to Udseth

9  about that he's going to buy a stock for his gun.

10      Okay.  Now, why do we present all of this stuff, Your

11  Honor?  And I'll summarize it this way.  I'll summarize it like

12  this.  First of all, the government's position is is that this

13  defendant should serve 11 years in custody, no matter what the

14  guidelines are.  First of all, there's a ten-year maximum

15  penalty on the crime.  And how many felonies do you got to get

16  and how many times have you got to get violated on supervised

17  release and how many times do you steal -- you know -- this --

18  nobody donates their identification to Goodwill.  They

19  accidentally leave it in their belongings because -- oh.

20  Mr. Kurt -- I'm going to donate this to Goodwill; and so here,

21  Goodwill.  Sell this for me.  That's baloney.  That's the

22  criminal mind.  It's a criminal mind that he has.

23      And I asked him would he ever change; and he said no, he'll

24  never change.  And he is a danger to the public, and he is a

25  danger of doing this again.  And he is bad.  And because he's a

1  perpetual criminal -- and when I say he's a perpetual criminal,

2  Your Honor, he's been in prison he told you 18 years.  18 years

3  in a federal penitentiary, and he doesn't learn, because last

4  time when we were in court and charging him with that crime, he

5  was on supervised release then.  In fact, he had, just prior to

6  that, asked the court to let him off of supervised release.  And

7  this time, he's on supervised release again.

8      And, Your Honor, he's got a taser.  And I have a real

9  problem with U.S. Probation -- and it's -- and it's not -- it's

10 a very respectful problem.  But I'm going to ask you to do

11 something, Your Honor.  He had a 1,000,700-volt taser, according

12 to him.  Now, I don't believe that that's true because a

13 1,000,700-volt taser is going to kill somebody really fast.  And

14 I don't know that they can -- that that's true.  But he had a

15 taser.  And contrary to what has been said, there is evidence he

16 went and intimidated a woman with that taser because she had

17 turned in one of these guys on a domestic violence, that he was

18 hanging out with.  And so I'm asking the Court no taser.  I'm

19 asking the Court he can't possess other people's identification.

20     And this baloney that he didn't have things that could

21 print counterfeit currency -- he had items that could print

22 counterfeit currency in 2004.  The agent testified to that

23 yesterday.  That's just baloney.  He was using it for other

24 purposes, maybe -- those little cards.  But he did have those

25 items.

40

1        But anyway, Judge, the bottom line is the government's
2   position is that he should only get one additional year.
3   11 years is an appropriate sentence.  And it's not about his
4   beliefs.  It's about his conduct.  And this 11 years should be
5   imposed, Your Honor, whether or not the guidelines are there
6   because we've got the § 3553 issue.  And you can look at the
7   nature and character of this person.  And, you know, you can
8   look at him; and you can look at what he's done, when he's done
9   it.  And has anything the court has done by putting him in
10  prison for 18 years stopped him?  In fact, even when he's in
11  prison, he violates the rules because he sends mail out under
12  other names, just like he did here.  So you can't even stop him
13  when he's in jail.
14        Protect the public.  Give him the 11 years.  Nothing is
15  going to stop him.  Nothing will stop him from committing crime,
16  petty or otherwise, Your Honor.  Thank you.
17            THE COURT:  Mr. Kurt, any thoughts you have you want
18  to share with the Court?
19            THE DEFENDANT:  I'd just like to address the Court
20  here and assure the Court that everything that I've testified to
21  on the stand is absolutely the truth, to the best of my ability,
22  as I so swore.
23        I'm a little bit concerned that anybody would take the word
24  of confidential informants just at absolute face value for
25  everything they've said.  You'd have to be extremely naive, in

1  my opinion.

2      That said, I admit that I was aware that my status in the

3  United States as a person previously convicted of a felony prior

4  to my possessing the Saiga rifle and the Rossi pistol.  I

5  stipulated before the trial that these two firearms should be

6  allowed as evidence for the United States' case in chief even

7  though these were not part of the charges at trial, the firearms

8  having previously been dismissed with prejudice by this Court.

9      Consistent with this stipulation, I testified that I

10  obtained these two firearms and went willingly with the

11  confidential informant, David Udseth, to practice, target

12  practice, with both his and my firearms.  The voice recordings

13  of David Udseth show that I was initially reluctant to possess

14  any firearm, and my reluctance was testified to by several of

15  the defense witnesses.  But in the end, the decision to possess

16  these firearms was my own.

17      That is all.

18          MR. HICKS:  Your Honor, could I make one correction?

19      Mr. Kurt's mistaken.  There was a second superseding

20  indictment, which included all five firearms.  That's why all

21  five were presented to the jury.

22          THE COURT:  I understand.  He's got all five.

23      The first thing we have to do is consult the advisory

24  guidelines.  And in this sentencing procedure, we all alluded to

25  them.  These guidelines are advisory.  The Court is not bound to

42

1  follow them.  But as many of the courts have said, they're a

2  starting point.

3      In this case, the base offense level is 20.  There are 2

4  points added because of the number of firearms, three to seven.

5  There are 4 more points added because there's more than enough

6  reason to believe that he possessed them in anticipation of

7  another felony offense.  I sustained the objection of the

8  defense regarding the 12 points.  They're not going to be added.

9  There are 2 more points added on the obstruction of justice for

10  the reasons that the Court has previously stated.  That results

11  in a total offense level on count group #1 of 28.

12      Group #2 involves the guilty plea to the -- and the

13  conviction -- for the unlawful production of identification

14  card.  That's CR-11-00161.  The base offense level on that is 6.

15  2 points are added because the Court, as I indicated earlier,

16  determined that that ID card was the result of theft from

17  another person.  The adjusted offense level is 8.

18      Now, there has been a good deal of discussion regarding

19  acceptance of responsibility; and the Court determined that it

20  was not appropriate.

21      We go through the multiple count adjustment process, as was

22  done by Ms. Petretee on Page 20 of the pre-sentence report.  We

23  end up with the adjustment -- we still end up with a 28 total

24  adjusted offense level.  Criminal history is V.  The advisory

25  guideline range is 130 months to 162 months.

43

1          Now, I want to say that if the Court had allowed 2 points

2     off for acceptance of responsibility, the adjusted offense level

3     would have been 26, with a Roman -- history of V.  The advisory

4     guideline range would have been 110 to 137.  Now, that's as to

5     count group #1, the firearm charge.

6          On count group #2, adjusted offense level is 8, criminal

7     history of V.  The guideline range is 15 to 21 months.  Now, had

8     the Court determined that acceptance of responsibility was

9     appropriate for that, the adjusted offense level would have been

10    6, criminal history of Roman numeral V; advisory guideline range

11    of 9 to 15 months.  And for reasons that you'll understand

12    later, whether or not the criminal -- the acceptance of 2 points

13    was awarded is not going to make a difference.

14         Now, in addition to the consultation of the advisory

15    guidelines, the Court must take into account statutory factors.

16    Those factors are found at 18 USC 3553(a).  And the Court has

17    spent a good deal of time considering those factors in this

18    case.

19         Suffice it to say that the Court feels that Mr. Kurt

20    presents a serious risk to the public.  He has a long-time

21    history of criminal conduct, including counterfeiting of U.S.

22    currency, federal reserve notes.  He acknowledged he's very good

23    at it, and he is.  He utilized very sophisticated procedures and

24    equipment.  He testified at the first trial -- or -- the trial

25    in the firearm case that he was proud of his skill.  And this is

44

1  a serious crime.  It defaces and degrades United States

2  currency.

3      He has a history of manufacturing false ID -- and we saw

4  quite a bit of that evidence yesterday -- both state and

5  federal.  Yesterday we saw in one of the exhibits an envelope

6  that contained 24 fake Washington driver's licenses.  And I will

7  say that you are good at it.  Those were good-looking driver's

8  licenses, Mr. Kurt.  They looked very real.  They all contained

9  your picture.  Each of them contained a different name, not

10  yours; different numbers; different addresses.  And you had 24

11  of them.

12      We also saw evidence that you had fake Social Security,

13  fake birth certificates, and even fake dental records, and fake

14  employment ID cards, all of which -- many of them could be all

15  put together.  And it looked like you were attempting to create

16  a new identity for yourself for some reason with a birth

17  certificate, Social Security, driver's license, dental records,

18  all in a name other than yours.  That's long-term conduct on

19  your part.  I don't think there's any legal justification for

20  that kind of conduct.

21      I mentioned that you had sophisticated equipment.  You had

22  to have had sophisticated equipment to come up with the quality

23  of the product that you did.  You had some sort of a device that

24  you could emboss a state or a federal certificate to make it

25  look real and official.  As I indicated, I can't see any legal

1  justification for that kind of conduct.  To the Court, it

2  reflects a bad motive.  And you have used those fake IDs

3  improperly to rent a storage locker in some fake name, to get a

4  post office box in a fake name.  You used the storage locker to

5  store the type of equipment that I talked about.  You used those

6  to falsely register a vehicle in a fake name.  You used

7  identifications of a deceased person.  You used ID of a living

8  person, and that person gave you no authority and was not aware

9  that you had the ID.  And that's part of the current case.

10      You are a prohibited person, and you acknowledge that; and

11  you're prohibited from using firearms because of your criminal

12  record.  In the past, you've had in your possession a machine

13  gun and other serious weapons.  You talked about subsonic

14  rounds.  You purchased and apparently used reloading equipment.

15  You talked about rounds that were capable of piercing body

16  armor.  You talked about manufacturing a suppressor or a

17  silencer of some type for a gun.  Whether it would work or not,

18  you had that in mind.

19      You had in your possession a stolen government or a

20  military computer.  And then as part of this case, you discussed

21  plans.  Now, you could say that you were just talking; but that

22  talk was really serious and of great concern.  You talked about

23  committing terrorist type crime.  You indicated on the video

24  that you'd been in the planning for a couple of decades, saving

25  money.  You indicated that the result would be somehow analogous

46

1  to Oklahoma City and serious enough that it would shock the

2  country and, if you were caught, would subject you to the death

3  penalty.  You made statements that would indicate that you were

4  contemplating threats to the President of the United States.

5      In the past, you avoided a warrant.  You've been a federal

6  fugitive.  You've had past supervised release violations.

7      You've been active in groups -- we saw the video of it --

8  white supremacist type groups.  It's fair to conclude that you

9  harbor antisocial views.

10     In the past, you've made efforts to elude police,

11 high-speed chases.  You've stolen business records from your

12 employer.  You took and used person's IDs found at the Goodwill.

13 You knew that wasn't right.  You indicated that part of your

14 plan was to utilize an airplane.  And you've attempted to and,

15 in fact, obstructed justice.

16     Mr. Kurt, you have a lifetime pattern of antisocial

17 criminal conduct.  And what is troubling, in addition to your

18 track record, is that, as far as I can see, you show absolutely

19 no remorse.  You apparently believe that the conduct, at least

20 as it applies to you, is not criminal.  The criminal laws and

21 laws and rules of society apparently don't apply to you, which

22 causes the Court to conclude that you are a risk to the public

23 because your criminal activity is serious.  The fact you've

24 spent a substantial amount of time in penitentiaries hasn't

25 deterred that kind of activity.  You obviously have no respect

1   for the law.  If you're not incarcerated, you're going to commit

2   crimes again.  You're going to continue that kind of activity.

3   You're going to be a repeater.  And if a sentence is not

4   significant, you're going to be out at large and, more likely

5   than not, committing more crimes.  You have no respect for the

6   law.

7        I don't know what that final resolution was that you had in

8   mind that you talked about, but I think the FBI and the other

9   agents were living up to their responsibilities to the public to

10  put a stop to it before something did happen.  Nobody knew

11  exactly what it was going to be.  You did.  Nobody else did.

12  But you can't take the risk until that something happened and

13  they clean up the mess and moan collateral damage that may

14  follow.  Now, those are the § 3553(a) factors that the Court has

15  taken into account.

16       The sentence on the firearm case is subject to a mandatory

17  maximum of 120 months.  That's 10-00114.  And that will be the

18  sentence on that charge.

19       Now, we have the other crime; and the sentence is separate

20  as to each of them.  The Court has to take into account the

21  advisory guidelines and particularly § 5G1.2(d).  And that is

22  on -- in the guideline book, the current book, at Page 449 --

23  5G1.2(d).  "If the sentence imposed on the count carrying the

24  highest statutory maximum is less than the total punishment,

25  then the sentence imposed on one or more of the other counts

48

1    shall run consecutive . . . to the extent necessary to produce a

2    combined sentence equal to the total punishment."  So the

3    sentence on what I call the ID case is going to be consecutive

4    to the firearm case.  And another source is the Federal

5    Sentencing Guidelines Handbook, that says, under 5G1.2(d), "when

6    the guideline range exceeds the statutory maximum and there are

7    two counts, the district court must impose consecutive sentences

8    to the extent necessary to reach the selected sentence within

9    the guideline range."  Now, this says the Court "must."  That's

10   not right because now we know that the guidelines are advisory,

11   not mandatory, but should be taken into account.  They indicate

12   a sentencing policy that makes some sense.  So the sentence on

13   the ID card is going to be 36 months.  Now, that's a departure

14   upward because, as the Court indicated a while ago, the range

15   for that is 15 to 21 months, without granting the acceptance, or

16   9 to 15 months if the acceptance were granted.

17       That results in a total sentence of 156 months; and that is

18   within the guideline range calculated by using the 28 adjusted

19   offense level, criminal history of V, which, as I indicated

20   earlier, results in a range of 130 to 162 months.  The result

21   would be the same if I granted the acceptance of responsibility,

22   which I'm not doing, but I'm just indicating that the sentence

23   of 136 is also within the range if the Court had allowed the

24   2-point acceptance, which would have resulted in a 26 and a V,

25   and a range of 110 to 137 months.

49

1          THE COURTROOM DEPUTY:  Excuse me.  Is that on both

2   Count 2 and Count 6, or are they different?

3          THE COURT:  I'm getting there.

4          THE COURTROOM DEPUTY:  Okay.

5          THE COURT:  Now, that is -- that 36 months is both on

6   Count 2 and Count 6.  Those two together run concurrently.  But

7   the 36 months on 11-00161 is consecutive to the 120 months on

8   10-00114.

9      Supervised release will be three years on 10-00114 --

10  that's the firearm charge, three years on Count 2 of the ID

11  charge, and one year on Count 6 of the ID charge, all supervised

12  release to run concurrent -- not consecutive but concurrent.

13     This conviction is the sixth federal -- or -- there are six

14  prior federal convictions.  You haven't learned.  I'm imposing a

15  fine of $1,500.  You qualify for the Federal Inmate Financial

16  Responsibility Act.

17     There are standard conditions of supervised release.  Oh.

18  And there's a $300 special assessment that has to be paid.

19  That's $100 for each of the three counts.

20          THE COURTROOM DEPUTY:  Excuse me.  On the fine, is

21  that $500 each count?  Or --

22          THE COURT:  It's just total.  Okay.  Then it's $500

23  for each of the three counts.  $300 total -- $100 for each of

24  the three counts for a special assessment.

25     Standard conditions of supervised release.

1      There are special conditions.  You'll undergo a mental

2 health evaluation and participate in any counseling or programs

3 that your supervising probation officer feels would be of help

4 to you.

5      Financial information of any type requested by your

6 supervising probation officer must be turned over to that

7 officer during the period of supervised release.

8      You should not obtain any form of personal identification

9 of any type, including your own, without first clearing it with

10 your probation officer.  And you shall never use any ID with a

11 name other than your own true, complete, legal name.

12      Submit to a search of your person, vehicle, or residence if

13 your probation officer determines that there's suspicious

14 conduct.

15      You may not rent a storage unit without first getting

16 clearance of your probation officer.

17      And you shall not have in your possession what I'll refer

18 to as the type of equipment that can be used to counterfeit or

19 create currency, identification cards; equipment such as

20 printing presses, copy machines; high quality paper, chemicals,

21 laminates, powdered pigments, computer hardware and software,

22 computer disks that are designed for that purpose, paper

23 cutters, records, images -- in other words, the type of

24 equipment that normally would be used or could be used to

25 counterfeit federal reserve notes or fake identifications.

1        You must cooperate in DNA collection.

2        Now, I have rejected in fact the provisions of the plea

3    agreement.  So you've not waived your right to appeal.

4        I think that covers everything.  Have I overlooked

5    something?

6             MR. HICKS:  Yeah.  There's a couple of things, Your

7    Honor.

8        First, the government requested that he not be allowed to

9    possess a taser.  The reason -- the government's position is

10   it's a deadly weapon, a dangerous weapon.  In fact, there's

11   lawsuits against police officers now in this country on the use

12   of tasers; and there's a big controversy about how dangerous

13   they are.  And --

14            THE COURT:  Well, is a taser an illegal device to own?

15            MR. HICKS:  It's not an illegal device, nor is a gun,

16   Your Honor.  But they're used to stun people, and they can kill

17   people; and Mr. Kurt has never shown the judgment --

18            THE COURT:  I agree.  There's no social justification

19   for him owning a taser.  That would be part of the special

20   conditions.

21            MR. HICKS:  Your Honor, we're also moving to dismiss

22   Counts 1, 3, 4, and 5 of the indictment, Your Honor.

23            THE COURT:  Motion granted.

24            MR. HICKS:  And then I thought -- I hope I didn't

25   interrupt the Court when you were going to advise the defendant

52

1    of his rights under appeal.

2            THE COURT:  Well, he has a right to appeal.  Appeal

3    time starts today and runs for 14 days.  You should discuss that

4    with Mr. Wall.

5        Anything further?

6            MR. WALL:  No, Your Honor.

7            MR. HICKS:  Your Honor, just one.  Ms. Van Marter

8    brought up one thing that I did forget -- that he have no

9    contact with witnesses, either directly or indirectly, Your

10   Honor.

11           THE COURT:  The only witness that would be -- the

12   person that I'd be concerned about would be that

13   Mr. David Udseth --

14           MR. HICKS:  Yes, Your Honor.

15           THE COURT:  -- the confidential informant.

16       You should not be in contact with him.  That would -- I

17   agree.

18           MR. HICKS:  Thank you, Your Honor.

19           THE COURT:  We'll be in recess.

20       (The proceedings recessed at 11:11 a.m.)

21

22

23

24

25

53

1                           C E R T I F I C A T E

2

3           I, DEBRA KINNEY CLARK, do hereby certify:

4           That I am an Official Court Reporter for the United

5   States District Court at the Eastern District of Washington;

6           That the foregoing proceedings were taken on the date

7   and at the time and place as shown on the first page hereto; and

8           That the foregoing proceedings are a full, true and

9   accurate transcription of the requested proceedings, duly

10  transcribed by me or under my direction.

11          I do further certify that I am not a relative of,

12  employee of, or counsel for any of said parties, or otherwise

13  interested in the event of said proceedings.

14          DATED this 16th day of July, 2012.

15

16

17

18                                  /s/Debra Kinney Clark

19                                  Official Court Reporter
                                    United States District Court
20                                  Eastern District of Washington

21

22

23

24

25